# EXHIBIT A-COMPLAINT AND ATTACHMENTS

Case 2:24-cv-06903-JMW   Document 1-2   Filed 09/30/24   Page 2 of 97 PageID #: 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------X

ANTHONY DEO individually and as shareholder/member
of NORTHSHORE MOTOR LEASING LLC and 189
SUNRISE HWY AUTO LLC; SARA DEO individually
and as shareholder/member of NORTHSHORE MOTOR
LEASING LLC and 189 SUNRISE HWY AUTO LLC; and
NORTHSHORE MOTOR LEASING LLC and 189 SUNRISE
AUTO LLC,

                                        Plaintiffs,

          -against-

RONALD BARON, JOSHUA AARONSON, JORY BARON,
MARCELLO SCIARRINO, DANIEL O'SULLIVAN,
BRIAN CHABRIER, WENDY KWUN, IRIS BARON,
RAYMOND PHELAN, ASAD KHAN, ESTATE OF
DAVID BARON, BARON NISSAN INC., d/b/a/
BARON NISSAN, ISLAND AUTO GROUP OF NEW
YORK LLC, a/k/a/ ISLAND AUTO GROUP OF NY LLC,
d/b/a/ ISLAND AUTO GROUP, ROBERT ANTHONY
URRUTIA, BRUCE NOVICKY, MICHAEL MORGAN,
PARMESHWAR BISSOON, SUPERB MOTORS INC.,
d/b/a/ TEAM AUTO DIRECT, RICHARDS, WITT &
CHARLES, LLP, CITRIN COOPERMAN & COMPANY
LLP, d/b/a/ CITRIN COOPERMAN, NEXTGEAR
CAPITAL INC., ALLY FINANCIAL INC.,
NISSAN MOTOR ACCEPTANCE COMPANY LLC,
d/b/a/ NMAC, JP MORGAN CHASE BANK N.A.,
a/k/a/ JP MORGAN CHASE & CO., a/k/a/
CHASE BANK N.A., d/b/a/ CHASE BANK, CYRULI,
SHANKS & ZIZMOR, LLP, MILMAN LABUDA
LAW GROUP, PLLC, JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20, JOHN DOES 1-20,
JANE DOES 1-20, JOHN DOE CORPORATIONS 1-20,
and NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

                                        Defendants.

-------------------------------------------------------------------X

To the within Defendant(s):

Index No.

**SUMMONS**

Plaintiffs designate
Nassau County as the
Place for trial.


The basis for venue is
the events set forth
herein took place in
Nassau County, NY.

1

YOU ARE HEREBY SUMMONED to answer the Verified Complaint in this action and to serve a copy of your answer or, if the Verified Complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Verified Complaint.

Dated: Wantagh, New York
        September 4, 2024

Respectfully submitted,

Plaintiffs, by Counsel,

Harry Thomasson, Esq.
3280 Sunrise Highway
Box 112
Wantagh, NY 11793
Tel. 516-557-5459
hrtatty@verizon.net

TO:

1) RON BARON
    98 Goose Hill Rd.
    Cold Spring Harbor, NY 11724

And

    10 Bancroft Ln.
    Kings Point, NY 11024

2) JOSHUA AARONSON
    55 Oak Drive
    Roslyn, NY 11576

3) JORY BARON
    10 Bancroft Ln
    Great Neck, NY 11024

2

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 4 of 97 PageID #: 10

And

    21 Wayside Ln
    Huntington NY 11743

4) MARCELLO SCIARRINO
    37 Montauk Pl.
    Staten Island, NY 10314

5) DANIEL O'SULLIVAN
    75 The Circle
    Glen Head, NY 11545

6) BRIAN CHABRIER
    4 Creek Ridge Rd.
    Bayville, NY 11709

7) WENDY KWUN
    671 4th Pl S
    Garden City, NY 11530

8) IRIS BARON
    105 Via Palacio
    Palm Beach Gardens FL 33418

And

    6 Old Wagon Ln.
    Old Westbury, NY 11568

9) RAYMOND PHELAN
    3 Dolphin Ln.
    West Islip, NY 11795

10) ASAD KHAN
    239-50 Jericho Turnpike,
    Floral Park, NY 11001

    And

    271-10 Grand Central 9H
    Floral Park, NY

11) ESTATE OF DAVID BARON
    6 Old Wagon Ln.
    Old Westbury, NY 11568

3

Case 2:24-cv-06903-JMW   Document 1-2   Filed 09/30/24   Page 5 of 97 PageID #: 11

12) BARON NISSAN INC., d/b/a/ BARON NISSAN
235 Glen Cove Rd.
Greenvale, NY 11548

13) ISLAND AUTO GROUP OF NEW YORK LLC, a/k/a/ ISLAND AUTO GROUP
OF NY LLC d/b/a/ ISLAND AUTO GROUP
55 Oak Drive
Roslyn, NY 11576

14) ROBERT ANTHONY URRUTIA
327 Lakewood Terrace
Newton, NJ 07860

15) BRUCE NOVICKY
36 High Ridge Rd.
Brookfield, CT 06804

16) MICHAEL MORGAN
65-07 Admiral Drive
Middle Village, NY

17) PARMESHWAR BISSOON
11516 120th St.
South Ozone Park, NY 11420

18) SUPERB MOTORS INC., d/b/a/ TEAM AUTO DIRECT
15 Lancaster Street
Lynbrook, NY 11563

19) RICHARDS, WITT & CHARLES, LLP
100 Ring Rd West
Garden City, NY 11530

20) CITRIN COOPERMAN & COMPANY LLP, d/b/a/ CITRIN COOPERMAN
c/o Corporate Service Bureau Inc.
283 Washington Ave.
Albany, NY 12206

21) NEXTGEAR CAPITAL INC.
c/o CT Corporation Service Co.
80 State Street
Albany, NY 12207

And

6205 Peachtree Dunwoody Rd.
Atlanta, GA 30328

4

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 6 of 97 PageID #: 12

22) ALLY FINANCIAL INC.
c/o CT Corporation System
111 8th Ave. 13th Floor
New York City, NY 10017

And

500 Woodward Ave.
Detroit, MI 48226

23) NISSAN MOTOR ACCEPTANCE COMPANY LLC, d/b/a/ NMAC
8900 Freeport Parkway
Irving, TX 75063

And

c/o CT Corporation Service Co.
80 State Street
Albany, NY 12207

24) JP MORGAN CHASE BANK N.A., a/k/a/ JP MORGAN CHASE & CO., a/k/a/
CHASE BANK N.A., d/b/a/ CHASE BANK
c/o CT Corporation System
111 8th Ave. 13th Floor
New York City, NY 10017

25) CYRULI, SHANKS & ZIZMOR, LLP
420 Lexington Avenue, Suite 2320
New York City, NY 10170

26) MILMAN LABUDA LAW GROUP, PLLC
3000 Marcus Avenue
Suite 3W8
Lake Success, New York 11042

27) NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES
Customer Service Counter – Rm. 136
Swan Street Building
Empire State Plaza
Albany, NY 12228

JOHN DOES 1-20
JANE DOES 1-20
JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20
JOHN DOE CORPORATIONS 1-20

5

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 7 of 97 PageID #: 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------------X

ANTHONY DEO individually and as shareholder/member     Index No.
of NORTHSHORE MOTOR LEASING LLC and 189
SUNRISE HWY AUTO LLC; SARA DEO individually
and as shareholder/member of NORTHSHORE MOTOR
LEASING LLC and 189 SUNRISE HWY AUTO LLC; and
NORTHSHORE MOTOR LEASING LLC and 189 SUNRISE
AUTO LLC,

                         *Plaintiffs,*

     -against-

RONALD BARON, JOSHUA AARONSON, JORY BARON,
MARCELLO SCIARRINO, DANIEL O'SULLIVAN,
BRIAN CHABRIER, WENDY KWUN, IRIS BARON,
RAYMOND PHELAN, ASAD KHAN, ESTATE OF
DAVID BARON, BARON NISSAN INC., d/b/a/
BARON NISSAN, ISLAND AUTO GROUP OF NEW
YORK LLC, a/k/a/ ISLAND AUTO GROUP OF NY LLC,
d/b/a/ ISLAND AUTO GROUP, ROBERT ANTHONY
URRUTIA, BRUCE NOVICKY, MICHAEL MORGAN,
PARMESHWAR BISSOON, SUPERB MOTORS INC.,
d/b/a/ TEAM AUTO DIRECT, RICHARDS, WITT &
CHARLES, LLP, CITRIN COOPERMAN & COMPANY
LLP, d/b/a/ CITRIN COOPERMAN, NEXTGEAR
CAPITAL INC., ALLY FINANCIAL INC.,
NISSAN MOTOR ACCEPTANCE COMPANY LLC,
d/b/a/ NMAC, JP MORGAN CHASE BANK N.A.,
a/k/a/ JP MORGAN CHASE & CO., a/k/a/
CHASE BANK N.A., d/b/a/ CHASE BANK, CYRULI,
SHANKS & ZIZMOR, LLP, MILMAN LABUDA
LAW GROUP, PLLC, JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20, JOHN DOES 1-20,
JANE DOES 1-20, JOHN DOE CORPORATIONS 1-20,
and NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

                        *Defendants.*

-----------------------------------------------------------------X

**VERIFIED COMPLAINT**

1

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 8 of 97 PageID #: 14

## PARTIES

1. Plaintiff, Anthony Deo (hereinafter, "Anthony Deo"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto Anthony Deo worked in Nassau County, New York. Anthony Deo pursues the instant action individually and as a shareholder/member of NorthShore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC; references to Anthony Deo herein are intended as Anthony Deo individually and as a shareholder/member of one or both corporate co-Plaintiffs.

2. Plaintiff, Sara Deo (hereinafter, "Sara Deo"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Sara Deo worked in Nassau County, State of New York. At all times relevant hereto, Sara Deo was and is the wife of Anthony Deo; Sara Deo is also sometimes known as Sara Rahman in one or more documents related hereto. Sara Deo pursues the instant action individually and as a shareholder/member of NorthShore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC; references to Sara Deo herein are intended as Sara Deo individually and as a shareholder/member of one or both corporate co-Plaintiffs.

3. Plaintiff, NorthShore Motor Leasing LLC (hereinafter, "NorthShore"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of

2

Case 2:24-cv-06903-JMW   Document 1-2   Filed 09/30/24   Page 9 of 97 PageID #: 15

New York. Anthony Deo and Sara Deo formed NorthShore during November 2017.

4. Plaintiff, 189 Sunrise Hwy Auto LLC (hereinafter, "189 Sunrise"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Suffolk County, State of New York. Anthony Deo and Sara Deo purchased 189 Sunrise on or about February 12, 2021.

5. Defendant, Ronald Baron (hereinafter, "Ron Baron") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Ron Baron owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Ron Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

6. Defendant, Joshua Aaronson (hereinafter, "Josh Aaronson" or "Josh" or "Aaronson"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Josh owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Aaronson had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

3

7. Defendant, Jory Baron (hereinafter, "Jory Baron") is an individual who, at all times relevant hereto, was and is a resident of Long Island, State of New York. At all times relevant hereto, Jory Baron owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Jory Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

8. Defendant, Marcello Sciarrino (hereinafter, "Sciarrino") is an individual who, at all times relevant hereto, was and is a resident of Staten Island, State of New York. At all times relevant hereto, Sciarrino owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Sciarrino had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

9. Defendant, Daniel O'Sullivan (hereinafter, "O'Sullivan") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, O'Sullivan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, O'Sullivan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

10. Defendant, Brian Chabrier (hereinafter, "Chabrier") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of

4

New York. At all times relevant hereto, Chabrier owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Chabrier had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

11. Defendant, Wendy Kwun (hereinafter, "Kwun") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Kwun worked for one or more automobile businesses owned and operated by one or more co-Defendants in the State of New York in the greater New York City area.

12. Defendant, Iris Baron (hereinafter, "Iris") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Iris Baron was the wife of David Baron during his lifetime.

13. Defendant, Raymond Phelan (hereinafter, "Phelan"), is an individual who, at all times relevant hereto, was and is a resident of Suffolk County, State of New York. At all times relevant hereto, Phelan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Phelan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

14. Defendant, Asad Khan (hereinafter, "Khan") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New

5

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 12 of 97 PageID #: 18

York.  At all times relevant hereto, Khan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, Khan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

15. Defendant, Estate of David Baron (hereinafter, the "Estate"), is an Estate of and for the benefit of the Decedent, David Baron.  At all relevant times in his lifetime, David Baron (hereinafter, "David Baron") owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, David Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

16. Defendant, Baron Nissan Inc., d/b/a/ Baron Nissan (hereinafter, "Baron Nissan") is a domestic corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York.  At all times relevant hereto, Baron Nissan was owned and operated by one or more of the Aaronson co-Defendants herein. Baron Nissan is an automobile dealership.

17. Defendant, Island Auto Group of New York LLC, a/k/a/ Island Auto Group of NY LLC, d/b/a/ Island Auto Group (hereinafter, "Island Auto Group"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New

6

York, and at all times relevant hereto was owned and operated by the Aaronson co-Defendants in the State of New York. Island Auto Group operates the Aaronson Defendants' dealerships, serving as the parent company thereof, whether or not the dealerships at issue are named Defendants herein.

18. Defendant, Robert Anthony Urrutia (hereinafter, "Urrutia") is an individual who, at all times relevant hereto, was and is a resident of the country of Costa Rica. At all times relevant hereto, Urrutia owned and/or operated one or more automobile businesses inside and outside of the State of New York with one or more co-Defendants. Urrutia resides in Costa Rica for the purposes of 1) living a lifestyle of wealth desired by Urrutia and his family (there is a lower cost of living in Costa Rica), and 2) to avoid paying creditors. At all times relevant hereto, Urrutia always maintained and still maintains one or more apartments and/or houses and/or residences in the Greater New York City area (within 75 miles of Manhattan) to serve as his U.S. residence when he is in the United States.

19. Defendant, Bruce Novicky (hereinafter, "Novicky") is an individual who, at all times relevant hereto, owned and/or operated multiple automobile businesses with and for co-Defendant Urrutia, including, but not limited to, co-Defendant Superb Motors Inc., in and near the State of New York.

20. Defendant, Michael Morgan (hereinafter, "Morgan"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Morgan owned and/or operated

7

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 14 of 97 PageID #: 20

multiple automobile businesses with and for co-Defendant Urrutia, including, but not limited to, co-Defendant Superb Motors Inc., in and near the State of New York.

21. Defendant, Parmeshwar Bissoon (hereinafter, "Bissoon") is an individual who, at all times relevant hereto, was and is a resident of Queens County, State of New York. At all times relevant hereto, Bissoon worked for one or more businesses in Nassau County, State of New York, owned and operated by one or more of the Urrutia co-Defendants.

22. Defendant, Superb Motors Inc. d/b/a/ Team Auto Direct (hereinafter, "Superb" and "Team Auto") is a domestic corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York.

23. Defendant, Richards, Witt & Charles, LLP, d/b/a/ Richards Witt (hereinafter, "RWC") is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, RWC performed accounting services for various parties hereto and/or their related businesses.

24. Defendant, Citrin Cooperman & Company LLP, d/b/a/ Citrin Cooperman (hereinafter, "Citrin") is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and

8

operate in the State of New York, and at all times relevant hereto operated in and from Nassau and Suffolk Counties, State of New York. Citrin's principal offices are operated from New York City, New York. At all times relevant hereto, Citrin performed accounting services for various parties hereto and/or their related businesses.

25. Defendant, NextGear Capital Inc. (hereinafter, "NextGear"), is a foreign corporation duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. NextGear's principal offices are located in Atlanta, Georgia.

26. Defendant, Ally Financial Inc. (hereinafter, "Ally"), is a foreign corporation duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. Ally's principal offices are located in Detroit, Michigan.

27. Defendant, Nissan Motor Acceptance Company LLC, d/b/a/ NMAC (hereinafter, "NMAC"), is a foreign limited liability company duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. NMAC's principal offices are located in Torrance, California and Irving, Texas.

9

28. Defendant, JP Morgan Chase Bank N.A., a/k/a/ JP Morgan Chase & Co., a/k/a/ Chase Bank N.A., d/b/a/ Chase Bank (hereinafter, "Chase") is a national association duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. Chase's principal offices are located in New York City, New York.

29. Defendant, Cyrulli, Shanks & Zizmore LLP (hereinafter, "CSZ"), is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from New York City, State of New York. At all times relevant hereto, CSZ performed attorney services for various parties hereto and/or their related businesses. At various times relevant hereto, CSZ performed services for the corporate Plaintiffs without authorization or agreement of the owners/members/stockholders of 189 Sunrise and NorthShore as then owned and operated by the Deo Plaintiffs.

30. Defendant, Milman Labuda Law Group PLLC (hereinafter, "MLLG"), is a domestic professional limited liability corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, MLLG performed attorney services for various parties hereto and/or their related

10

businesses. At various times relevant hereto, MLLG performed services for the corporate Plaintiffs without authorization or agreement of the owners/members/stockholders of 189 Sunrise and NorthShore as then owned and operated by one or both of the Deo Plaintiffs.

31. Defendants John Doe Attorneys 1-20 are twenty unknown attorneys working for and with and employed by CSZ and/or MLLG as attorneys, employees, partners and/or members and being compensated therefore; each of these attorneys are admitted to the bar for the State of New York and at various times performed various services for one or more of the corporate Plaintiffs without authorization from the owners/members/stockholders of the corporate Plaintiffs when the owners/members/stockholders were one or both of the Deo Plaintiffs.

32. Defendants John Doe Accountants 1-20 are twenty unknown accountants working for and with and employed by Citrin and/or RWC as accountants, employees, partners and/or members and being compensated therefore by Citrin and/or RWC; each of these accountants are licensed and/or permitted to perform accounting services in the State of New York and at various times performed various services for one or more of the corporate Plaintiffs without authorization from the owners/members/stockholders of the corporate Plaintiffs when the owners/members/stockholders were one or both of the Deo Plaintiffs.

33. Defendants John Does 1-20 are twenty male individuals living and/or working in Nassau and/or Suffolk Counties, New York at all times relevant

11

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 18 of 97 PageID #: 24

hereto. Said individuals assisted one or more of the co-Defendants to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these individuals are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. John Does 1-20 are also known herein as the "co-Conspirators."

34. Defendants Jane Does 1-20 are twenty female individuals living and/or working in Nassau and/or Suffolk Counties, New York at all times relevant hereto. Said individuals assisted one or more of the co-Defendants to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these individuals are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. Jane Does 1-20 are also known herein as the "co-Conspirators."

35. Defendants John Doe Corporations 1-20 are twenty businesses, corporations, limited liability companies, limited liability partnerships, or other duly formed companies/businesses that were utilized by one or more of the Defendants herein to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these businesses, corporations or other duly formed companies are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. John Doe Corporations 1-20 are also known herein as the "co-Conspirators."

12

36. Defendant New York State Department of Motor Vehicles (hereinafter "NYSDMV") is named as a necessary party given the injunctive relief sought in Count XII; there are no substantive claims herein against the NYSDMV.

37. Defendants Joshua Aaronson, Jory Baron, Ron Baron, Marcello Sciarrino, Daniel O'Sullivan, Brian Chabrier, Wendy Kwun, Iris Baron, Raymond Phelan, Asad Kahn, David Baron (by and through the Estate of David Baron), Baron Nissan, and Island Auto Group (and any d/b/a's or derivative businesses relating thereto) are hereinafter collectively referred to as the "Aaronson Defendants." David Baron was the agent for the Aaronson Defendants during his lifetime for all purposes relevant hereto; since the death of David Baron during or about May 2021, Joshua Aaronson serves as agent for the Aaronson Defendants for all purposes relevant hereto.

38. Defendants Robert Anthony Urrutia, Bruce Novicky, Michael Morgan, Superb Motors Inc. and Team Auto Direct (and any d/b/a's or derivative businesses relating thereto) are hereinafter collectively referred to as the "Urrutia Defendants." Urrutia serves as agent for the Urrutia Defendants at all relevant times and for all purposes relevant hereto.

39. Defendants NextGear, Ally Financial, NMAC, and Chase Bank are hereinafter collectively referred to as the "Lenders."

40. Defendants Richards Witt and Citrin Cooperman are hereinafter collectively referred to as the "Accountants."

41. Defendants CSZ and MLLG are hereinafter collectively referred to as the "Attorneys."

13

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 20 of 97 PageID #: 26

42. The Lenders and Accountants and Attorneys are hereinafter collectively referred to as the "Professionals."

## FACTS COMMON TO ALL COUNTS

### A. NorthShore Motor Leasing LLC

43. During and after 2016, the Deos owned and operated a business known as UEA Premier Motors Corporation (hereinafter, "UEA"); the Deos entered into a Lease through UEA to operate a used automobile dealership at and from 180 Michael Drive, Syosset, New York.

44. Until 2018, the Deos had met only one (1) of the individual Defendants herein (David Baron) and did not conduct any business with any of the individual Defendants herein.

45. During or about the fall of 2017, the Deos decided that it was necessary to expand and/or increase their Floor Plan in order to expand and/or increase their profitability at the 180 Michael Drive location.

46. On or about November 1, 2017, the Deos filed papers with the New York Secretary of State's Office to incorporate and duly form the limited liability company/co-Plaintiff NorthShore Motor Leasing LLC as the first step in expanding/increasing profitability.

47. Within one (1) week of forming NorthShore, Sara Deo applied for and was given an Employer Identification Number (hereinafter, "EIN number") from the Internal Revenue Service/IRS. Attached hereto as Exhibit A is a true and accurate copy of the notice provided to Sara Deo of the EIN number from the IRS.

14

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 21 of 97 PageID #: 27

48. NorthShore did not begin operations immediately, instead commencing actual operations during 2018.

49. Operations for NorthShore commenced at 180 Michael Drive, Syosset, New York during or about June 2018. Attached hereto as Exhibit B is a true and accurate copy of the lease assigned by and through the Landlord and formerly held by UEA entered into by the Deos to operate NorthShore Motors, a used car sales business, from 180 Michael Drive, Syosset, New York.

50. Attached hereto as Exhibit U is a true and accurate copy of the receipt Anthony Deo obtained when ordering the corporate book for NorthShore Motor Leasing, LLC, co-Plaintiff herein, when the Deos obtained the lease for NorthShore from UEA that same month, June 2018.

51. Concurrent with and in furtherance of opening NorthShore and conducting business in 2018, Sara Deo opened a bank account for NorthShore with Defendant Chase Bank. Attached hereto as Exhibit C are true and accurate copies of the documents utilized by Chase Bank and Sara Deo to open one or more bank accounts with Chase Bank for NorthShore Motors. The account(s) with Chase Bank for NorthShore were opened by Sara Deo during January 2018; pursuant to internal bank rules and policies as well as applicable law, Sara Deo was required to and did in fact present proof of ownership documents to Chase Bank in order to open said account(s) for NorthShore.

15

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 22 of 97 PageID #: 28

52. After forming the company, obtaining an EIN, obtaining the corporate book, and opening the bank account(s) for NorthShore through Chase Bank, the Deos (together) commenced operations of NorthShore Motors at 180 Michael Drive, Syosset, New York, during 2018.

53. As part of the plan to expand and increase profitability in the automobile sales business from 180 Michael Drive, Syosset, New York, the Deos accepted an offer from David Baron.

54. By and before 2018, David Baron created, owned, and operated the Baron automobile dealership empire in and around Long Island, New York, with one or more of the other Aaronson Defendants; the Aaronson Defendants lead by David Baron during his lifetime purchased, opened and operated a variety of dealerships under the umbrella of Island Auto Group, including the Baron Auto Group and Baron Nissan.

55. The automobile dealerships owned and operated by the Aaronson Defendants since or before 2018 under the umbrella of parent company Island Auto Group include, but are not limited to, Baron Nissan, Baron Honda, Island Chevrolet, Island Chrysler Dodge Jeep Ram, Island GMC, Island Kia, Island Hyundai, Island Mazda, Island Subaru, NY Off Lease, Island Toyota, Island Volkswagen, Baron Auto Mall, Driveworld, Sunrise Auto Outlet, Baron Auto Emporium, Stream Auto Outlet, Long Island Motors, Baron Kia, Tri-County Motors, Rockland Hyundai, Route 1 Chrysler Dodge Jeep Ram of Lawrenceville, 161-10 Hillside Auto Ave, Best Auto Outlet, and co-Plaintiff 189 Sunrise up until selling same to the Deos (a true and accurate copy of the

16

189 Sunrise purchase documents by the Deos are attached hereto as Exhibit D).

56. The Aaronson Defendants' personal wealth combined with the value of the assets of the automobile dealerships the Aaronson Defendants operate and control exceeds one billion dollars ($1,000,000,000.00).

57. The fact that the assets of the Aaronson Defendants and the dealerships they control are valued in excess of one billion dollars ($1,000,000,000.00) has a huge impact on every party to this action and all of the facts set forth herein.

58. The Aaronson Defendants and the dealerships they control engage in elaborate shell games with the businesses owned and operated by the parties hereto, sometimes to line their own individual pockets, sometimes to make it appear as though the businesses are losing money when they are not (for income tax purposes), and sometimes to divert funds from one business to the benefit of one or more of the individual Aaronson Defendants or one or more of their Island Auto Group businesses.

59. As between the Deos, at all times relevant hereto it was Anthony Deo who operated NorthShore and eventually 189 Sunrise; Sara Deo assisted Anthony Deo in the operation of these two businesses. The Deos each owned as members and/or stockholders portions of each business; their ownership interests combined constituted 100% of the ownership interests in NorthShore and 189 Sunrise (since 189 Sunrise was purchased in February 2021; *see* Exhibit D hereto).

17

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 24 of 97 PageID #: 30

60. During late 2017 or early 2018, David Baron explained to Anthony Deo that he, David Baron, was the head of the Baron-owned automobile dealerships under the umbrella of the Island Auto Group, detailed his business empire for Anthony Deo, and offered to "help" the Deos with their new business, NorthShore, in ways that he plainly indicated would be mutually beneficial for all three of them, David Baron and the Deos.

61. Specifically, David Baron offered to provide two main types of assistance to the Deos: 1) Baron offered to provide a "floor plan" for the Deos and NorthShore for a fee; this floor plan would be provided by and through the umbrella of Island Auto Group and would be personally guaranteed by David Baron, and 2) if they accepted the floor plan offer, he would also provide his own Accountants to the Deos at no additional cost to the Deos. Since Anthony Deo and Sara Deo were both still new to the used car dealership business and inexperienced in both operations and floor plans, the offer from the much older and extremely more experienced and wealthy David Baron seemed too good to be true, and they gladly accepted his offer.

62. The offer to provide a floor plan to the Deos was extremely important to the then brand-new business known as NorthShore Motors.

63. A floor plan in the automobile dealership business is the credit provided by one or more lenders to that business; this credit/money is utilized to purchase automobiles for the business to sell to the public at a profit. Each car purchased by the dealership has a value on the floor plan; once that car is sold, the value assigned to the vehicle on the floor plan is then re-paid to the

18

lender, and in simple terms, the dealership keeps the difference as profit between the floor plan value and the paid sales price of the vehicle.

64. Since the Deos were new to the business of selling (used) automobiles, they did not have access to a "big" floor plan, they only had a smaller amount of money available to them through UEA, since unlike the billionaire Aaronson Defendants, the Deos and UEA were not wealthy and did not operate on a scale anywhere near the extremely higher levels of the Aaronson Defendants. Smaller amounts available on floor plans from lenders also come with larger interest rates, so NorthShore could make a lot more money with a bigger floor plan offered through David Baron backed by his companies' billion dollars or more in assets, thereby allowing NorthShore to get a bigger floor plan at lower interest rates than the Deos obtained through UEA and ever could have obtained for NorthShore on their own.

65. Even better, the Deos thought, they would be getting free accounting services through the Accountants/co-Defendants herein for their new business. "Too good to be true" is the understatement of the century compared to what David Baron and the Aaronson Defendants actually did to the Deos and NorthShore (and eventually, 189 Sunrise).

66. In reality, what David Baron and the Aaronson Defendants did was to prey on the Deos by stealing their Northshore dealership (and eventually, 189 Sunrise) from them. The Aaronson Defendants "groomed" the Deos, NorthShore, and eventually, 189 Sunrise, much the same way a pedophile "grooms" a child for eventual abuse.

19

67. First, the Aaronson Defendants (Josh Aaronson is related to the Barons by marriage; at all time relevant hereto prior to the death of David Baron, David Baron acted as agent for the Aaronson Defendants as they dealt with the Deos; since the death of David Baron, Aaronson acted as the agent for the Aaronson Defendants as they dealt with the Deos) put their own people in charge of all finances for NorthShore, including, but not limited to, one or more (over time) on-site controllers and/or comptroller(s), plus daily oversight from one or more (over time) of the Aaronson Defendants' and Island Auto's chief financial officer(s) (hereinafter, "CFO"), plus daily oversight from one or more of the Aaronson Defendants themselves.

68. Each of these individuals put in place at NorthShore by David Baron initially and then Josh Aaronson (after David Baron's death) on behalf of the Aaronson Defendants had complete, 100% control over all company finances, as the Deos had to obtain permission from one or more of the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals to write checks from their own (NorthShore) business.

69. Through June 16, 2020, the Deos wrote their own checks and operated the NorthShore bank accounts themselves, albeit with the Aaronson Defendants' overview and approval of all company business through the token and Positive Pay systems put in place by the Aaronson Defendants with the cooperation of Chase Bank.

70. On and after June 16, 2020, the Deos had to obtain checks from NorthShore's account(s) from the Aaronson Defendants and/or the Aaronson

20

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 27 of 97 PageID #: 33

Defendants' employees and/or Professionals to even get a check to write before obtaining permission to write it, plus the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals continued to maintain off-site oversight on all checks written from NorthShore's accounts through various agreements between the Aaronson Defendants and their companies on the one hand, and Chase Bank as the controlling Lender for NorthShore's bank account(s).

71. Through Chase Bank, the Aaronson Defendants put in place two different systems to control all money at NorthShore (and eventually, 189 Sunrise): 1) a system called "Positive Pay" and 2) a system called "Tokens."

72. Positive Pay is a system offered by Chase Bank to its business customers to ensure complete, 100% control over all checks written from that customer's business checking account.

73. Simply put, Positive Pay *requires* that customer to affirmatively approve (via electronic approval) each check presented for payment to Chase from that customer's checking account before the end of the business day that the check is presented to Chase for payment. If for *any* reason the customer does not electronically approve each check presented for payment to Chase, then that check is not paid by Chase for that customer.

74. The Aaronson Defendants put co-Defendant Wendy Kwun (Island Auto's CFO) and co-Defendant Daniel O'Sullivan (the person the Aaronson Defendants put in place as controller/comptroller at NorthShore to be their on-site eyes and ears) in charge of the Positive Pay system at NorthShore.

21

This system allowed the Aaronson Defendants to 1) control all money at the dealership, and 2) know about and approve or disapprove every check written from the dealership. This Positive Pay system allowed the Aaronson Defendants to perpetuate their fraud against Plaintiffs by allowing the Defendants to seemingly be in charge of writing checks for NorthShore, when in fact, the Aaronson Defendants remained 100% in charge of all monies in and out of the dealership's accounts. Once the Positive Pay system was put into place at NorthShore, the Island Auto Group employees (lead by Wendy Kwun and Daniel O'Sullivan) necessarily approved all checks written from NorthShore accounts within one (1) day of being presented to Chase or else such check(s) would be declined by Chase and would not be honored by Chase.

75. The Positive Pay system is and was limited to just controlling all checks written from dealership accounts. But there are significant other types of financial transactions that take place at a dealership including, but not limited to, wires in and out of accounts as deals get funded, deposits and on-line banking transfers.

76. Given that the Positive Pay system was limited to controlling just checks written from NorthShore accounts, the Aaronson Defendants also put in place a Token system for all NorthShore accounts at Chase.

77. The Token system worked as follows: An electronic device (the Token) about the size of a wristwatch generates random numbers that must be inputted into the Chase system for any transaction to be approved and

22

allowed from NorthShore's accounts *other than* the checks subjected to the Positive Pay system.

78. At all times relevant hereto, the Aaronson Defendants controlled *every* financial transaction at NorthShore through the floor plan provided by the Aaronson Defendants exclusively, the Positive Pay system, and the Token system, leaving those Defendants 100% in charge of all finances at NorthShore from the time David Baron first provided a floor plan for NorthShore during 2018 through the Aaronson Defendants' departure from NorthShore during November 2022.

79. From the commencement of NorthShore operations around mid-June, 2018, the Deos had an unwritten agreement with David Baron as the point man/agent for the Aaronson Defendants (with greater than one billion dollars ($1,000,000,000.00) in assets to obtain the biggest floor plans at the lowest interest rates) to provide the floor plan under the umbrella of Island Auto Group that would allow the company to sell more cars at a greater profit margin than if the Deos obtained a floor plan themselves.

80. It seemed in all respects to the Deos that both sides of the relationship could profit from this arrangement, so they agreed to David Baron's proposal.

81. What the Deos never agreed to was having the Aaronson Defendants steal their company, NorthShore, from the Deos without the Deos knowing they were defrauded from their own company, NorthShore, and eventually, also defrauded from their interests in 189 Sunrise (and eventually, Baron Nissan).

23

Case 2:24-cv-06903-JMW   Document 1-2   Filed 09/30/24   Page 30 of 97 PageID #: 36

82. There were many events over time that were all part of the conspiracy perpetuated by the Aaronson Defendants to defraud the Deos of money from their own companies (NorthShore and 189 Sunrise) and to defraud the Deos of the companies themselves.

83. First, the David Baron led Aaronson Defendants put the floor plan in place from utilizing the assets and existing floor plan from "at least" Baron Nissan ("at least" is necessary herein due to the fact that the Deos were certainly never given any company documents from any of the Aaronson Defendants' companies and do not know what the Aaronson Defendants were actually putting on those companies' internal financial and tax documents; Baron Nissan is what David Baron and Josh Aaronson told the Deos was the source of the NorthShore and 189 Sunrise floor plans).

84. Next, the David Baron led Aaronson Defendants insisted upon putting the Token and Positive Pay systems in place for NorthShore (and eventually 189 Sunrise). The Deos were told that the systems were necessary to safeguard company accounts; in reality, these systems were another step in the direction of stealing the company from the Deos while leaving the Aaronson Defendants in complete control of all company assets and accounts.

85. The David Baron led Aaronson Defendants also put their own Professionals in place for NorthShore and eventually 189 Sunrise; these Professionals answered to the extremely wealthy Aaronson Defendants and followed only the Aaronson Defendants' instructions, the Deos were completely shut out by the Aaronson Defendants and their Professionals from running the two

24

businesses; they were merely given the appearance of running the businesses from the Aaronson Defendants.

86. Since NorthShore did not commence business until 2018, no tax documents needed to be filed (as far as the Deos knew at the time) until sometime in 2019. Prior to June 16, 2020, Sara Deo kept asking Brian Chabrier, Asad Khan, and the controller put in place by the Aaronson Defendants, Melissa Beltre, for the Deos K-1 documents for tax filing purposes; on and after June 16, 2020, Wendy Kwun (the CFO for the Aaronson Defendants and Island Auto) and Daniel O'Sullivan (the controller who succeeded Melissa Beltre and put in place at NorthShore by the Aaronson Defendants) became the individual Aaronson Defendants who Sara Deo kept asking for the Deos' K-1 documents, the forms *required* by the Internal Revenue Service for the United States (hereinafter, "IRS") and the New York State Department of Finance (hereinafter, "NYSDOF") to be given to the owners of a business reflecting their earnings for the calendar year 2018 forward in time at NorthShore.

87. Upon information and belief, the K-1 documents were, in fact, created and given to the Aaronson Defendants and not the Deos by the companies' Accountants, CFOs, controllers and/or other Professionals in conspiracy with the Aaronson Defendants to defraud the Deos from their own companies.

88. At all times relevant hereto, the Aaronson Defendants explained to the Deos that the documents and taxes were complicated and were being filed late, and that the K-1's would be produced when the taxes were prepared and readied

25

for filing. The Deos trusted the Aaronson Defendants, trusted that the Aaronson Defendants were being honest with the Deos and were only interested in making profits for the entire companies including the Deos, and didn't have any reason at that time to believe that there was any problem with their ownership of NorthShore (and eventually 189 Sunrise).

89. However, by early 2020, the Deos were wondering where their K-1 forms were from the previous year (2019), as well as when they would be getting their K-1 forms for the 2018 tax year, so their complaints to the CFO and/or the comptroller and/or one or more of the Aaronson Defendants (including David Baron in particular) increased.

90. On or about March 5, 2020, the Aaronson Defendants responded for the first time with a reaction other than trying to continue to delay and put off the Deos: Defendant Asad Khan stormed into NorthShore's offices in Syosset, New York, and began yelling, threatening, and acting like a mad man. This incident is hereinafter referred to as the "Khan" incident.

91. While yelling in the middle of NorthShore's showroom, Khan threatened the lives of both Sara Deo and Anthony Deo, and demanded that both of them vacate, leave, and never come back to NorthShore while also specifically yelling that NorthShore "belongs to me [Khan] and my partners."

92. The police were called, investigated Khan's claims, spoke with the Anthony Deo, and Khan was escorted out of the dealership by the police, who told Khan in front of Anthony Deo that the Deos were the owners of the business

26

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 33 of 97 PageID #: 39

and not Khan; the policeman also said that he thought Khan was drunk that day.

93. In reality, this was a slip by the Aaronson Defendants insofar as the incident *almost* alerted the Deos to the fraud that already took place by the Aaronson Defendants stealing the NorthShore business from the Deos, but the Deos at that time still did not know about the theft. In fact, after the policeman sided with the Deos during the Khan incident, the Deos thought that Khan was just drunk and never gave his claims of ownership another thought.

94. In the ensuing few months after the Khan incident, David Baron fed the Deos more lies about tax filing delays, apologized for the Khan incident and claimed he (Khan) *was* merely drunk that day, and did all he could to assuage the Deos' concerns over the Khan incident. But David Baron also pressured Anthony Deo to change the terms of their agreement, demanding that Deo pay more money to the Aaronson Defendants for the floor plan provided; David Baron's "carrot and stick" method caused his relationship with the Deos to change over the next few months, worsening through and until June 16, 2020.

95. On or just before June 16, 2020, Anthony Deo received word that his father was dying and would not live much longer. Anthony Deo called and spoke to David Baron on the morning of June 16, 2020, to inform David Baron that the Deos would be away from NorthShore to deal with the imminent death of Anthony Deo's father; Anthony Deo's father did die on June 17, 2020.

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 34 of 97 PageID #: 40

96. While absent from NorthShore's offices on June 16-17, 2020, the Deos learned that David Baron emptied all cars from the lot at NorthShore, and somehow locked the Deos out of NorthShore's bank account(s) at Chase Bank. This date/situation is hereinafter referred to as the "David Baron incident."

97. When the Deos returned from dealing with the death of Anthony Deo's father, they found that all company files, records, books, recording/security cameras, and most important, all company cars were gone. The business basically did not exist anymore.

98. The David Baron incident was, in reality, a display of power by David Baron in order to get what he wanted from the business and to control the Deos and prevent them from discovering the frauds; David Baron also wanted more money knowingly being paid by the Deos for the floor plan after they resisted David Baron's requests for several months after the Khan incident. In addition, the David Baron incident temporarily scared the Deos and stopped them from asking about the tax preparations and forms; it is now known (since Chase Bank gave the Deos documents during 2024 in Action #2, *infra*) that the David Baron incident was staged mainly by the Aaronson Defendants to obtain and utilize NorthShore's corporate book for 100% fraudulent purposes.

99. Within days of the David Baron incident, discussions between David Baron for the Aaronson Defendants and Anthony Deo took place and seemingly

28

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 35 of 97 PageID #: 41

resolved all differences, leading to another series of ongoing events all meant to continue to perpetuate fraud by the Aaronson Defendants against the Deos.

100. In addition to the money that the Deos now know were taken without authorization by the Aaronson Defendants from company account(s) like a piggy bank, a new agreement was leveraged into being by the David Baron incident for even more money per month to be paid by NorthShore and the Deos to the Aaronson Defendants from the NorthShore accounts and/or the Deos' personal accounts.

101. Thereafter, the Aaronson Defendants returned all company cars and access to all company software to allow NorthShore to re-open and continue operations.

102. However, not all of the company's records were returned. While upon first glance the Deos thought all company records were returned, they eventually realized and learned that the company's corporate book was never returned. The David Baron incident helped the Aaronson Defendants to steal even more money from NorthShore and the Deos, lead to more known payments by the Deos, and actually helped the Aaronson Defendants the most through obtaining the corporate book and records without the Deos knowing it initially.

103. Throughout the second half of 2020 after the David Baron incident, David Baron repeatedly expressed remorse to both Deos for the incident he perpetrated on June 16-17, 2020, and kept telling the Deos that he was "going to make up for it." Like Bernie Madoff, David Baron on behalf of the

29

Aaronson Defendants was about to deepen the fraud against the Deos with further promises of riches.

### B.  189 Sunrise Hwy Auto LLC

104.   During or about the end of 2020, David Baron proposed and arranged for the Deos to buy 189 Sunrise Hwy Auto LLC, a smaller used car business than NorthShore located at 189 Sunrise Highway, Amityville, Suffolk County, New York.

105.   During February 2021, at David Baron's urging, the Deos arranged to purchase 189 Sunrise and paid fifty thousand dollars ($50,000.00) therefore. Attached hereto as Exhibit D are true and accurate copies of the payments related thereto.  At all times relevant hereto, Anthony Deo and David Baron agreed that the sale of 189 Sunrise to the Deos would be a "stock sale," meaning that the corporation's stock would be transferred to the Deos, leaving the corporation in place so that no new licenses, software agreements, or Floor Plan changes would become necessary.  In reality, it allowed the Aaronson Defendants to withhold paperwork and stock transfers and keep ownership for themselves, surreptitiously and without the Deos' knowledge.

106.   Naturally, after purchasing the business known as 189 Sunrise, the Deos entered into a lease with the landlord/owner of the property.  Attached hereto as Exhibit E is a true and accurate copy of the lease entered into by Anthony Deo at the property located at 189 Sunrise Highway, Amityville, New York, in order to allow Anthony Deo to operate the business thereon.  Thereafter,

30

Deo was responsible for and made all lease payments at that property, just as the Deos were responsible for and made all lease payments for the property where NorthShore was located since the commencement of the lease for NorthShore.

107.    Although the Deos immediately took over the operation of 189 Sunrise after paying for same, their pleas for finalized closing papers/stock transfers were met with the usual delay tactics from the Aaronson Defendants, "they're being prepared," "they're coming," "the [Professionals] are busy" and other statements were told to the Deos at various times first by David Baron and then Josh Aaronson merely as delay tactics.

108.    Although it appeared as though the Deos were the owners and they certainly paid the money attached hereto as Exhibit D to become the owners of 189 Sunrise (and even took over day to day operations of 189 Sunrise after that money was paid), the Aaronson Defendants were, in fact, doing the same thing in stealing the Deos ownership interests in 189 Sunrise by *not* producing corporate/closing documents that they perpetrated upon the Deos with NorthShore: Behind the scenes and without the Deos' knowledge or approval, the Aaronson Defendants continued to file all tax forms and returns for 189 Sunrise *as if they were still owners when they were not.*

109.    In the months after the 189 Sunrise Sale, the Deos pushed for the closing documents for that sale, and also for the corporate book and records for 189 Sunrise to be turned over to the Deos; it was during this time in 2021 that the Deos first discovered that the corporate book and records for NorthShore

31

Case 2:24-cv-06903-JMW     Document 1-2     Filed 09/30/24     Page 38 of 97 PageID #: 44

were not returned to NorthShore after the David Baron incident about ten (10) months earlier.

## C. Baron Nissan

110. When confronted by Anthony Deo about the closing documents for 189 Sunrise and corporate books for 189 Sunrise and also NorthShore, David Baron on behalf of the Aaronson Defendants turned into Bernie Madoff yet again: This time he promised to sell the Deos the business known as Baron Nissan.

111. During or about May 2021, David Baron on behalf of the Aaronson Defendants sold to Anthony Deo the business known as Baron Nissan. Attached hereto as Exhibit F are true and accurate copies of the documents and checks executed in connection with that sale; the Deos paid two hundred fifty thousand dollars ($250,000.00) to purchase Baron Nissan and an additional twenty plus thousand dollars ($20,000.00+) for the first month of rent for that dealership.

112. It is the express intention of Plaintiffs that the documentation attached as Exhibit F indicating the sale of Baron Nissan is either 1) completely finished and indicates that the sale was finished, or, in the alternative, 2) partially finished and Anthony Deo stepped into the shoes of David Baron at Baron Nissan at the very least at that time.

113. Later that month (May 2021), with the Deos prepared to physically and actually take over Baron Nissan on June 1, 2021, David Baron died.

32

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 39 of 97 PageID #: 45

## D. After the Death of David Baron

114. After the death of David Baron, Josh Aaronson told Anthony Deo that the family needed time to grieve David's death; this was merely another delay tactic by the Aaronson Defendants preventing the Deos from discovering the frauds being committed upon them and their companies.

115. During or about the fall of 2021, Josh Aaronson informed the Deos that 1) the Aaronson Defendants were not going to "finish" the Baron Nissan sale; 2) that the Baron Nissan deal was not "a done deal;" 3) that the Aaronson Defendants would continue to provide the floor plan at NorthShore and 189 Sunrise, but only for even more money and only if the Deos stopped complaining about tax documents and the Baron Nissan deal.

116. Aaronson further explained that if the Deos did not like what he, Aaronson, was telling them, he would make sure that the floor plans for NorthShore and 189 Sunrise were immediately shut down, and that the Aaronson Defendants would take back all of "their" cars and ruin the businesses for the Deos.

117. Simply put, the Deos knew that they had no say and no leverage at their own dealerships (that had literally been stolen from them without their knowledge), and that Aaronson's threats were real, since they also knew that the removal of the cars from the dealerships and cessation of the floor plan at the dealerships would ruin the businesses. The Deos were forced and leveraged into paying even more money to the Aaronson Defendants given the very real and dangerous threats to ruin the businesses.

33

118.  Thereafter, the Deos demanded either that they be allowed to take over Baron Nissan or that their money be returned from the Baron Nissan deal; Aaronson refused both requests and again threatened to shutter NorthShore and 189 Sunrise.

119.  The Deos asked for NorthShore's and 189 Sunrise's corporate books to be returned to the dealerships; Aaronson refused and again threatened to shutter NorthShore and 189 Sunrise.

120.  The Deos continued to demand tax documents in connection with their ownership interests in NorthShore and 189 Sunrise; initially (after David Baron's death) Josh Aaronson told the Deos to continue to be patient, that it "wouldn't be much longer" before he would arrange for them to get the tax documents that were required to be given to owners.

121.  In reality, the Aaronson Defendants knew that they were playing "keep away" from the Deos and were just dragging the situation out to steal as much money as they could and to continue creating documents that feigned ownership of the two companies until an eventual departure from the dealerships by the Aaronson Defendants could no longer be avoided.

122.  By late summer 2022, Aaronson and Wendy Kwun's attitude over tax documents changed: The Deos were invited to prepare the tax documents as they saw fit and Aaronson and Kwun would review and approve them, which the Deos immediately undertook to prepare for the previous year, which the Aaronson Defendants indicated was "on extension."

34

123. Attached hereto as Exhibit G are true and accurate copies of the email approvals from Wendy Kwun and Josh Aaronson (Wendy Kwun's direct boss); these emails make clear that the Aaronson Defendants knew and approved of the Deos as owners of both businesses, even though no changes in the operation or ownership took place contemporaneously with the preparation and filing of the tax documents accompanying those emails.

124. Attached hereto as Exhibit H are true and accurate copies of the tax returns as approved for filing in Exhibit G by Wendy Kwun (an Aaronson Defendant and CFO for the Aaronson Defendants) and Josh Aaronson on behalf of the Aaronson Defendants.

125. During and prior to the approval of the attached tax returns (Exhibit H), Josh Aaronson's demeanor and Wendy Kwun's demeanor with the Deos changed: They became friendlier, and repeatedly told the Deos that the tax situation was going to resolve "imminently."

126. Upon information and belief, the Aaronson Defendants and/or Island Auto Group were making and did make certain financial maneuvers that necessitated, for the Aaronson Defendants and/or Island Auto Group, "officially" making the Deos owners (finally) of 189 Sunrise and NorthShore; these maneuvers in some way benefited the Aaronson Defendants and/or Island Auto Group financially or such maneuvers never would have been made; the Aaronson Defendants personal tax returns and their companies' corporate tax returns will indicate clearly how the Aaronson

35

Defendants benefited from their corporate shell games with 189 Sunrise and NorthShore.

127. In the months leading up to and including October, 2022, the Aaronson Defendants cooperated in approving and filing tax returns indicating that the Deos were the sole owners of 189 Sunrise and NorthShore (Exhibits G & H).

128. During or about the end of November, 2022, without any warning to the Deos, the Aaronson Defendants 1) took all books and records from 189 Sunrise; 2) took all automobiles from 189 Sunrise; 3) locked out the Deos from all software required to run 189 Sunrise; 4) locked out the Deos from all bank accounts required to run 189 Sunrise; 5) took all books and records from NorthShore; 6) took all automobiles from NorthShore; 7) locked out the Deos from all software required to run NorthShore; and 8) locked out the Deos from all bank accounts required to run NorthShore. As a direct and proximate result of these wrongful acts, 189 Sunrise and NorthShore were shuttered and ruined; in their last full operating year, these two businesses yielded forty-four million dollars ($44 million) in gross sales.

129. Within days after ruining the businesses at 189 Sunrise and NorthShore, the Aaronson Defendants filed a lawsuit in Nassau County (New York) Supreme Court, *Brian Chabrier, et al., v. Anthony Deo, et al.*, Index No. 617224/2022, in which the Aaronson Defendants utilized the "best defense is a good offense" strategy by *actually* alleging, *inter alia*, that the Deos and their hired help stole from the Aaronson Defendants (who were, at all times relevant hereto, *solely* in charge of *all* company finances for both

36

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 43 of 97 PageID #: 49

companies), and that 189 Sunrise and NorthShore belonged to the Aaronson Defendants and not the Deos, mere weeks after approving tax returns that indicated that the Deos were the true owners of 189 Sunrise and NorthShore, which the Deos certainly are and remain the owners of those two businesses as set forth in Exhibits A, B, C, D, E, G, H and U hereto.[1]

E. The Urrutia Defendants

130. At the time that the Aaronson Defendants left the Deos and their businesses shuttered and ruined during November 2022, Anthony Deo borrowed money against the Deos' business(es) and personally guaranteed these funds (hereinafter, the "Borrowed Money").

131. After the Aaronson Defendants shuttered and ruined 189 Sunrise and NorthShore, Anthony Deo utilized some of the Borrowed Money to purchase an interest in co-Defendant Superb Motors Inc., a company owned and operated by co-Defendant Anthony Urrutia.

132. Attached hereto as Exhibits I-1 and I-2 are true and accurate copies of the Agreements entered between Anthony Deo and Urrutia on or about December 1, 2022. Through the present, Deo was and remains ready, willing and able to live up to his obligations under the Agreements attached as Exhibits I-1 and I-2.

---

[1] At no time since December 2022, have the Aaronson Defendants filed any tax documents on behalf of 189 Sunrise or NorthShore; only the Deos have filed those tax documents. Moreover, upon information and belief, the Aaronson's have either benefitted from including related losses on their personal tax filings since ruining 189 Sunrise and NorthShore, or, in the alternative, failed to include those companies on their personal tax filings since shuttering and ruining those two businesses. Either way is telling as to their true intentions regarding those businesses: Either they admit that the businesses are not the Aaronson Defendants' by not including them on their tax returns, or, those businesses are included for write-off benefits, only. And of course, by ruining 189 Sunrise and NorthShore the Aaronson Defendants managed to ruin 2 of the Island Auto Group's competitors by and through the within illegal conduct.

37

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 44 of 97 PageID #: 50

133. Anthony Deo met Urrutia through co-Defendant Michael Morgan (hereinafter, "Morgan"). Upon information and belief and at all times relevant hereto, Morgan was and remains banned from the automobile business as the result of an order of the New York Attorney General by and through one or more Court cases brought by the New York Attorney General against one or more of the Aaronson Defendants; Morgan ignores that order and upon information and belief, operates behind the scenes for several companies including Credit Forget It (until it closed) and Select Dealer Services; Morgan specifically assisted the Urrutia Defendants in carrying out the scheme to disenfranchise the Deos from Superb in the incident referred to herein as the Lock-Out.

134. When Deo commenced work at the Superb dealership, he was put in place as the hands-on owner/operator of the dealership by Urrutia, who retained control of the company and all company finances by and through the agreements attached as Exhibits I-1 and I-2.

135. From the time that the parties entered into the Agreements attached hereto as Exhibits I-1 and I-2, Deo and Urrutia planned for Deo to purchase the rest of the Superb dealership from Urrutia (Deo only obtained 49% ownership through the purchase attached hereto as Exhibits I-1 and I-2), and the parties also planned for Deo to purchase at least one other dealership (Mitsubishi) from Urrutia located in Hartford, Connecticut.[2]

---

[2] Although Deo commenced his due diligence for the Hartford dealership owned by Urrutia, the parties never formally conducted any written transaction in connection therewith.

38

136.  From the commencement of the agreements attached as Exhibits I-1 and I-2, Urrutia inserted Anthony Deo as the on-site operator of Superb Motors for the two partners (Urrutia and Anthony Deo), with discretion to add employees Deo deemed necessary, subject to Urrutia's approval. In fact, Anthony Deo did hire several employees to help at the dealership with Urrutia's full knowledge and approval, including Deo's wife, Sara Deo.

137.  Urrutia retained control over all company finances by and through the agreements in Exhibits I-1 and I-2, and utilized the same types of control over company finances as the Aaronson Defendants utilized with 189 Sunrise and NorthShore: Urrutia had the same token system in place as 189 Sunrise and NorthShore; in addition thereto, Superb also had a texting system in place for the Urrutia Defendants to control all of the company's finances. Superb's token and texting systems were put into place by the Urrutia Defendants through Chase Bank.

138.  Urrutia's overseer of the accounts and finances at Superb was co-Defendant Bruce Novicky, Chief Operating Officer (hereinafter, "COO") for Superb and Urrutia.

139.  Through the token and texting systems that Urrutia put in place at Superb, Novicky had final say on all financial transactions at Superb, whether or not the Deos were working at Superb: If Novicky did not specifically sign into one or the other system and affirmatively approve all financial transactions in a given day through at least one of those systems, then any such transaction(s) that he did not affirmatively approve would be denied by the

39

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 46 of 97 PageID #: 52

bank. Just as with the Aaronson Defendants at 189 Sunrise and NorthShore, the Deos had no *actual* control over *any* financial transaction at Superb; Urrutia had complete knowledge of all transactions and control over all such transactions by and through Novicky's oversight and required approval of all such transactions through the token and texting systems.

140. Nonetheless, Anthony Deo was certainly aware of company finances, and with Urrutia's knowledge and approval looked into company finances while working at Superb in anticipation of obtaining the outstanding 51% of stock still controlled by Urrutia in Superb.

141. By the end of February 2023, Deo noticed financial improprieties at Superb, including, but not limited to, terrible finances for 2022 as the company was losing money (Deo did not commence work at Superb until at least December 2022, or even just after the 1st of the year in 2023). Thus, Deo informed Urrutia of his concerns, and asked the CFO at Superb (Alysia Cayer) to conduct an audit of company finances for Deo to find out what was wrong.

142. Attached hereto as Exhibit J are true and accurate copies of certain emails regarding the audit requested by Deo.

143. Immediately after Deo asked for the audit as approved by Urrutia, Urrutia fired the Urrutia Defendants' Chief Financial Officer (Alysia Cayer) and never replaced her during the time that Deo remained with Superb through the Lock-Out.

40

144. Upon information and belief, the firing of the CFO at Superb was committed by Urrutia out of fear that Deo would find out that Urrutia was bleeding the company of money for his own personal gain and/or to benefit one or more of Urrutia's other businesses. In addition, by firing the CFO, Urrutia was able and did, in fact, tell Deo that she, Alysia Cayer the CFO, must have been responsible for the irregularities that Deo found, in hopes that it would placate Deo's concerns over company finances.

145. When Anthony Deo joined Superb, he asked for and was granted approval by Urrutia to hire Sara Deo to help Superb, which was not in good financial standing when Anthony bought into the company.

146. In fact, Sara Deo's main skill in the automobile dealership industry is marketing; while Sara Deo worked at Superb, she increased monthly leads from dozens to thousands per month and oversaw a system where the young salespeople at the dealership called those leads to increase sales.

147. During or about June 2023, Deo asked his own accountant to review company finances and to produce a Profit and Loss Statement for Superb; attached hereto as Exhibit K is a true and accurate copy of the Profit and Loss Statement produced at that time indicating that the company's finances improved significantly during 2023 (under the direction/operation of the Deos) from its poor condition as it existed in 2022 (prior to the Deos becoming involved at Superb).

148. Thus, it was clear by early summer, 2023, that Superb's finances had improved considerably under the day-to-day operations of the Deos.

41

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 48 of 97 PageID #: 54

149. At all times relevant hereto, Anthony Deo kept Urrutia informed of the disputes with the Aaronson Defendants, since the Agreements attached as Exhibits I-1 and I-2 called for the cross-collateralization of the Deos' other dealerships. Attached hereto as Exhibit L are true and accurate copies of certain texts between Anthony Deo and Urrutia keeping Urrutia informed in all respects with the progress Anthony Deo made in the spring of 2023 towards re-opening dealerships at the sites of NorthShore and 189 Sunrise, including but not limited to Deo's excitement over obtaining his own dealership licenses for those locations while disputes commenced by the Aaronson Defendants were sorted out in Court. Some of the exchanges also cover Deo's request for documentation needed by Deo to open a new Superb bank account needed and desired by Deo after obtaining, as verbally agreed between Deo and Urrutia, full ownership by Deo of Superb.

150. During or about mid-July 2023, Urrutia approached Anthony Deo and pressured him into completing the purchase of outstanding stock in Superb and also to purchase the stock in the Connecticut dealership owned and operated by Urrutia. Specifically, Urrutia demanded that Deo produce at least five hundred thousand dollars ($500,000.00) "and we can do the paperwork later," Urrutia told Deo, *just as Deo had been approached and dealt with previously to his determent by the Aaronson Defendants.*

151. Deo immediately commenced due diligence on the Connecticut dealership and told Urrutia that it would take some time to come up with the money for the two deals, and then Deo suggested to Urrutia that the paperwork could be

42

commenced in the interim until Deo could obtain the money for these transactions. For reasons that were unknown at the time to Deo, Urrutia seemed dissatisfied with Deo's response, and indicated that he wanted Deo to come up with that money quickly and before any paperwork was commenced or he would consider "other offers." But as Deo informed Urrutia, it was going to take some time for Deo to obtain and deliver to Urrutia that large sum of money.

152. Less than two (2) weeks after Urrutia demanded money from Deo without concurrent paperwork (just like the Aaronson Defendants did to Deo regarding Baron Nissan and 189 Sunrise), on August 3, 2023, Urrutia 1) locked Deo out of Superb Motors without any warning, discussion, or explanation; and 2) called the Nassau police department and claimed that Deo "stole" one hundred and four (104) cars.

153. The Nassau police department investigated the claims made by Urrutia through Bruce Novicky and Michael Morgan, and determined that such claims were not proven and to date have done nothing about that criminal complaint made falsely against the Deos.

154. The reason that the Nassau police department took no action against the Deos is transparently clear: The Deos did nothing wrong at Superb, and Urrutia and Novicky have completely failed to date to prove *anything* illegal happened to the 104 cars that they alleged (on August 3, 2023) disappeared from the dealership. In fact, almost all of the cars allegedly "stolen" by the Deos have since been accounted for absent any theft by anyone, which was

43

admitted by the Urrutia Defendants in the Federal Court Action #2 they joined the Aaronson Defendants in wrongfully bringing against the Deos. (*See,* section F, "Legal Actions Commenced by Certain Defendants Against Plaintiffs," *infra*).

155.    In fact, the allegations and lock-out (hereinafter, the "Lock-Out") that took place on August 3, 2023, were strictly a ruse and were and remain false in all respects, it was just the beginning of a plan/conspiracy devised between the Urrutia Defendants and the Aaronson Defendants to defraud Plaintiffs of their ownership interests and operation in Superb, 189 Sunrise, and NorthShore; this conspiracy has been conducted by and through state and federal Court actions commenced fraudulently by the Urrutia and Aaronson Defendants (*Id.*).

156.    Later in August 2023, Urrutia joined the Aaronson Defendants in engaging in "the best defense is a good offense" strategy by suing Plaintiffs and alleging that the Deos were actually (and falsely) the wrongdoers in the three (3) dealerships at issue, Superb, NorthShore, and 189 Sunrise (Action #2), and then commenced his own action against Anthony Deo only (Action #3).

F.    Legal Actions Commenced by Certain Defendants against the Plaintiffs

157.    Just after 1) stealing all of the books and records still located at NorthShore and 189 Sunrise (they had already taken the corporate books from those businesses); 2) taking all of the automobiles from NorthShore and 189 Sunrise; 3) locking the Deos out of all company bank accounts for 189

44

Sunrise and NorthShore; and 4) locking the Deos out of all company software utilized for operating both businesses, the Aaronson Defendants commenced an action against the Plaintiffs and one or more of the Professionals for the Plaintiffs in an action styled as *Brian Chabrier, et al., v. Anthony Deo, et al.*, Nassau County (New York) Supreme Court Index No. 617224/2022 (hereinafter, "Action 1"), before the Honorable Sharon Gianelli, JSC. Attached hereto as Exhibit M is a true and accurate copy of the Complaint utilized by the Aaronson Defendants in an attempt to wrongfully utilize the Nassau Supreme Court to shut down 189 Sunrise and NorthShore.

158. Action 1 was commenced by the Aaronson Defendants with the Complaint attached hereto as Exhibit M and an Order to Show Cause that effectively shut down NorthShore and 189 Sunrise (through false allegations of wrongdoing by the Deos advanced by the Aaronson Defendants) pending Plaintiffs' response and oral argument related thereto.

159. After oral argument before Judge Gianelli, the Court issued a decision that found, in relevant part, that "the [Aaronson Defendants] have failed to establish a likelihood of success on the merits [of that case], as well as [failed to establish in that case] irreparable injury in the face of the Court's denial. Further, [the Aaronson Defendants] have also fallen short in demonstrating that the equities balance in their favor." Attached hereto as Exhibit N is a true and accurate copy of the Order of the Court, Gianelli, J., dated June 15, 2023; *see* pp. 6, 7, *id.*

45

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 52 of 97 PageID #: 58

160.   For obvious reasons including, but not limited to the fact that they 1) lost their Order to Show Cause in its entirety, 2) the Order was dismissed, and 3) the Complaint was determined to fail "to demonstrate a likelihood of success on the merits," the Aaronson Defendants were dissatisfied with having the case before Judge Gianelli.

161.   Upon information and belief, Urrutia knew at all relevant times about the Aaronson Defendants both independently through his own contacts as well as through Anthony Deo, who told Urrutia all about the troubles with the Aaronson Defendants well before the Lock-Out. *See, e.g.,* Exhibit L hereto, which lays out to Urrutia Deo's actions to re-open dealerships at the sites of the former 189 Sunrise and NorthShore and to obtain licenses to sell automobiles thereat, since the Deos still held (through the summer of 2023) the leases for those two (2) sites and were, at all times relevant hereto, the sole shareholders/members of 189 Sunrise and NorthShore, just as represented in Exhibits I-1 and I-2 by Anthony Deo.

162.   Moreover, it is beyond dispute that given the Aaronson Defendants' efforts to engage in the "best defense is a good offense" strategy by, *inter alia*, commencing Action 1, the Deos had an absolute duty to mitigate their damages, and attempted to do so by applying for their own DMV licenses to re-open dealerships where they still had the leases at the locations of NorthShore in Syosset, New York, and 189 Sunrise in Amityville, New York.

46

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 53 of 97 PageID #: 59

163. Thus, Urrutia and the Aaronson Defendants joined forces during August 2023, to file a new action (Action 2) together against the Deos in a different Court (thereby conveniently avoiding the Nassau Supreme Court Judge that ruled against them), against their companies at issue, as well as against various former employees of the Deos and Professionals for the Deos in order to leverage the Deos and their former employees and Professionals. Attached hereto as Exhibit O is a true and accurate copy of the Complaint in the Federal action hereinafter referred to as Action 2. Once again, the Aaronson and Urrutia Defendants wrongfully stopped the Deos from opening and operating their own businesses at the locations where they still held the leases in Syosset and Amityville via their aggressive and fraudulent litigation tactics in Action 2.

164. After filing a Complaint against Deo in the Federal action (Action 2), Anthony Urrutia then filed an action against Anthony Deo in this Court (Action 3). A true and accurate copy of the Complaint in Action 3 is attached hereto as Exhibit P.

165. In all respects, the allegations in Actions 1, 2 & 3 by the Urrutia Defendants and the Aaronson Defendants against the Deos and the Deos' employees and Professionals are transparently false, are intentionally false, and constitute a fraud upon the Courts that said allegations even exist; the allegations against the Deos and their employees and Professionals are merely an attempt to cover up the wrongs committed by the Urrutia Defendants and the Aaronson Defendants, as well as to prevent the Deos

47

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 54 of 97 PageID #: 60

from being able to fund their own and their companies', employees', and Professionals' defenses and potential claims by keeping shuttered the businesses that the Deos rightfully should be operating.

166. The fraudulent Court actions commenced by the Urrutia Defendants and the Aaronson Defendants constitute transparent attempts to engage in "the best defense is a good offense" strategy.

167. Moreover, after nearly two years of pursuing the Deos in Court actions alleging millions of dollars of thefts by the Deos, the Aaronson Defendants have not obtained (e.g., through subpoenas) nor produced a single document proving any theft by the Deos by or from 189 Sunrise or NorthShore at any time.

168. Additionally, after one year of pursuing the Deos in Court actions alleging millions of dollars of thefts by the Deos, the Urrutia Defendants have not obtained (e.g., through subpoenas) nor produced a single document proving any theft by the Deos by or from Superb at any time.

G. The Lenders and Cozy Relationships

169. At all times relevant hereto, the Urrutia Defendants, the Aaronson Defendants (both with and after David Baron), and their respective Professionals (whether named or unnamed as Defendants herein) established and enjoyed relationships with the Lenders (whether named or unnamed as Defendants herein) by and through a series of representatives working on behalf of the Lenders with and for the Urrutia and Aaronson Defendants (hereinafter, the "Representatives").

48

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 55 of 97 PageID #: 61

170. The known Representatives for Chase at all relevant times hereto were Deborah Womeldorf, Rajni Khanna, Anthony Tropiano, Javier Cruz, Christopher Varous, Samantha Phillips, Jim Simonetti, Rosa Pesce, and Jason Kush; upon information and belief, there are more Representatives for Chase currently unknown to Plaintiffs.

171. The known Representatives for NextGear at all relevant times hereto were Jonathan Abbot and Vincent Fallacaro; upon information and belief, there are more Representatives for NextGear currently unknown to Plaintiffs.

172. The Representatives for NMAC at all relevant times hereto were Joseph Bennetta, Jack Crowley, Ron Das and Nathan Newell; upon information and belief, there are more Representatives for NMAC currently unknown to Plaintiffs.

173. The known Representatives for Ally at all relevant times hereto were Kelly-Ann Foster and Cindy O'Pharrow; upon information and belief, there are more Representatives for Ally currently unknown to Plaintiffs.

174. The relationships between the Urrutia Defendants and the Aaronson Defendants with the Lenders and their Representatives were lucrative for all parties thereto.

175. On the one hand, these relationships between the Urrutia Defendants and the Lenders' Representatives, and between the Aaronson Defendants and the Lenders' Representatives, left the Urrutia and Aaronson Defendants with huge sums of money available to them to fund their businesses and lavish lifestyles. The Defendants' lavish lifestyles include, but are not limited to,

49

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 56 of 97 PageID #: 62

multiple homes both domestic and foreign, multiple vacations yearly each both domestic and international, jewelry and gifts for spouses and family members, and, of course, luxury automobiles for the Defendants and their entire families.

176. The Lenders made tens of millions of dollars (or more) over the years lending money to the Urrutia Defendants and especially the Aaronson Defendants, and certainly did not want those lucrative relationships with those Defendants to end or be disrupted.

177. E.g., the Urrutia Defendants and the Aaronson Defendants frequently listed automobiles on more than one Floor Plan, as each of their multiple dealerships had its own Floor Plan, thereby allowing the Urrutia Defendants and Aaronson Defendants to list cars on multiple Floor Plans, getting money made available to these Defendants in multiple amounts, instead of rightfully obtaining only one amount for each automobile listed (e.g., each automobile has only one value; these Defendants engaged in illegal valuations of some of their dealerships' autos, then listed that auto on the Floor Plan of more than one dealership in order to obtain multiple amounts of money/value for each automobile).

178. The practice of putting automobiles on more than one Floor Plan is called "Double Flooring" in the automobile dealership business, is known by all in the automobile dealership business, is illegal in all respects, and in the instant action, was known and intentionally ignored by the Automobile Lenders to the detriment of the Plaintiffs; the Double Flooring of automobiles by the

50

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 57 of 97 PageID #: 63

Urrutia and Aaronson Defendants contributed to the draining of money and ruination of the three dealerships (Superb, NorthShore, and 189 Sunrise) at issue by the Urrutia and Aaronson Defendants.

179. At all times relevant hereto, the Deos had no direct contact with any of the Automobile Lenders and had no ability to put any car on or off of any Floor Plan for any of the three relevant dealerships, which is an important part of the Chinese Wall carefully constructed by the Urrutia Defendants and the Aaronson Defendants to allow these Defendants to completely control 100% of the finances at Superb, NorthShore, and 189 Sunrise; nonetheless, at all times relevant hereto, the Automobile Lenders knew and should have known of the involvement of the Deos in the three dealerships in which the Deos held interests: Superb, 189 Sunrise, and NorthShore.

180. The intentional ignorance of the Lenders was part of the Cozy Relationships between the Urrutia Defendants/Aaronson Defendants and the Lenders at all times relevant hereto, driven in all respects by simple greed.

181. At all times relevant hereto, the Lenders' Representatives were and are Caucasians, in contrast with the Deos' African and Caribbean heritage.

182. At all times relevant hereto, the Aaronson Defendants and the Urrutia Defendants held various meetings and parties with the Representatives of the Lenders; upon information and belief, one or more gifts were even exchanged between these parties at such meetings and parties (hereinafter, the "Cozy Relationships").

51

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 58 of 97 PageID #: 64

183. From time to time, the meetings and parties constituting Cozy Relationships between the Urrutia Defendants and Aaronson Defendants with the Representatives were held at restaurants and banquet halls in and around New York City and Long Island, New York.

184. Periodically, the Deos asked the Urrutia Defendants and the Aaronson Defendants if the Deos could attend these meetings and parties between the Urrutia Defendants and the Lenders' Representatives, and also between the Aaronson Defendants and the Lenders' Representatives.

185. Without exception when making such requests, the Deos were told that "you people" are not invited to these meetings and that "the Lenders don't want you people at the meetings" even though the meetings were for NorthShore and/or 189 Sunrise and/or Superb at times that the Deos were shareholders/operators of these businesses, as (deceptively, at times) agreed to by the Urrutia Defendants and Aaronson Defendants.

186. The racism against the Deos by the Lenders was part of the Cozy Relationships between the Urrutia Defendants/Aaronson Defendants and the Lenders and their Representatives at all times relevant hereto.

### G1: Chase Bank

187. At all times relevant hereto, Chase Bank was the provider of bank accounts for NorthShore, 189 Sunrise, and Superb Motors.

188. Attached hereto as Exhibit C are true and accurate copies of documents utilized by Sara Deo to open the bank account(s) at Chase Bank for NorthShore.

52

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 59 of 97 PageID #: 65

189. Attached hereto as Exhibit Q are true and accurate copies of documents provided by Chase Bank to the Deo Plaintiffs during 2024 court proceedings (in Action 2 in U.S. District Court/EDNY) pertaining to the same account(s) originally opened by Sara Deo with Chase Bank on behalf of NorthShore.

190. Attached hereto as Exhibit R is a true and accurate copy of a document executed by Sara Deo on or about November 8, 2018, adding David Baron to the Chase account(s) for NorthShore opened by Sara Deo as set forth in Exhibit C hereto.

191. The Deos were treated differently by the Lenders than the way the Lenders treated the Urrutia and Aaronson Defendants.

192. In the immediate aftermath of the David Baron incident during mid-June 2020, Sara Deo went to Chase because she learned there were problems with the account(s) she originally opened for NorthShore during or about January 2018.

193. At that time, Sara Deo still believed that the account(s) belonging to NorthShore were owned and operated by her, as she originally set up the account.

194. At that time, Chase, by and through Jane Doe 1, refused to allow Sara Deo to access her own account without first "producing tax returns proving that you [Sara Deo] are the true owner of NorthShore," which the Deos subsequently learned such tax returns listing them as owners did not exist because the corporation was stolen from them by the Aaronson Defendants by and through, *inter alia*, filing false tax returns.

53

195. On and after June 16, 2020, the day of the David Baron incident, David Baron (at first, then Josh Aaronson after David's death in May of 2021) told the Deos to just continue writing checks as before (all of which were known to the Aaronson Defendants necessarily by and through the Token and Positive Pay systems).

196. However, after the Aaronson Defendants shuttered NorthShore (and 189 Sunrise) during November 2022, the Deos learned that the NorthShore Chase account was closed by the Aaronson Defendants in the days leading up to the Aaronson Defendants abandoning, stealing everything including cars and all company documents, and shuttering 189 Sunrise and NorthShore. Accordingly, Sara Deo went to Chase and spoke with Deborah Womeldorf, one of the Representatives with Chase who knew and worked with the Aaronson Defendants and the Deos over time.

197. On the occasion of late November 2022 that Sara Deo spoke with Chase Representative Womeldorf, Sare Deo did so for the purpose of removing the Aaronson Defendants from the NorthShore account(s) she opened for NorthShore.

198. On this occasion, the Deos (remembering the request for tax returns from Chase in the aftermath of the David Baron incident) brought the tax returns attached hereto as Exhibit H (as approved by the Josh Aaronson Defendants in the email chain attached hereto as Exhibit G) with them to straighten out the situation, but this time, Ms. Womeldorf conveniently (again, to the Aaronson Defendants' benefit and the Deos' detriment) refused to even look

54

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 61 of 97 PageID #: 67

at the tax returns, and refused all of Sara Deo's requests to resolve the situation or remove the Aaronson Defendants from the accounts for the two corporations.

199. At all times relevant hereto, Chase Bank provided use of the token system and the Positive Pay system for the accounts Chase provided to NorthShore and to 189 Sunrise.

200. At all times relevant hereto, Chase Bank provided use of the token system and text confirmations for the accounts Chase provided to Superb Motors.

201. David Baron died during May 2021.

202. From the date of David Baron's death through and including the shuttering of NorthShore's and 189 Sunrise's businesses and accounts by the Aaronson Defendants in November 2022, the Aaronson Defendants utilized (the deceased) David Baron's tokens and passwords and usernames to access and authorize account activities for (at least) the NorthShore and 189 Sunrise accounts.

203. This use of the deceased David Baron's credentials to access and eventually drain the accounts of all funds in those accounts constitutes criminal fraud and wire fraud at the very least, and was committed in conspiracy with and with the knowledge, allowance, and intentional ignorance of Chase Bank by and through its employees and Representatives.

204. Immediately after the Aaronson Defendants shuttered NorthShore and its bank accounts in November 2022, Anthony Deo arranged to borrow money ($735,000.00) against his ownership interest in NorthShore, having been

55

acknowledged as the 99% shareholder only weeks before by the Aaronson Defendants and their Accountants (*see* Exhibits G and H). This loan was obtained solely by Anthony Deo for his companies, 189 Sunrise and NorthShore, and was solely personally guaranteed by Anthony Deo; these funds were intended to save NorthShore and to obtain an interest (with cross collateralization) in Superb. *See* Exhibits G, H, I-1 and I-2 attached hereto.

205. During late November 2022, by and through the illegal use of the deceased David Baron's credentials as intentionally allowed and ignored by Chase Bank, the Aaronson Defendants stole that money ($735,000.00) from 189 Sunrise's Chase account "on their way out the door" and shockingly, deposited those funds into one or more of their own corporate accounts. Upon information and belief, the Aaronson Defendants put that money into an account belonging to Baron Nissan.

206. Upon learning of the theft, Anthony Deo reported the theft to the Nassau County (New York) Police Department. Attached hereto as Exhibit S is a true and accurate copy of the police report of the incident.

207. The police contacted the Aaronson Defendants by and through Josh Aaronson and informed Josh Aaronson that if he did not return the money immediately, he would be charged with at least one (1) felony criminal charge.

208. Thereafter, Aaronson, by and through one or more Professionals, returned the money to a Professional of Anthony Deo's choosing, who returned the money to Anthony Deo.

56

209. By and through his theft of money from Anthony Deo's account just weeks after personally (and on behalf of the Aaronson Defendants) approving Deo as the 99% shareholder of NorthShore, Josh Aaronson committed criminal fraud (by and through the actual theft), criminal conversion (in conjunction with the other Aaronson Defendants by putting the money into one or more unrelated corporate accounts), criminal theft (stealing the money), criminal conspiracy (with the co-Aaronson Defendants and Chase Bank and one or more of Chase Bank's Representatives), federal criminal wire fraud (by and through the use of a dead man's electronic credentials in conspiracy with one or more of Chase Bank's Representatives who intentionally ignored both David Baron's death and the use of the credentials for a year and a half after his death), and perjury and fraud upon the Court (by and through false allegations in the Court cases known herein as Action 1 and Action 2; *see* Exhibits M and O).

210. Even worse, Chase Bank had every opportunity to protect their contractual relationship with the Deos and 189 Sunrise and NorthShore, but intentionally failed to do so and intentionally ignored information attached hereto that constitutes breaches *per se* of Chase's contractual relationship with 189 Sunrise and NorthShore, and constitutes breaches *per se* of Chase's obligation to engage in good faith and fair dealing given their contractual relationship and fiduciary relationship with these corporate Plaintiffs and the corporate shareholders, the Deos.

57

211.  Attached hereto as Exhibit C are the documents indicating Sara Deo's opening of the corporate bank account for NorthShore by and through Chase Bank.

212.  Attached hereto as Exhibits Q and R are documents provided by Chase Bank to the Plaintiffs through Action 2 evidenced herein by the Federal Complaint attached as Exhibit O.

213.  Any fair reading of these documents alerts the reader to the following incontrovertible facts:

a)  Sara Deo opened the NorthShore Bank account during January 2018 (*see* Exhibit C); the documents attached as Exhibit C have been known to Chase and in Chase's possession, custody and control since January, 2018;

b)  On November 8, 2018, Sara Deo added David Baron as a signatory to the corporate account for NorthShore (*see* Exhibit R, "Business Account Add Signers Form" produced by Chase to the instant Plaintiffs during and through Action 2); the document attached as Exhibit R has been known to Chase and in Chase's possession, custody and control since November 8, 2018;

c)  On and about June 16, 2020, the Aaronson Defendants provided to Chase the eight (8) pages of documents attached hereto as Exhibit Q; the first four (4) pages were faxed to Chase on June 16, 2020, from "Baron Nissan" as set forth in the "fax confirmation print" at the top of each page; the second four (4) pages were delivered to one or more of

58

Chase's Representatives in hand and executed in front of said Representative(s) on the date of each such page between June 16, 2020 and June 18, 2020.

214. On June 16, 2020, the Aaronson Defendants took advantage of the imminent death of Anthony Deo's father; to do so, they had a plan that required instantaneous reaction to NorthShore *not having either Sara Deo or Anthony Deo present, as one or both always otherwise were.*

215. On the morning of June 16, 2020, Anthony Deo informed David Baron that Anthony's father was dying, and that he and his wife Sara would be out of the office for the next day few days to deal with his father's impending and expected death.

216. Whereupon, the Aaronson Defendants, then-led by David Baron, put their plan into immediate action, and rushed to the NorthShore dealership and cleaned it out, mostly as a smokescreen for what the Deos now know (since the production of documents by Chase in Action 2 during 2024, only) was the Aaronson Defendants' real purpose: The Aaronson Defendants had long since (by the date of the David Baron incident, June 16, 2020) stolen the Deos' corporation, slowly, over time by various acts including filing tax documents, but what the Aaronson Defendants did not have until June 16, 2020, was the corporate book as opened and kept by the Deos, since the Deos had the corporate book since they opened the corporation, obtained the EIN number (Exhibit A hereto), entered into the lease for the space for NorthShore (Exhibit B hereto), opened the Chase Bank account(s) for

59

NorthShore (Exhibit C hereto), and obtained the corporate book for NorthShore (Exhibit U hereto).

217. But once the Aaronson Defendants obtained the corporate book from the Deos/offices of NorthShore on June 16, 2020, they fraudulently filled out documents that are transparently fraudulent for all (including Chase and its Representatives) to see:

a) Page 1 of Exhibit Q indicates that David Baron, Brian Chabrier, and Asad Khan are the "Managing Members" of NorthShore as of "February 14, 2018" (the fax print clearly indicates this document was sent along with the next three pages to Chase at and immediately after 5:00 p.m. on June 16, 2020, from "Baron Nissan");

b) Pages 2-4 of Exhibit Q indicate that David Baron, Brian Chabrier, and Asad Khan were members of NorthShore Motor Leasing LLC ("NorthShore") since January 4, 2018;

c) Page 5 of Exhibit Q indicates that David Baron signed the document in front of a Chase Representative on June 16, 2020, the very day Baron stole the corporate book from NorthShore;

d) Page 6 of Exhibit Q indicates that David Baron removed Sara Deo from the account on June 16, 2020; again, this is an account(s) that *Sara Deo opened* (*see* Exhibit C hereto) for the Deos' corporation, NorthShore;

e) Page 7 of Exhibit Q indicates that David Baron and Brian Chabrier added their names to the accounts on June 16, 2020; and

60

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 67 of 97 PageID #: 73

f) Page 8 of Exhibit Q indicates that on or about June 18, 2020, the Aaronson Defendants caused a letter from one of their Professionals to be hand delivered to Chase's Representative (there is no mailing address on the letter, it had to be hand delivered to Chase for Chase to have it to turn over in Action 2 during 2024); this letter is also a transparent attempt to falsely claim ownership of NorthShore since "2018" as set forth by the Aaronson Defendants' Professional, Richards, Witt & Charles, LLP, by named partner Paul Charles, a CPA.

218. The reason that the documents set forth in Exhibit Q are transparently false is because for the documents set forth in Exhibit Q to be true and accurate, Exhibit R *would not exist*.

219. Exhibit R is the document through which Sara Deo, the owner and opener of the account(s) at issue for NorthShore at Chase, added David Baron to the account.

220. If, as set forth in Exhibit Q, David Baron, his partner Asad Khan, and his partner Brian Chabrier were already the owners/members of NorthShore since January and/or February, 2018, then there would be no need for Sara Deo to add David Baron as a signatory to the accounts at Chase; *Baron could and would do so himself through the corporate book that he and his partners would have owned and controlled.* Sara Deo added David Baron to the account since 1) he requested it; given that 2) he was the then-agent/leader of the Aaronson Defendants, the Deos' contractual partners/Floor Plan provider

61

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 68 of 97 PageID #: 74

at NorthShore, certainly not because he was an owner/member of NorthShore, neither he nor Chabrier nor Khan were ever made members or owners of NorthShore, they simply stole their purported ownership interests with their decades of inside knowledge of the automobile business over time, with the plan finalized (and unintentionally revealed) once they stole the corporate book on June 16, 2020 and sent Chase the documents attached hereto as Exhibit Q.

221. In contrast, the Deos' first automobile venture was, in fact, Premier Autos, NorthShore's predecessor, making them lambs lead to slaughter by David Baron and the Aaronson Defendants.

222. Startlingly, Exhibit U hereto provides further irrefutable proof of the scheme engaged in by the Aaronson Defendants with Chase Bank regarding the theft of Plaintiffs' Chase Bank account(s) on June 16, 2020, the date of the David Baron incident: Exhibit U is a true and accurate copy of the receipt for the payment made by Anthony Deo to the Notary Superstore of Huntington Station, New York, to produce the corporate book for NorthShore Motor Leasing LLC, co-Plaintiff herein, clearly dated June 7, 2018, which Deo obtained once the lease was assigned from Premier to NorthShore at the 180 Michael Drive location.

223. Therefore, it is an impossibility for David Baron, Asad Khan, and Brian Chabrier to have been assigned stock certificates on January 4, 2018, as set forth and attached hereto in Exhibit Q *at* pages 2-4 from the NorthShore corporate book *that wasn't created or produced until more than five (5)*

62

*months later as set forth in Exhibit U.* The frauds and extent of frauds and other wrongdoings by the Aaronson Defendants and the Professionals were not known by the Plaintiffs until Chase produced the documents attached hereto as Exhibit Q during document production in Action #2 in 2024 due to the intentionally surreptitious, sneaky, and underhanded methods/conspiracy by the Aaronson Defendants in conjunction with the Professionals.

224.  Exhibit U inarguably establishes that the Aaronson Defendants committed criminal fraud, criminal theft, and criminal wire fraud when they created and caused the purported corporate documents attached hereto in Exhibit Q to be wired/faxed to Chase Bank on and after June 16, 2020, and they did so in conspiracy with and the cooperation of RWC and Chase Bank itself.

225.  When Sara Deo added David Baron to the Chase account(s) as set forth in Exhibit R, he gained further control over the money at the dealership, but could not "prove" his ownership (which he and Khan and Chabrier outright stole) until the death of Anthony Deo's father left the dealership unguarded by the Deos, and then the longstanding plan to steal the corporate book and back-date the documents attached as Exhibit Q was put into action on June 16, 2020.

226.  Even if Chase and its Representatives did not know of the scheme by the Aaronson Defendants to outright steal ownership of NorthShore prior to June 16, 2020, it is impossible to look at the documents attached hereto as Exhibits C, Q, and R (which Chase already possessed when the documents in Exhibit Q arrived after hours on the evening of June 16, 2020) without

63

knowing *immediately* that the documents in Exhibit Q are phony, and a mere phone call to their longtime contracted account holders (the Deos) would have revealed the scheme to everyone. The documents attached hereto as Exhibits C, Q, and R have been fully in Chase's possession, custody, and control since no later than June 18, 2020, and were, at all relevant times, intentionally ignored by Chase since that date.

227. Chase purposely ignored the conflicting evidence and took no steps to verify with and through the Deos the actual status of NorthShore's ownership; Chase and its Representatives simply remained silent, content to side with the rich Caucasians against the poor minorities; the Cozy Relationships carefully fostered by the Aaronson Defendants and the Urrutia Defendants on the one hand, and Chase and its Representatives on the other hand, quite simply paid off for all of these Defendants.

228. At all times relevant hereto, Chase and its Representatives and the Accountants knew or should have known that the Aaronson Defendants were engaged in illegal activities including, but not limited to, fraudulent conduct regarding the ownership of NorthShore, fraudulent conduct regarding the ownership of 189 Sunrise, fraudulent conduct regarding the accounts of NorthShore and 189 Sunrise, and criminal fraud and wire fraud regarding the access given to the Aaronson Defendants to accounts of 189 Sunrise and NorthShore by Chase Bank and its Representatives via the utilization of a dead man's account credentials for a year and a half after his death.

64

229. By utilizing the Chase credentials of a dead man (David Baron) to clean out the 189 Sunrise and NorthShore accounts in November, 2022, the Aaronson Defendants again unknowingly reveal a necessary truth, just as with the obviously phony documents attached hereto as Exhibit Q: The dead man's electronic credentials wrongfully and illegally utilized by the Aaronson Defendants in November 2022 to clean out the Deos' corporate accounts at Chase *necessarily expire without constant use due to internal bank policies and rules. Thus, for the Aaronson Defendants to utilize a dead man's Chase credentials in November 2022 to clean out the Deos' corporate accounts, the Aaronson Defendants were necessarily utilizing those credentials on a regular basis since the death of David Baron a year and a half earlier, a fact necessarily known to and ignored by Chase to the detriment of the Plaintiffs.*

230. The use of the dead man's electronic credentials to clean out the Plaintiffs' bank accounts as set forth, above, constitutes criminal fraud and criminal wire fraud by the Aaronson Defendants, and was knowingly allowed at all times relevant hereto by Chase Bank.

231. At all times relevant hereto, Chase and its Representatives violated their own internal rules and policies and procedures regarding minorities, racial inequities, inclusion, handling of accounts, lending, and diversity given that Chase ignored its duties owed to the Plaintiffs, and intentionally sided with the rich Caucasian Aaronson Defendants with whom Chase made millions of dollars over the years; these and other acts and omissions constitute breaches

65

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 72 of 97 PageID #: 78

of Chase's contracts with the corporate Plaintiffs and the covenant of good faith and fair dealing Chase owed to all of the Plaintiffs.

232. By the within and other acts and omissions, Chase Bank by and through its Representatives/employees violated the Deos' Civil Rights as guaranteed by the U.S. Constitution and related statutes.

233. When the Deos appeared at Chase Bank with their own determinative tax returns to discuss this matter with Chase's Representative (Deborah Womeldorf) in the immediate aftermath of the Aaronson Defendants' emptying and shutting down 189 Sunrise's and NorthShore's corporate bank accounts in November 2022, Chase Bank took the side of the rich Caucasians, the Aaronson Defendants, against the poor minorities, the Deos, and allowed it to happen, ruining 189 Sunrise, NorthShore, and the Deos' lives in the process. Chase's Representative this time (contrasting how Chase and its Representatives handled questions from the Deos after the David Baron incident during June 2020, in which Chase insisted upon seeing tax returns when that was in the Aaronson Defendants' best interests) refused to even consider or look at the Deos proof/tax returns and emails from Josh Aaronson approving the returns and the Deos as owners of the two companies at issue.

## G2: The Automobile Lenders

234. Ally, NextGear, and NMAC are the Automobile Lenders herein as they are the providers of one or more Floor Plans for 189 Sunrise, NorthShore, and/or Superb.

66

235. Floor Plans are the method/loans that automobile dealerships utilize to fund their purchase of new and/or used automobiles for sale to the public. At times, other automobiles are financed by and through Floor Plans, including, but not limited to, automobiles that are traded into a dealership; however an automobile dealership obtains an automobile, it may be put on to Floor Plans, including the practice of "Double Flooring" set forth herein. At all times relevant hereto, the Automobile Lenders knew and should have known of the methods employed by the Defendants in putting automobiles on to the Floor Plans provided by the automobile Lenders to Superb, NorthShore, and 189 Sunrise.

236. At all times relevant hereto, Superb Motors, solely by and through the Urrutia Defendants' decisions, entered into a contract/agreement with NMAC for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Superb Motors.

237. At all times relevant hereto, Superb Motors, solely by and through the Urrutia Defendants' decisions, also entered into a contract/agreement with NextGear for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Superb Motors.

238. At all times relevant hereto, Northshore, solely by and through the Aaronson Defendants' decisions, entered into a contract/agreement with Ally for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

67

239.   At all times relevant hereto since November 2022, Northshore, solely by and through the Deos' decisions, entered into a contract/agreement with a company called Westlake Financial Services (hereinafter, "Westlake") for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.  During the summer of 2023, the Deos willingly gave up their Floor Plan with Westlake due to the ruination of the company caused by the Urrutia Defendants' and the Aaronson Defendants' wrongful acts and omissions set forth herein, including, but not limited to, the legal actions commenced by the Defendants and referred to herein as Actions 1, 2, and 3.

240.   It is telling that the Defendants herein have not sued Westlake in any of their three legal proceedings (Actions 1, 2, and/or 3) even though at all relevant times the Defendants 1) could know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 2) should know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 3) did know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 4) knew that they, the Defendants, did not have anything to do with NorthShore having its Westlake Floor Plan at times that the Defendants were, in fact, engaged in Actions 1, 2, and/or 3 against the Deos because the Defendants knew that at all times relevant hereto, the Deos were the true owners/members/stockholders of NorthShore.

241.   Even though the Urrutia and Aaronson Defendants claim ownership interests in NorthShore, these Defendants have not and will not sue Westlake

68

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 75 of 97 PageID #: 81

because 1) due to greed, they do not want to be seen in the automobile industry as suing any Floor Plan provider, that could impact the Defendants' ability to obtain and keep Floor Plans from other providers; and 2) they know that at all relevant times, the Deos were, in fact, the true owners/members/stockholders of NorthShore and had full authority to make decisions on behalf of NorthShore as the sole owners/members/shareholders thereof.

242. At all times relevant hereto, Westlake did not breach its agreement/contract with NorthShore and acted in good faith and dealt fairly with the Plaintiffs.

243. At all times relevant hereto through the early fall of 2022, 189 Sunrise, solely by and through the Aaronson Defendants' decisions, engaged in a contract/agreement with Ally for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

244. At all times relevant hereto between November 2022 and August 2023, 189 Sunrise, solely by and through the Deos' decisions, engaged in a contract/agreement with NextGear for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

245. The Floor Plans obtained by the Aaronson Defendants for use at NorthShore and 189 Sunrise were obtained without the authority of the Deos, the true owners/members/stockholders of those companies.

246. The Floor Plans obtained by the Aaronson Defendants for use at NorthShore and 189 Sunrise were obtained without any due diligence by the Automobile Lenders who provided said Floor Plans; such diligence would

69

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 76 of 97 PageID #: 82

have revealed the within schemes and conspiracies and would have prevented the Deos' losses.

247. At all times relevant hereto, the Automobile Lenders to 189 Sunrise and NorthShore knew and/or should have known of the Deos' ownership interests in 189 Sunrise and NorthShore.

248. At all times relevant hereto, the Automobile Lenders providing Floor Plans to 189 Sunrise and NorthShore knew and/or should have known of the Deos' ownership interests in 189 Sunrise and NorthShore by and through the fact that at all times for NorthShore, and since February, 2021 for 189 Sunrise, the Deos operated both dealerships and were present to meet the Automobile Lenders and their various Representatives when the Representatives were present at the dealerships, including during on-site audits by the Automobile Lenders.

249. Likewise, at all times relevant hereto since December 2022, the Automobile Lenders providing Floor Plans to Superb knew and/or should have known of the Deos' ownership interests in Superb.

250. At all times relevant hereto since December 2022, the Automobile Lenders providing Floor Plans to Superb knew and/or should have known of the Deos' ownership interests in Superb by and through the fact that at all times for Superb since December, 2022, the Deos operated Superb and were present to meet the Automobile Lenders and their various Representatives when the Representatives were present at the dealership, including during on-site audits by the Automobile Lenders.

70

Case 2:24-cv-06903-JMW   Document 1-2   Filed 09/30/24   Page 77 of 97 PageID #: 83

251. The lack of due diligence by the Automobile Lenders to determine ownership of the 3 dealerships at issue and uphold their contractual obligations to those dealerships constitutes at all times intentional ignorance by the Automobile Lenders herein in order to protect their financial gains made possible by and through the Billionaire Defendants herein, who provided tens of millions of dollars or more in profits over the years to the Automobile Lenders herein.

252. If the Lenders herein uncovered the within schemes and conspiracies in any detail, then the extremely profitable relationships between these Defendants would have been ruined; the corporate Defendants have and should have had internal rules, policies and procedures that would have prevented a continuation of the relationships between the Defendants; given the enormous sums of money at stake between these parties (and others not named as parties herein), it was instead easier and far more profitable to ignore the Deos' plight (to the extreme detriment of the Deos) while simultaneously keeping and maintaining at all times relevant hereto the relationships between the Defendants herein.

253. The agreements and contracts between the Lenders and the Urrutia/ Aaronson Defendants, whether express or implied, were repeatedly requested to be obtained by the Deos; the Defendants herein should have been alerted to the wrongdoings of the co-Defendants by these requests from the Deos, but instead, in order to keep and maintain lucrative relationships, the Lenders

71

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 78 of 97 PageID #: 84

and the Urrutia/Aaronson Defendants refused the Deos' requests each and every time.

254. The agreements between the Defendants hereto were weaponized by those Defendants, and were wrongfully kept from the Plaintiffs at all times relevant hereto through and including the present.

255. Each and every agreement between any Defendant and the Plaintiffs, whether express or implied, was conducted by the Defendants in violation of the implied covenant requiring good faith and fair dealing in New York State on all such agreements/contracts.

256. At all times relevant hereto, the Aaronson Defendants told the Deos that the Floor Plans were provided by and through Baron Nissan, which was a lie to keep the Deos from discovering the Aaronson Defendants' theft of the Deos corporations, 189 Sunrise and NorthShore.

257. At all times relevant hereto, the Automobile Lenders told the Deos on behalf of 189 Sunrise and NorthShore that they were not the party to the contract at issue, which the Deos took to mean that Baron Nissan was the contracted party; if the Automobile Lenders told the Deos even once that the party was, in fact, 189 Sunrise and/or NorthShore, it would have alerted the Deos to the within schemes. However, the Automobile Lenders carefully avoided telling the Deos that 189 Sunrise and NorthShore were, in fact, the true parties; this fact demonstrates that the Automobile Lenders for 189 Sunrise and NorthShore (except for Westlake) intentionally ignored the

72

Deos' position foisted upon them by the Aaronson Defendants acting in conspiracy with the Automobile Lenders.

258. At all times relevant hereto, the Lenders took direction from non-owners of the corporations that are parties hereto, did nothing to verify ownership of the corporate parties hereto, and could not have obtained the corporate book or documentation proving ownership of NorthShore prior to June 16, 2020 since the Aaronson Defendants did not obtain that book and documents until that date; these facts alone should have alerted the Lenders to the schemes, conspiracies, and wrongdoing set forth herein. Instead, the Lenders refused to even talk to the Deos about these companies to the detriment of the Plaintiffs and to the benefit of the co-Defendants.

259. At all times relevant hereto, the known and unknown Representatives of NMAC for Superb engaged in a Cozy Reletionship with the Urrutia Defendants.

260. At all times relevant hereto prior to the Lock Out in August, 2023, NMAC made millions of dollars with and from the Urrutia dealerships.

261. The extent of the Cozy Relationship and the extent that NMAC has gone and continues to go in protecting its dealings set forth herein is further highlighted by the fact that immediately prior to the filing of this Third-Party Complaint, NMAC intervened and queered a deal for Anthony Deo to purchase an interest in another automobile dealership on Long Island called Route 112 Mitsubishi; upon information and belief, one or more Representatives of NMAC told the owner(s) of 112 Mitsubishi not to sell the

73

dealership to Anthony Deo and pointed that owner to look at the Federal Complaint in Action 2 attached hereto as Exhibit O.

262. Upon reviewing the Federal Complaint attached as Exhibit O, the owner of 112 Mitsubishi cancelled the deal when all that was left (the parties had already agreed to terms) was for the parties to execute the documents and provide payment, which Deo was fully prepared to do. Upon information and belief, it was NMAC by and through one or more of its Representatives that queered the deal for Deo, intentionally and fully interfering with business relations of Anthony Deo.

263. At all times relevant hereto, Nissan operated various corporations under its automobile umbrella, including, but not limited to, NMAC and a company called Nissa Extended Services North America, G.P., a Delaware general partnership business (hereinafter, "NESNA").

264. Whereas NMAC provides Floor Plans to automobile dealerships, NESNA provides warranties for sale to the automobile purchasers at dealerships.

265. Attached hereto as Exhibit X are true and accurate copies of several contracts by and between NESNA on the one hand, and Anthony Deo both personally (as Guarantor) and on behalf of 189 Sunrise (since the Deos' purchase in February 2021) and NorthShore.

266. These contracts provide irrefutable proof that Nissan, NMAC, and NESNA all knew that Anthony Deo was the true party in interest in 189 Sunrise and NorthShore, as it was he, Deo, that was entering into contracts and personally guaranteeing same on behalf of 189 Sunrise and NorthShore

74

for warranties from Nissan; these contracts were, at all relevant times, also in the possession, custody and control of the Aaronson Defendants and were approved by the Aaronson Defendants.

267. The Aaronson Defendants *necessarily* had to approve the contracts attached in Exhibit X: These contracts include monies owed by the Aaronson Defendants on 189 Sunrise from prior to the sale to the Deos in February 2021; in fact, the Aaronson Defendants *required* Anthony Deo to assume certain debt in connection with the purchase of 189 Sunrise as a *precondition* to letting Deo purchase 189 Sunrise in February 2021.

268. Thus, even as NMAC was cutting off the Deos from Floor Plans and interfering with Anthony Deo's purchase of Route 112 Mitsubishi, NMAC by and through its sister corporation NESNA and by and through the Aaronson Defendants knew that the Deos were the true owners/operators/ stockholders/members of 189 Sunrise and NorthShore, but continued to side with the Aaronson Defendants in a conspiracy to (successfully) ruin the Deos, their livelihoods, and businesses.

269. At all times relevant hereto, the known Representatives of Ally and NextGear for 189 Sunrise and NorthShore and one or more unknown Representatives of Ally and NextGear for 189 Sunrise and NorthShore, engaged in a Cozy Reletionship with the Aaronson Defendants.

270. At all times relevant hereto, Ally and NextGear made tens of millions of dollars and more with and from the Aaronson Defendants through their various dealerships over the years.

75

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 82 of 97 PageID #: 88

271. At all times relevant hereto, the Automobile Lenders by and through their Representatives knew and should have known of the Deos interests in Superb, NorthShore, and 189 Sunrise.

272. Despite repeated requests by the Deos to explain to the Automobile Lenders what was going on with 189 Sunrise and NorthShore (since November, 2022) and Superb (since the Lock Out) in order to protect their interests in the three companies at issue, the Automobile Lenders 1) sided at all relevant times with the Urrutia and Aaronson Defendants; 2) failed and refused to discuss anything with the Deos, either from the Deos' request or to simply find out what was going on with the companies at issue; 3) shut off the Floor Plans to each of the companies at issue to the detriment of the Deos; 4) ignored their own policies and rules regarding diversity, racial relations, and minority lending practices in siding with the Urrutia/Aaronson Defendants against the Deos; 5) failed and still refuse to create policies and rules to protect minorities such as the Deos from predatory practices set forth herein and perpetrated by the Urrutia/Aaronson Defendants; 6) have not taken any actions against any of the Urrutia/Aaronson Defendants for their illegal activities set forth herein, but have instead refused to lend to the Deos ever again; and 7) at the specific requests of the Urrutia/Aaronson Defendants, ruined the Deos' businesses.

273. The within and other acts and omissions between the Urrutia/Aaronson Defendants in conjunction with the Lenders constitute a conspiracy to breach

76

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 83 of 97 PageID #: 89

all contracts with the Plaintiffs and to intentionally interfere with the Deos' businesses at issue herein.

274. Said acts and omissions constituting the conspiracy are on-going acts and omissions, and the Lenders and Urrutia/Aaronson Defendants acted jointly in severally in perpetrating the within ruination of the Deos three businesses and their lives.

275. At all times relevant hereto, and upon information and belief, the Deos were 1) the only African/Caribbean dealership owners/partners in the State of New York; and 2) two of only a handful of any minority owners of automobile dealerships known on Long Island.

### H. The Accountants

276. Defendants RWC and Citrin are accounting firms that at all times relevant hereto worked with and for the Aaronson Defendants and one or more of the Aaronson Defendants' Island Auto Group dealerships doing accounting work for these co-Defendants by and through various employees of each of those two firms; at various times in the last six years, these firms and their employees performed various tasks as accountants for 189 Sunrise and NorthShore.

277. As such, these Accountants (both the firms and their employees) owed a fiduciary duty to 189 Sunrise and NorthShore, separate and apart from any duties owed to the Aaronson Defendants and Island Auto Group.

278. As such, these Accountants (both the firms and their employees) maintained contractual relationships (whether express or implied) with 189

77

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 84 of 97 PageID #: 90

Sunrise and NorthShore, separate and apart from any duties owed to the Aaronson Defendants and Island Auto Group.

279. Like the Lenders, the Accountants made millions of dollars working for and with the Aaronson Defendants, Island Auto Group, 189 Sunrise, and NorthShore.

280. The duties of care arising from the Accountants' (both the firms' and each employee therein) contracts (implied, only, since the Deos never contracted with the Defendant Accountants either individually or on behalf of their corporations, 189 Sunrise and NorthShore) with and fiduciary duties owed to 189 Sunrise and NorthShore include, but are not limited to, 1) performing sufficient due diligence to confirm the identity of the shareholders/members of 189 Sunrise; 2) performing sufficient due diligence to confirm the identity of the shareholders/members of NorthShore; 3) strictly adhering to the covenant of good faith and fair dealing towards 189 Sunrise; 4) strictly adhering to the covenant of good faith and fair dealing towards NorthShore; 5) utilizing due diligence in preparing and filing all tax documents for 189 Sunrise; 6) utilizing due diligence in preparing and filing all tax documents for NorthShore; 7) utilizing due diligence in preparing any documents to be utilized on behalf of 189 Sunrise; 8) utilizing due diligence in preparing any documents to be utilized on behalf of NorthShore; 9) utilizing due diligence and strictly adhering to the covenant of good faith and fair dealing towards 189 Sunrise in obtaining and utilizing Pandemic Relief Funds; 10) utilizing due diligence and strictly adhering to the covenant of good faith and fair

78

dealing towards NorthShore in obtaining and utilizing Pandemic Relief Funds; 11) correcting any tax filings prepared and filed by the Accountants for 189 Sunrise that turn out to be incorrect or mistaken due to the failures of the Accountants to perform due diligence; and 12) correcting any tax filings prepared and filed by the Accountants for NorthShore that turn out to be incorrect or mistaken due to the failures of the Accountants to perform due diligence.

281.  Instead, the Accountants engaged in a scheme/conspiracy with the Aaronson Defendants and their Island Auto Group dealerships to intentionally ignore obvious red flags both before and after preparing various documents over the years for 189 Sunrise and NorthShore for the simple reason that the Accountants made millions of dollars or more off of the Aaronson Defendants and their Island Auto Group dealerships; they would and did even go so far as to commit gross malpractice, breaches of contracts, and breaches of their fiduciary duties in their conduct by and for 189 Sunrise and NorthShore.

282.  E.g., the last page of Exhibit Q attached hereto contains a letter produced by RWC that simply constitutes gross malpractice and breaches of its contract with and fiduciary duties towards NorthShore.

283.  There is no possibility that RWC possessed the corporate book for NorthShore or any parts thereof (including stock certificates) prior to the David Baron incident perpetrated on June 16, 2020, yet by that time RWC

79

had already filed (as indicated in the last page of Exhibit Q) tax returns for NorthShore absent any authority from the Deos, the true owners thereof.

284. To avoid any breaches of duties to NorthShore, at a bare minimum RWC would have needed to know what that letter was to be utilized for; it was, in fact utilized by the Aaronson Defendants to remove Sara Deo from NorthShore's bank accounts, accounts which Sara Deo opened as a shareholder/member of NorthShore. *See, also,* Exhibit C hereto.

285. The removal of Sara Deo from the accounts with Chase for NorthShore in combination with the Aaronson Defendants obtaining the corporate book and producing the phony stock certificates indicated in Exhibit Q by and through the staged David Baron incident on June 16, 2020, materially damaged the Deos and cost them their interests in NorthShore permanently from at least that moment on, and the letter from RWC contributed significantly to the Aaronson's illegal fraud and theft perpetrated with RWC's help.

286. RWC, by and through its employees, partners, and/or members, knew or should have known that seeing stock certificates for the first time on and after June 16, 2020, purportedly indicating the Aaronson Defendants' listed interests since January or February 2018 was a red flag and should have prompted the following questions: Why didn't the Aaronson Defendants produce these certificates to their Accountants sooner, and what does Sara Deo have to say about this? A simple call to the dealership would have constituted at least partial due diligence and produced the following answers: The Aaronson Defendants were perpetrating a fraud by obtaining those

80

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 87 of 97 PageID #: 93

corporate books and certificates as they were stolen from the dealership on June 16, 2020, by and through the staged David Baron incident; and Sara Deo had no intention of being removed from the accounts of NorthShore, willingly or otherwise, as not a penny of consideration was every paid by the Aaronson Defendants for NorthShore, and if asked by RWC, it would have raised even more red flags easily spotted by any competent accountant.

287.    Instead of doing its work and upholding its duties to 189 Sunrise and NorthShore, RWC badly damaged the dealerships and the Deos by and through its breaches of duties, breaches of agreements with the dealerships, and breaches of duties to the dealerships' shareholders/members, the Deos, in order to continue the revenue stream it obtained for years worth millions of dollars from the Aaronson Defendants, all to the detriment of 189 Sunrise and NorthShore and their shareholders/members, the Deos.

288.    Simply put, at all relevant times related hereto, and for all work performed by RWC and its members, partners, and employees by and for NorthShore and 189 Sunrise (and much of that work is unknown at this time to the Plaintiffs and will be subject to obtaining same during discovery in this action and/or pursuant to within Demands), RWC breached contracts, duties of care, duties of good faith and fair dealings, and committed professional malpractice thereby, especially due to intentionally ignoring obvious dishonesty from the Aaronson Defendants regarding 189 Sunrise and NorthShore.

81

289. Likewise, Citrin faces the same scrutiny and is held to the same standards and duties of care as RWC (and Citrin's employees, members, and partners) with respect to work performed by and for 189 Sunrise and NorthShore.

290. Likewise, Citrin conveniently ignored red flags regarding the dishonesty of the Aaronson Defendants regarding the operations of 189 Sunrise and NorthShore.

291. Citrin knew or should have known of the Deos' purchase of 189 Sunrise as set forth in Exhibit D hereto; yet either conveniently ignored that purchase in performing work for the Aaronson Defendants or utterly failed in its duties to find out and know about that purchase, including the funds for that purchase and how those funds were accounted for on the Aaronson Defendants' personal and business tax returns prepared by Citrin.

292. At a bare minimum, Citrin would have necessarily known about the lease the Deos entered into for the space at 189 Sunrise as the accountants would have needed to know about the lease's payments for tax purposes. *See also* Exhibit E hereto.

293. Likewise, the email chain and tax returns attached hereto as Exhibits G and H raised staggering red flags missed by Citrin that cost the Plaintiffs their businesses and livelihoods: 1) When did the Deos obtain their interests in 189 Sunrise and NorthShore? 2) What was the consideration paid for the Deos' interests in 189 Sunrise and NorthShore? 3) What consideration was paid by the Aaronson Defendants for their interests in 189 Sunrise and NorthShore? 4) Do tax returns (personal and corporate) need amendments

82

due to the new ownership interests indicated in Exhibits G and H? 5) How to contact, meet, and understand the Deos and their interests in these two businesses? All of these questions and more should have been asked of the Deos by Citrin (and RWC) or any competent accountant, but were instead intentionally ignored to the Aaronson Defendants' benefit and to the Plaintiffs' detriment.

294.   Quite literally, the Deos have never met anyone from Citrin; all work performed by Citrin for the Deos' two companies at issue (189 Sunrise and NorthShore) was performed by Citrin at the sole direction of the Aaronson Defendants and without any input from the Deos, the true owners/members/ stockholders.

295.   By the within and other acts and omissions, Citrin and its employees, partners, and members have breached their duties of care and fiduciary duties to 189 Sunrise, NorthShore, and the Deos; Citrin has also breached its agreements with 189 Sunrise and NorthShore and committed malpractice thereby.

296.   The Accountants failed and refused to even meet with the Deos, a fact that is telling with respect to wrongful conduct: Despite ups and downs in their relationship with the Aaronson Defendants over the years, the simple fact remains that it was the (phony, by and for the Aaronson Defendants) business relationship between the Deos and the Aaronson Defendants that the Deos considered left them "on the same side" as their business partners; the Accountants failure and refusal to even meet with or speak to the Deos

83

directly suggests that at all times relevant hereto, the Accountants knew of the wrongdoings by the Aaronson Defendants against the Deos and 189 Sunrise/ NorthShore, knew that such wrongdoings put the parties on opposite sides in their relationship, and picked the rich Aaronson Defendants to side with after making millions of dollars off of the Aaronson Defendants and their Island Auto Group while simultaneously contributing to the shuttering and ruination of 189 Sunrise and NorthShore.

### I.   The Attorneys

297.   CSZ and its employees, members, and/or partners, engaged in representing the corporate Plaintiffs, 189 Sunrise (since February 2021) and NorthShore (at any time) without the authorization or approval of the owners/members/ stockholders of those corporate Plaintiffs, the Deos.

298.   Likewise, MLLG and its employees, members, and/or partners, engaged in representing the corporate Plaintiffs, 189 Sunrise (since February 2021) and NorthShore (at any time) without the authorization or approval of the owners/members/stockholders of those corporate Plaintiffs, the Deos.

299.   The unauthorized work performed by the Attorneys includes but is not limited to obtaining Pandemic Relief Funds ("PPP" funds), steering those funds away from the Plaintiffs and instead to the Aaronson Defendants, representing the corporate Plaintiffs in one or more lawsuits, plus other work unknown at this time to the Plaintiffs.  Attached hereto as Exhibit T is a true and accurate copy of an email chain including one or more attorneys

84

employed by MLLG regarding Pandemic Relief Funds for 189 Sunrise and/or NorthShore.

300. It is also known that by and through the assistance of various Professionals including but not limited to at least MLLG, the Aaronson Defendants diverted and converted and stole all of those PPP funds from 189 Sunrise and NorthShore into their own accounts and/or the accounts of one or more of the Island Auto Group, and may also have utilized the PPP funds to wrongfully pay their Professionals, instead of utilizing those funds lawfully for the benefit of the Plaintiffs.

301. At all times relevant hereto, the Attorneys knew and should have known of the Deos' interests as owners/members/stockholders of the corporate Plaintiffs.

302. At all times relevant hereto the Attorneys kept and maintained longstanding lucrative relationships with the Aaronson Defendants, providing ample incentive for the Attorneys to intentionally ignore multiple red flags with respect to the true owners and operators of the corporate Plaintiffs, the Deos.

303. MLLG and CSZ have filed lawsuits known herein as Actions 1 & 2 (as reflected in the Complaints attached hereto as Exhibits M & O); it is hereby specifically alleged that these two actions (Actions 1 & 2) are frauds upon the Courts in which they are and were filed and constitute on-going intentional interference with the Plaintiffs' businesses and business relations.

85

304.   It is hereby specifically alleged that at all relevant times, CSZ and MLLG and their attorneys/partners/members/employees knew and should have known that Actions 1 & 2 constitute frauds upon the Court.

305.   It is hereby specifically alleged that at all relevant times, CSZ and MLLG and their attorneys/partners/members/employees knew and should have known that they had and have no authority to initiate or continue any litigation on behalf of any Plaintiff herein since the Deos obtained their ownership interests in the corporate Plaintiffs, February of 2021 for 189 Sunrise, and since the formation of NorthShore in November of 2017.

306.   To that end, CSZ and MLLG are specifically instructed to abandon their representations of the corporate Plaintiffs herein, and to cease and desist from ever again representing any of the Plaintiffs going forward in time.

307.   The within and other acts and omissions by these Attorneys constitute gross attorney malpractice, *per se* attorney malpractice, and breaches of the ethical rules and obligations for each of the attorneys who acted at relevant times purportedly for any of the within Plaintiffs absent proper due diligence and efforts made to determine ownership of the corporate Plaintiffs in light of the within allegations and the extremely important and revealing Exhibits hereto, beyond just undertaking representation of the corporate Plaintiffs on the mere words of the Aaronson Defendants.

308.   Aside from the Lenders, Accountants and Attorneys named as parties hereto, it is unknown to the Plaintiffs herein whether or not other Professionals have in any way wrongfully impacted the Plaintiffs rights

86

Case 2:24-cv-06903-JMW Document 1-2 Filed 09/30/24 Page 93 of 97 PageID #: 99

and/or wrongfully caused the Plaintiffs damages, since all of the Defendants acted in a conspiracy to keep relevant information away from the Plaintiffs.

309. Upon information and belief, as with the named Lenders, Accountants and Attorneys herein, other Professionals have benefited from payments by the Aaronson Defendants and their companies in unknown amounts but not less than millions of dollars, so there is plenty of incentive for all Professionals, both known and unknown, whether a named party or not, to serve the Aaronson Defendants and the Island Auto Group even at the expense of ruining 189 Sunrise, NorthShore, and the Deos.

310. Both David Baron and Josh Aaronson made racist remarks to the Deos over the years, 189 Sunrise and NorthShore served as the Aaronson Defendants personal piggy banks and were drained of moneys by these Defendants extensively and expertly, upon information and belief, the Aaronson Defendants and/or their Island Auto Group companies benefitted from tax write offs due to the appearance of losses by 189 Sunrise and NorthShore expertly created by the Aaronson Defendants and their Accountants, so it is expected that additional Professionals will be witnesses and parties to this action, as necessary, over time, especially with respect to those professionals who worked for, with, or represented 189 Sunrise since February 2021 and NorthShore at any time since November 2017.

J. GENERAL ALLEGATIONS

311. Unlike the attached and other documentation on behalf of the Deos which proves that ownership of NorthShore rests with the Deos at relevant times

87

hereto via the initial incorporation of the business and obtaining the 1) corporate book, 2) EIN number (Exhibit A), 3) lease (Exhibit B), and 4) Josh Aaronson approved (Exhibit G) tax returns indicating ownership by the Deos (Exhibit H), the Aaronson Defendants cannot demonstrate ownership other than through their transparently false and fraudulent misdated documents attached as Exhibit Q.

312. The Aaronson Defendants in particular are unable to prove any consideration paid for obtaining NorthShore from the Deos, as nothing was ever paid to the Deos directly for their business, no transfer was ever approved nor authorized, no documents transferring the business were ever created or executed, no emails were created/exchanged indicating a change in ownership, and the only thing that the Aaronson Defendants ever did for the businesses directly was to provide arm's length Floor Plans carefully kept from the Deos and any Deo involvement, and for which the Deos paid the Aaronson Defendants from the business in ever increasing amounts under the threat of ruination from the Aaronson Defendants, a plan they eventually carried out.

313. All records indicating payments to the Aaronson Defendants directly for their Floor Plan provisions are in the exclusive possession, custody and control of the Aaronson Defendants and the Lenders, and the Aaronson Defendants have refused, to date, to turn over any of the documents they took when they wrongfully shuttered NorthShore and 189 Sunrise and wrongfully closed those businesses' accounts through and with the assistance of Chase.

88

Case 2:24-cv-06903-JMW   Document 1-2   Filed 09/30/24   Page 95 of 97 PageID #: 101

314. The lawsuits commenced by the Aaronson Defendants (Actions 1 & 2, Exhibits M & O are the Complaints in those Actions) are, like the documents attached as Exhibit Q, transparently false and brought as frauds upon those Courts: For the Aaronson Defendants to be believed in their claims that they ever owned NorthShore or 189 Sunrise since the Deos bought same in February 2021, it is necessary to also believe that 1) in November of 2022, the Aaronson Defendants emptied their own profitable companies known as NorthShore and 189 Sunrise and left both locations permanently; 2) they sold off the automobiles from those locations at a loss without transferring those autos to another of their Island Auto Group businesses for a profit; and 3) the Aaronson Defendants left their own businesses and permanently shuttered and ruined their own businesses on purpose.

315. Simply put, the allegations by the Aaronson Defendants in Actions 1 & 2 are and always have been false, especially considering that it is herein specifically alleged that with respect to the operation of 189 Sunrise and NorthShore, at all relevant times hereto it was the Aaronson Defendants, only, that completely controlled 100% of the companies' finances through the Positive Pay system and token system put in place by the Aaronson Defendants by and through Chase Bank. The Deos did not and could not conduct or make any financial decisions impacting those businesses without the direct knowledge and approval, daily, of the Aaronson Defendants. If the Deos even wrote a check, it was necessarily known to and approved by the Aaronson Defendants, or that check would not be honored by Chase.

89

Case 2:24-cv-06903-JMW    Document 1-2    Filed 09/30/24    Page 96 of 97 PageID #: 102

316.    Likewise, the Urrutia Defendants operated Superb with the same total control over the company's finances via their own token and texting systems put in place by the Urrutia Defendants by and through Chase Bank. Likewise, the Deos did not and could not conduct or make any financial decisions impacting Superb without the direct knowledge and approval, daily, of the Urrutia Defendants. If the Deos even wrote a check, it was necessarily known to and approved by the Urrutia Defendants, or that check would not be honored by Chase.

317.    In their zeal to ruin the Deos and their businesses, the Urrutia Defendants even arranged for Anthony Deo to receive a death threat from one of the Superb employees, co-Defendant Parmeshwar Bissoon, who, after speaking with one or more of the Urrutia co-Defendants, told Anthony Deo that he, Bissoon, would "pop" Deo and kill him if he ever sees Deo again for ruining Superb. Attached hereto as Exhibit V is a true and accurate copy of the written words utilized by Bissoon on behalf of the Urrutia Defendants threatening Anthony Deo's life; that text and other, spoken words lead directly to a restraining order to keep Bissoon away from Deo.

318.    In fact, none of the Plaintiffs are responsible for the Urrutia Defendants' choice to close all of their businesses; the Urrutia Defendants' businesses failed due to years-long abuses by these Urrutia Defendants in running their businesses into the ground, then falsely and fraudulently 1) taking money from the Deos, 2) trying to take even more money from the Deos, before 3)

90

Locking-Out the Deos and falsely accusing the Deos of theft that is not even possible given the Urrutia Defendants' control over all company finances.

319.   As Anthony Deo discovered upon taking over day to day operations at Superb during or about January 2023:  Superb was in dire financial straits, Anthony Urrutia and other Urrutia Defendants including Bruce Novicky were Double Flooring cars, and Urrutia was taking money from Superb to try to save a Mitsubishi dealership in Hartford, Connecticut that he, Urrutia, ran into the ground and has subsequently lost back to Mitsubishi.

320.   With the help of the Deos, Superb's finances improved measurably during 2023 up to the Lock Out.

321.   Just as the Aaronson Defendants have had nearly two years to prove their false allegations of theft by the Deos set forth in their transparently false Complaints, so too, have the Urrutia Defendants now had more than a year to obtain documents or records to prove their own false allegations of theft by the Deos, yet all of the Defendants have completely failed to obtain or demonstrate any such wrongdoing by the Deos.

322.   Instead, it is the Deos who have attached extensive documentation attached to this Complaint that prove their allegations repeatedly throughout; the Exhibits attached hereto are hereby incorporated herein by reference.

323.   At all times relevant hereto, the Deos trusted and believed their business partners, the Aaronson Defendants and the Urrutia Defendants; their misplaced trust lead to the Deos being woefully harmed by these Defendants who, at all times relevant hereto, were lying and deceiving the Deos for the

91