# EXHIBIT X

DocuSign Envelope ID: 33FB02FD-F8BB-4D47-8937-0BB548828CC9



# SECURITY+PLUS AND QUALITYGUARD+PLUS MANAGEMENT FEE ADVANCE REQUEST FORM

| Dealer Participation Agreement Date: | 06/15/2023 | | |
|---|---|---|---|
| **Dealer Name:** Sunrise Auto Outlet | | **NNA Dealer #:** | SA10084 |
| **Advance Effective Date (MM/YY)** 06/23 | | **Advance Term (months):** | 18 |

| 1. ADVANCE PAYMENT OPTION: | Term: | **18** |
|---|---|---|
| **Security+Plus & QualityGuard+Plus Sales(Monthly)** | | |
| New Net Vehicle Volume | (A) | 0 |
| Net Security+Plus Service Contracts (New and Pre-Owned) | (B) | 0 |
| Net QualityGuard+Plus Service Contracts | (C) | 16.5311 |
| Total Net Contracts (B + C) | (D) | 16.5311 |
| | | |
| **Security+Plus 100% Markup Calculations** | | |
| Average Security+Plus Net Cost Per Contract (Including 100% Markup) | (E) | $ 0 |
| **Net Security+Plus Sales Dollars (B x E)** | (F) | $ 0 |
| **2023 REQUESTED SECURITY+PLUS ADVANCE (100% Markup) (F / 2)*** | (G) | $ 0 |
| | | |
| **Security+Plus and QualityGuard+Plus Over-Remit Markup Calculations** | | |
| Amount per Contract to Over-Remit | (H) | $ 800 |
| **2023 REQUESTED SECURITY+PLUS and QUALITYGUARD+PLUS ADVANCE (Over-Remit) (D x H)*** | (I) | $ 238,048 |
| **TOTAL 2023 REQUESTED ADVANCE  (G + I)*** | (J) | $ 238,048 |
| **Advance Fee %, if applicable (Pursuant to Section 5 of Exhibit A and as set forth in Exhibit A-1)** | (K) | 0.0% |
| **Advance Fee Amount, if applicable (K x J)** | (L) | $ 0 |
| **NET TOTAL ADVANCE PAYMENT (J – L)*** | (M) | $ 238,048 |

*\* Subject to any adjustment pursuant to Section 5 of the terms and conditions set forth on Exhibit A hereto.*

In this Docusign, you will find a new 18-month advance with no new money paid out, only an extended term of 18 months. Please review, fill in where instructed, and sign the documents as soon as possible. A minimum of 38 QualityGuard VSC contracts will need to be received from Northshore Motors each month for 18 months, and a minimum of 17 QG contracts will need to be received from Sunrise Auto Outlet a month for 18 months to repay this advance. Any shortages in either store's contract count will result in a collection of the unresolved portion of that month's agreed-upon amounts.

Example: NorthShore is required to produce 37.5 contacts on average. If 36 are produced, a debit request for the difference would be $800 per contract, so we would ask for the $800 (1 contract) + $400 (.5 of a contract amount) for a total of $1200 to keep the advance on track to be paid off at the end of the 18 months term.

Management Fee Advance Request Form 5-17-2023

| **2a. ALTERNATE PAYEE OPTION (up to 4):  Use whole percentage numbers (i.e. 10% not 9.9%). Security Plus (100% option)** | | |
|---|---|---|
| Name:  NESNA | Percentage: | 100.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |

| **2b. ALTERNATE PAYEE OPTION (up to 4):  Use whole percentage numbers (i.e. 10% not 9.9%). Security Plus & QualityGuard (Over-Remit option)** | | |
|---|---|---|
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |

By signing below, I agree to the terms and conditions set forth on Exhibit A to this Management Fee Advance Request Form and the Dealer Participation Agreement as incorporated by reference herein. This Management Fee Advance Agreement ("MFAA") may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this MFAA if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.

| | | |
|---|---|---|
| *anthony deo* | anthony deo | 6/18/2023 |
| Dealer Signature | Print | Date |
| *Lisa Cicchini* | Lisa Cicchini | 6/19/2023 |
| Regional Financial Services Manager | Print | Date |

Management Fee Advance Request Form 5-17-2023

Case 2:24-cv-08963-AJC-JMW   Document 47-25   Filed 01/31/25   Page 4 of 49 PageID #: 4343

| | | |
|---|---|---|
| *Jack Crowley* | Jack Crowley | 6/26/2023 |
| NESNA's Manager or Director | Print | Date |

| | | |
|---|---|---|
| NESNA | Print | Date |

## EXHIBIT A

## TERMS AND CONDITIONS TO MANAGEMENT FEE ADVANCE REQUEST FORM

1. These terms and conditions ("Terms") are attached to the Management Fee Advance Request Form ("Form") and together the Terms and Form are henceforth referred to as the Management Fee Advance Agreement ("MFAA"). This MFAA is made a part of the Dealer Participation Agreement between Company and Dealer, including any amendments thereto (the "DPA"). Capitalized terms used but not defined in this MFAA are defined in the DPA.

2. In consideration of Dealer agreeing to actively promote and sell the Products selected as part of this MFAA (the "MFAA Products"), Company will collect a Management Fee from the Dealer to compensate Dealer and/or Alternate Payees (individually and collectively referred to herein as ("Payee") for administrative and marketing services provided in connection with the sale of such MFAA Products by Dealer. Dealer has requested an Advance of such Management Fee pursuant to this MFAA.

3. As of the Advance Effective Date, Company will charge the Dealer the Management Fee for each MFAA Product as set forth in the MFAA. At the time of sale, the applicable. Management Fee is added to the dealer net cost of each MFAA Product sold by Dealer. Dealer will be invoiced at the end of each month on its NVA or via ACH, as applicable, for dealer net cost plus applicable Management Fee for all MFAA Products sold that month. Company will distribute the Management Fee to the Payee as set forth in this MFAA. Dealer, for itself and for the Payee, agrees that the Management Fee shall compensate Payee for certain administrative and marketing services provided by Payee to the Dealer.

4. Dealer will pay to Company the Management Fee by the same procedure by which Dealer pays Company the dealer cost for each MFAA Product sold by Dealer, as such procedures may be modified from time to time by Company in its sole discretion.

5. In consideration of Dealer substantially exclusively selling the MFAA Products to customers in lieu of any competitive assurance products and such other consideration as set forth herein, Company agrees to advance to Dealer or Payee the Advance within fifteen (15) days after mutual execution of this MFAA; provided that, notwithstanding anything to the contrary, (x) for any Advance longer than twelve (12) months, Company shall be entitled to a fee which it may deduct from the Advance at such rate as set forth in Exhibit A-1 hereto and (y) if as of the Advance Effective Date (i) Dealer owes any amounts to Company from a prior advance or otherwise, as determined by Company in its sole discretion, then Company shall deduct such amounts from the Advance and (ii) Dealer has any excess earned Management Fees owed by Company to Dealer, as determined by Company in its sole discretion, then Company shall add such amounts to the Advance, in each case prior to making the Advance to Dealer or Payee and in such amounts determined by Company in its sole discretion. The Advance shall be repaid in full to Company on or before the last day of the Advance Term ("Advance Repayment Date"), or (b) the effective date of termination

3

DocuSign Envelope ID: 33FB02FD-F8BB-4D47-8937-0BB548828CC9

of this MFAA.

6. Until such time as the Advance has been repaid to Company in full, all Management Fees actually collected by Company hereunder on behalf of Payee will be applied by Company, as and when received, as a credit in repayment of the Advance. Once the Advance has been repaid to Company in full, Company will pay to Payee on a monthly basis, electronically or otherwise, the Management Fees thereafter actually collected on behalf of Payee. If the Advance is not repaid in full by the Advance Repayment Date or in the event any other sum becomes due to Company hereunder, Company shall be entitled to recover the unpaid balance of the Advance by (a) charging the Dealer's NVA or via ACH, as applicable, and/or (b) right of offset against any moneys Company or any Company affiliate thereof may owe or have custody of that is due Dealer.

7. Company will provide Dealer a month end report on the Management Fees actually collected hereunder, electronically, as soon as practicable after the end of each month. Until such time as the Advance has been repaid to Company in full, such report

   shall include an accounting of all credits to-date of collected Management Fees in repayment of the Advance.

8. Should Company receive any communication from any third party that questions, objects to or refuses to pay the Management Fee, Company shall direct the communication to Dealer for resolution. Company shall not be obligated to take any action with respect to third parties that question, object to or refuse to pay the Management Fee, and shall not otherwise have any obligation to Payee with respect thereto except as provided for in this section.

9. Dealer agrees to defend and hold harmless Company and its affiliates and their respective directors, officers, agents, shareholders and employees from and against any and all claims, demands, investigations, proceedings and actions, whether at law, equity or by any administrative body, and any and all liabilities, losses, damages or expenses resulting therefore, including court or arbitration costs and reasonable attorneys' fees, relating to or arising out of, or alleged to relate to or arise out of the Management Fee, including but not limited to (a) claims of any Dealer, its employees or affiliates, (b) claims for the payment of any taxes or other charges with respect to the collection of the Management Fee, and (c) claims by any regulatory agency or other third party. The obligations of this section shall survive the termination of this MFAA.

10. Company will evaluate Dealer performance throughout the Advance Term. Dealer authorizes Company to debit Dealer's NVA or ACH, as applicable, for the unearned portion of the Advance at any time at Company's discretion ("Advance Recovery").

11. Company will evaluate Dealer's performance at the end of each six-month allocation period (or partial allocation period if less than six months at the end of the Advance Term).

    a. Advance dollars are allocated equally by month across the Advance Term.

    b. If Dealer does not earn at least 75% of the Advance allocated for an allocation period or partial allocation period (the "Minimum Performance Objective"), as applicable, Company may initiate Advance Recovery on a graduated basis as provided in Table #1 below.

    c. If Dealer does not achieve the Minimum Performance Objective, Dealer will be subject to an Advance Recovery by Company. The entire Advance or a portion of the advance may be recovered. Dealer's NVA or ACH will be debited for the

4

Advance Recovery amount as determined using the following parameters:

**Table #1: Calculation of Advance Recovery**

| % Earned of Allocation Period | Advance Recovery Schedule |
|---|---|
| 75%+ | $0 |
| 50-74% | 50% of Unearned Advance Allocation |
| 25-49% | 100% of Unearned Advance Allocation |
| 0-24% | 100% of Total Unearned Advance |

d. If an Advance Recovery is issued, Dealer will have the opportunity to earn additional Management Fee Dollars for the balance of the Advance Term.

Case 2:24-cv-00063-AJC-DAN   Document 97-35   Filed 01/31/25   Page 7 of 49 PageID #: 3127

12. This MFAA shall continue in full force and effect from the Advance Effective Date unless earlier terminated as provided herein. Either party hereto may terminate this MFAA without cause, at any time upon thirty (30) days prior written notice, provided that Company shall promptly credit in repayment of the Advance or remit to Payee, as applicable, any Management Fees collected after any such termination.   If Dealer terminates this MFAA without cause, Dealer agrees to cause Payee to repay, or to repay on behalf of Payee, to Company the unearned portion of the Advance in full within thirty (30) days after giving Company notice of termination.  Company may also terminate this MFAA effective immediately upon written notice to Dealer should Company receive a notice from any governing agency to cease collection of the Management Fee. Company may further terminate this MFAA effective immediately upon the occurrence of any of the following events anytime during the Advance Term, as applicable, in which event any then unearned portion of the Advance shall immediately be repaid in full:

   a. Dealer's DPA with Company is terminated;

   b. Dealer fails, for any reason, to offer and sell all the MFAA Products as set forth in this MFAA;

   c. Dealer sells or offers to sell any product that is considered competitive with any of the  MFAA Products; or

   d. Dealer is in default under this MFAA, its DPA, or any other agreement with Company or any affiliate thereof.

   e. The obligations of this section shall survive the termination of this MFAA.

13. Each of the parties hereto warrants and represents that it has full right, power and authority to enter into this MFAA. Each of the parties hereto further warrants and represents that its entering into this MFAA shall not conflict with or violate any provision of any existing agreement it may have with any Dealer, employee, or other person or entity.

14. Dealer shall be solely responsible for its compliance and the compliance of the Payee with all applicable laws, regulations or other legal mandates relative to the Management Fee, including, without limitation, the payment of any taxes owing in connection with the collection of the Management Fee by Company and the remittance of the Management Fee to Payee, including but not limited to all tax laws.

15. All notices and correspondence pertaining to this MFAA will be issued pursuant to the Notice section of the DPA.

16. The parties acknowledge that this MFAA does not in any way create an agency relationship between them, and that Dealer is not an agent of Company its performance under this MFAA or in the sale of MFAA Products.

17. The DPA is incorporated herein by reference.  If there is a conflict with any of the terms and conditions of the DPA, the MFAA controls.

   By signing below, I acknowledge and agree to the terms of this Exhibit A to Management Fee Advance Agreement.

DocuSigned by:

*anthony leo*

**DEALER SIGNATURE**

6/18/2023

**DATE**

DocuSign Envelope ID: 33FB02FD-F8BB-4D47-8937-0BB548828CC9

**EXHIBIT A-1**

**Schedule of Fees**

| Advance Term | Fee |
|---|---|
| 0-17 months | 0% |
| 18-23 months | 1.5% |
| 24-29 months | 2.0% |
| 30-35 months | 2.5% |
| 36+ months | 3.0% |

DocuSign Envelope ID: 33FB02FD-F8BB-4D47-8937-0BB548828CC9

| DEALER AGREEMENT ("Agreement") | | |
|---|---|---|
| **Effective Date:** 06/15/2023 *(mm/dd/yyyy)* | **Dealer ID:** SA10084 | (assigned by NESNA) |
| **Corporate Name:** Sunrise | **State of Domicile:** Ny | |
| **DBA name, if any:** Sunrise | | |

This Agreement is between Nissan Extended Services North America, G.P., a Delaware general partnership, or Nissan Extended Services North America, Inc., a Delaware corporation, as applicable ("Company") with administrative offices at One Nissan Way, Franklin, TN 37067 and the entity named above ("Dealer").

WHEREAS, Company desires to offer certain automotive assurance programs ("Program I Programs") and products ("Product I Products") for sale by dealers that have entered into a Dealer Sales and Service Agreement ("DSSA") with Nissan North America, Inc. (the "Manufacturer") on the terms and conditions set forth herein; and

WHEREAS, Dealer desires to select Products from the Programs to sell to its customers; and

NOW THEREFORE, Company and Dealer ('the Parties') hereto agree as follows:

1. **DEALER OBLIGATIONS.**
   a. **AGREEMENT PERIOD.** This Agreement begins on the date indicated above and shall remain in effect until terminated as provided herein.
   b. **AUTHORIZATION.** Dealer certifies that it holds appropriate licenses and/or registrations required by state regulatory authorities to make auto installment sales, or provide leasing or leasing services, and is authorized to offer Programs to its consumers subject to the terms and conditions of this Agreement. Dealer shall only offer the Programs on the Program contracts approved and supplied by Company. Dealer is not authorized and is expressly forbidden, without the prior written approval of Company, to (i) incur any indebtedness or liability on behalf of Company; (ii) enter into any legal proceeding in connection with Company's business; (iii) obligate Company to any Program contract (iv) waive or modify any term, condition or limitation of any Program contract or any other Agreement under any Program, extend the time of payment or waive any payment under any Program contract, or bind Company in reinstatement of any canceled Program contract or (v) possess or exercise any authority on behalf of Company other than that expressly provided for in this Agreement. Dealer shall have no authority to adjudicate, authorize, settle, compromise, or pay any benefits under any Program contract.
   c. **ELIGIBILITY.** Dealer is responsible for marketing to eligible consumers only as specified in this agreement under Section 1.I. Dealer shall assist Company in resolving any discrepancies or errors which may occur in the administration of the Program(s).
   d. **PROGRAM COSTS AND FEES.** The Program costs and fees are contained in the rate chart(s) provided to the Dealer by Company on the Company Pricing Schedule(s) ("Pricing Schedule"). Program cost and fees include insurance premiums for the related insurance policy, if applicable, and administrative fees. Company may periodically adjust the Program cost and fees and any adjustment shall take effect following notice of Dealer or on the effective date shown on a new Pricing Schedule, as the case may be. Dealer shall be entitled to participate in additional Programs following notification of the Company and completion of required documentation.
   e. **REMITTANCE TO COMPANY.** Dealer is authorized to collect amounts due for Programs and shall hold amounts due Company in a fiduciary capacity as trustee for Company until remitted to and received by Company. Amounts owing to Company for all Program contracts issued during each calendar month shall be due on the payment due date stated in the Dealer's monthly Billing Statement (the "Billing Statement") posted on NESNA's Administration Platform or successor system ("PCRS"). Dealer authorizes the Company to debit the Dealer's non-vehicle account with the Manufacturer ("NVA") via Electronic Funds Transfer/Automated Clearing House ("ACH") for such amounts. Failure to remit a Program contract within sixty (60) days of its date of issue shall relieve the Company and any applicable insurer from any liability for amounts due Dealer under said Program contract unless such late Program contracts have been resubmitted in accordance with the instructions provided by Company. Any claims occurring after the remittance due date and before the date the Program contract(s) and payment are received by Company are the responsibility of Dealer and shall be reimbursed to Company within thirty (30) days of Dealer's receipt of Company's written request. Dealer agrees to pay all costs associated with collections, including attorney's fees, court costs and other related expenses or fees. At all times, Dealer shall be responsible for a complete accounting of any pre-printed Program contracts supplied by Company. Company is responsible for the monthly fees to maintain a Company sponsored e-menu (e.g. MaximTrak). Dealer is responsible for the monthly fee associated with dealer management system (DMS) integration unless otherwise agreed by the Company (e.g. through programs designed to assist dealers by subvening some or all of the costs of DMS integration).
   f. **PAYMENT OF MANAGEMENT FEES.** Dealer hereby authorizes Company to pay portions of the remittance amount for each Program contract as a management fee ("Management Fee"), if applicable, in the amounts and directly to the individuals or entities both as identified on the Management Fee Information Form attached to this Agreement. Company shall provide Dealer with statements in electronic form at the end of each month reflecting the Management Fees collected from the Dealer by Company on the Dealer's behalf and redistributed to the individuals or entities both as identified on the Management Fee Information Form. Dealer shall review all such statements and shall notify Company, in writing, of specific mistakes or discrepancies in the statement(s) within ninety (90) days after the date of the compensation shown in such statement(s). Dealer shall indemnify and hold Company harmless from any and all claims arising from such payments.
   g. **MANAGEMENT FEE ADVANCE.** In the event Dealer elects from time to time to accept an advance on Management Fees (each, a "Over-Remit Advance"), Company shall promptly, following the Advance Effective Date set forth in the related Management Fee Advance Request Form, pay Dealer the advance amount noted on the related Management Fee Advance Request Form, as adjusted in accordance with the terms and conditions thereof . In exchange for the Over-Remit Advance, Dealer agrees to sell, on an exclusive basis for the entire Term, assurance products selected by the Dealer on the Dealer Setup Form and such future assurance products issued by or on behalf of the Company as agreed by the Dealer in writing. Dealer agrees to be bound to all terms and conditions set forth in the Management Advance Request Forms.
   h. **REFUNDS.** Upon cancellation of any Program contracts during the reporting period, Company shall pay Dealer the unearned portion of the Program cost received by Company, less an administrative fee as associated with a consumer refund on a Program contract. For the purposes of making Dealer's customer (or its lender) whole, Dealer shall add to such amount paid by the Company the unearned portion of any fees, allowances, retail mark-upor compensation originally paid to any party. Dealer shall credit the unearned portion of the customer cost to the consumer's lender/lessor, if the customer cost was funded by such lender/lessor. If the customer cost was not funded by a lender/lessor, or the loan/lease was paid in full and such proof was provided to Dealer by the consumer, the refund shall be payable directly to the consumer. Refunds

must be paid to the appropriate party as indicated above within thirty (30) days of the refund request or sooner if mandated by law. In the event that Company pays the Program contract holder or lienholder the full calculated refund amount Dealer will be responsible for reimbursing Company Dealer's prorated chargeback portion, plus expenses, within thirty (30) days of receipt of written notice from Company. Dealer shall remain responsible to the Company for all refunds and collections associated with unearned or refunded Management Fees paid, regardless of the individual or entity paid. If the refund is not paid timely by Dealer as outlined in this Agreement or by the laws of the state, Dealer is responsible for all penalties or costs due under the Program contract(s). In the event that this Agreement is terminated, Dealer's obligation to refund its portion of any Program cost refunded for which it received compensation shall survive the termination of this Agreement. For business processed electronically, cancellation refunds processed may be netted as reflected in the Dealer's monthly Billing Statement.

i.   **OFFSET.** Company reserves the right to offset any amounts due to or from Dealer under this or any other agreements Dealer may have from time to time with Company or its affiliates. The foregoing shall survive the expiration or earlier termination of this Agreement.

j.   **KEEPING OF RECORDS.** Dealer agrees to maintain accurate and complete records relating to its obligations under this Agreement and to make such records available for inspection by Company or its representatives at any time during normal business hours. Related records may include but are not limited to vehicle transaction records, buyer orders, odometer statements, transaction receipts, vehicle inspection forms, and service history records, as may be required by a particular Program or Product. Dealer shall assist Company in resolving any discrepancies or errors that may occur. Records shall be kept for seven (7) years after all obligations under the Program contract(s) have expired.

k.   **MATERIALS.** Dealer shall not create, distribute, or use any marketing, sales, or administrative materials, regarding Company's Programs or containing Company's name, or the name of its parent or any of its affiliates, trade names, or logos, without prior written approval from Company. Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject Company to liability or loss of goodwill; may damage the reputation of Company or Company's customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company's standards of good taste and honest dealing; or may be detrimental to the business interests of Company. Dealer shall maintain in a secure and safe place, and upon request, shall account for all the supplies and materials furnished by Company to Dealer with respect to this Agreement. Dealer shall return the supplies and materials immediately and in no event later than five (5) days of Company's request if this Agreement is terminated

l.   **DIRECT SALES.** Dealer shall sell Program contract(s) only through in-dealership, customer face-to-face methods. Dealer may not conduct sales via the internet or make Program or Product prices available on the internet. Dealer may, however, promote awareness of Program contracts on its dealership website.

m.   **PROCEDURES.** Dealer will follow the instructions and procedures regarding the offering of Program contracts, remittance processes, and claims procedures and any instructional materials provided by Company including any and all additions, deletions, amendments or alterations approved by Company. Dealer further agrees to comply with all applicable laws and regulations and to be bound by all Program Rules, Pricing Schedules, Assurance Products Resource Manual(s), bulletins, field letters, forms, communications and similar documentation issued by the Company, including all amendments, revisions or replacements thereto (collectively, and as the same may be amended or replaced from time to time, the "Ancillary Documents") now in force and such as may be hereafter adopted. Dealer shall not engage in unlawful discrimination, misrepresentation of, or any unfair trade practice pertaining to the Program contract(s) that is prohibited by law. Dealer agrees to provide full disclosure to the Program contract purchaser of all provisions of the Program contract before procuring the purchaser's signature on the Program contract. Dealer shall not negotiate or endorse any check or other negotiable instrument made payable to Company. While this Agreement is in force, or at any time thereafter, Dealer shall not induce the lapse, cancellation, or termination of any Program contract. For Products that require installation or application of components obtained from a third party vendor (e.g. theft deterrent systems, appearance protection plans) Dealer agrees to use only third party vendors approved by Company, and to only offer the Product on vehicles where the components are installed in accordance with the instructions provided by the third party vendor. Dealer agrees, when applicable, to permit vendor's service technicians designated by Company to conduct repairs at Dealer's location pursuant to the Program contracts issued by the Dealer's Dealer. Dealer is not liable for any damages or injuries caused by service technicians designated by Company unless damage or injury was sustained as a direct or in direct result of Dealer's actions.

n.   **INDEMNIFICATION.** Dealer agrees to indemnify, defend (with counsel acceptable to Company) and hold Company harmless from all demands, claims, liabilities, damages, losses, judgments, and expenses (including attorney's fees), arising out of or caused by Dealer's (including its employees or its assignees) failure to comply with all applicable laws and regulations or acts or omissions of Dealer or its employees with respect to the offering or administration of the Program(s), including but not limited to the failure of Dealer to follow Company's procedures and instructions or to comply with the terms of this Agreement, and any claim arising between Dealer and Manufacturer. The foregoing provisions shall survive the expiration or earlier termination of this Agreement.

o.   **REGULATORY INQUIRIES.** In the event Company receives any inquiry or notification of charges from a regulatory agency regarding Program contract(s), Dealer shall promptly provide to Company information and records requested by Company regarding the inquiry. In the event Dealer receives any inquiry or notification of charges from a regulatory agency, Dealer shall immediately provide such inquiry to Company, provide any information and records requested by Company regarding the inquiry, and timely respond to each inquiry after Company reviews such response.

2.  **COMPANY'S OBLIGATIONS.**

a.   **ADMINISTRATION.** Company shall be responsible for acceptance or rejection of new Program contracts, cancellation and transfer processing, claim authorization and payments, and provision of supplies such as forms, brochures, and marketing materials as needed for the sale of Program contracts.

b.   **CLAIMS.** Company shall process requests for benefit upon receipt of complete documentation for a benefit request under any Program contract. Company shall not be responsible for processing any benefit request not covered under the Program contract, not reported to Company as provided herein, or for any Program contract for which Company has not received payment as provided herein. Any improper claim for benefit under the applicable Program contract if any, may be denied by Company and such claim for benefit will be the sole responsibility of Dealer.

c.   **INELIGIBLE PROGRAM CONTRACT SALES.** Company shall not have any liability or administrative obligations for Program contract(s) sold or marketed in violation of this Agreement, Program contract terms or any law, regulation or administrative ruling. If Company pays a claim and subsequently determines that the Program contract was sold or marketed in violation of this Agreement, the Program contract terms, or any law, regulation or administrative ruling, Dealer shall reimburse the cost of all claims paid and costs incurred by Company prior to the Program contract's termination within thirty (30) days of Dealer's receipt of Company's written request.

d.   **COOPERATION.** Subject to the terms of this Agreement, Company agrees to cooperate fully with Dealer and to render all assistance reasonably necessary in order to enable Dealer to carry out its obligations hereunder. All administrative forms relating to this Agreement, including Program contract forms, and marketing materials, reasonably necessary for Dealer to conduct the business of entering into Program contract(s) hereunder,

shall be furnished by Company.

e.  **MAINTAIN PHONE NUMBER.** Company shall make available a toll free telephone number to enable consumers to contact Company.

3.  **CONFIDENTIAL INFORMATION.**

   a.  Each party hereto acknowledges that in the course of performing its obligations under this Agreement, it may receive or have access to information which is confidential or proprietary to the other party or its affiliates, including, but not limited to, rates, pricing, training, Program/Product materials, non-public personal information about customers or other information ("Confidential Information"). The receiving party shall not, without the prior written consent of disclosing party, disclose any Confidential Information to any third party for a period of ten (10) years from and after the expiration or earlier termination of this Agreement, except to receiving party's employees and its affiliates' employees who are under the same level of confidentiality protection as the receiving party.

   b.  Confidential Information shall not include any information that (i) is or subsequently becomes publicly available without receiving party's breach of any obligation owed to disclosing party; (ii) became known to receiving party prior to disclosing party's disclosure of such information to receiving party; (iii) became known to receiving party from a source other than disclosing party other than by the breach of an obligation of confidentiality owed to disclosing party; or (iv) is independently developed by receiving party.

   c.  Receiving party acknowledges that it has received, may receive, or may have access to consumer, customer or individual information ("Private Information"), which information may be subject to the protections of federal, state and/or local privacy, safeguards or information security laws, and receiving party further agrees, warrants and represents that it will comply with requirements imposed by these laws, including financial privacy laws.

4.  **TERMINATION.**

   a.  This Agreement may be terminated at will at any time by either Party with sixty (60) days written notice to the other.

   b.  Company may terminate this Agreement immediately, without written notice, upon Dealer's act of fraud, malfeasance, misappropriation, withholding or non-payment of amounts due, willful neglect of any duty or obligation hereunder, including non-conformance with Company's Dealer eligibility requirements, or violation of this Agreement or applicable laws, regulations or administrative rulings.

   c.  This Agreement shall automatically terminate without prior notice, upon (i) the dissolution of Dealer's partnership, LLC, or corporation, as the case may be, (ii) Dealer's invoking, or having invoked against it, any form of federal bankruptcy jurisdiction or state jurisdiction for receivership, liquidation, or conservatorship, or (iii) Dealer becomes or is declared insolvent according to any law.

   d.  This agreement shall automatically terminate upon termination of the DSSA between Dealer and Manufacturer.

   e.  In the event that this Agreement is terminated as provided herein, Dealer shall promptly forward to such person as Company shall designate in writing, (i) all Program contract forms, administrative forms and other written materials supplied by Company to Dealer pursuant to this Agreement other than executed forms of Program contracts then in effect (ii) all other written materials in the possession or control of Dealer, which contain the name, logo service mark, trade name or trade mark which is created by or on behalf of Company to market or administer the Programs (including, without limitation, all stationery and advertisement) and (iii) all duplicate copies of any of the above forms and materials in the possessions or control of Dealer.

   f.  Termination shall not affect the rights or duties of either Party with respect to the Program contracts issued prior to the termination date of this Agreement.

   g.  Dealer shall continue to be liable for its portion of any refund of Program cost, Management Fees, or any retail mark-up or other fees on Program contracts still in force after the termination of this Agreement and charge backs for canceled Program contracts. Any amounts subject to future cancellations will be collected by Company at the time of Dealer termination or buy/sell. Company will recover the pro-rata portion of any applicable Management Fee or any retail mark-up or other fees from Dealer in order to reimburse the customer the retail amount of any refund due to a Program contract cancellation after Dealer's termination. Dealer's active Program contract dollar portfolio will be determined as of the last full month-end prior to the Dealer termination date. Company reserves the right to do a one-time lump sum charge back at the time of Dealer termination or buy/sell which will show as a debit to the outgoing Dealer's final statement (NVA) for the following recoveries:

       Unearned Advances:

       (i)  Over-Remit Advance Recovery Amount = Outstanding Over-Remit Advance – aggregate Management Fees paid by Dealer to NESNA as of termination date

       Ongoing Cancellations:

       (i)  Management Fee Recovery Amount = The Management Fee portion of active Program contract dollar portfolio x cancellation %

       (ii)  Mark-Up Recovery Amount = Retail markup on active Program contract dollar portfolio x cancellation %

5.  **DEALER DEFECTION.**

   A "Defecting Dealer" means a Dealer in run-off status (defined as net sales dollars less than or equal to zero due to ongoing cancellations of their active Program contracts as reported in PCRS) that continues to be a party to a DSSA with the Manufacturer. A Dealer Defection shall not affect the rights or duties of either Party with respect to the Program contracts issued prior to the Dealer Defection. A Defecting Dealer shall continue to be liable for its portion of any refund of Program cost, Management Fees, retail mark-up or any other fees on Program contracts still in force and charge backs for canceled Program contracts. Any amounts subject to future cancellations will be collected by Company at the time of Dealer defection. Company will recover the pro-rata portion of the Management Fee in order to reimburse the customer the retail amount of any refund due to a Program contract cancellation after Dealer defection. Any applicable Management Fee or any retail mark-up or other fees will continue to be processed as a credit or debit as applicable to the Dealer's NVA as long as Dealer has an active DSSA with the Manufacturer. Defecting Dealer's active Program contract dollar portfolio will be determined as of the last full month-end prior to such determination date. Company reserves the right to do a one-time lump sum charge back at the time of determination of defecting status which will show as a debit to the NVA of Defecting Dealer's (or affiliate's) statement for the following recoveries:

       Unearned Advances:

       (i)  Over-Remit Advance Recovery Amount = Outstanding Over-Remit Advance – aggregate Management Fees paid by Dealer to NESNA as of determination date

       Ongoing Cancellations:

       (ii)  Management Fee Recovery Amount = Active Program contract dollar portfolio x Management Fee rebate % x cancellation %

6.  **SERVICE MARK AND TRADE NAME PROTECTION.**

   a.  Dealer agrees to cooperate fully in the quality control program conducted by Company relating to the use of all service marks and trade names

used in connection with the Program and the nature and quality of services rendered and goods distributed under such service marks and trade names, including but not limited to brand awareness training and periodic re-certification. Dealer agrees to ensure that all finance & insurance staff selling Company's Programs have completed brand awareness training and required re-certifications. Company will have the right to specify, delineate, or limit the services or goods in connection with which Dealer may use any of such service marks or trade names. In the event that the nature of the quality of the services or goods in connection with which Dealer uses any of such service marks or trade names is not acceptable to Company, Company will have the right to require Dealer to institute appropriate procedures to correct any deficiencies noted by Company.

b. Dealer agrees, at the request and expense of Company, to assist Company in protecting and enforcing the rights of Company in and to any and all of the service marks and trade names which Dealer may then be using.

c. Dealer will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names Company authorizes the Dealer to use in the performance of this Agreement, except as permitted in Section 6.b.

7. **MISCELLANEOUS.**

a. **NOTICES.** Any notice or other communication required shall be sent electronically or in writing and sent via United States Postal Service registered, or certified mail, postage prepaid, return receipt requested; or by a nationally recognized delivery service, addressed to the party to be notified at its address specified herein, or in the event of a change in address, to the address on file with Company.

b. **ASSIGNMENT.** Dealer shall not assign or transfer any rights or benefit under this Agreement, either in whole or in part without the prior written consent of Company. Subject to the foregoing, this Agreement shall be binding upon and shall insure to the benefit of and shall be enforceable by the heirs, legal representatives, successors and assignees of the parties hereto.

c. **SEVERABILITY.** If any term or condition of this Agreement, or the application of such term or condition, shall be found by a court of competent jurisdiction to be, to any extent, invalid or unenforceable, the remainder of this Agreement and the application of all other terms and conditions shall be valid to the fullest extent permitted by law.

d. **EXPENSES.** Company shall not be liable for any expense of Dealer, including without limitation, the cost of any rentals, transportation, postage, other advertising, employee costs, local license fees, or sales taxes.

e. **WAIVER OR MODIFICATION.** No forbearance, neglect or other failure of either Party to enforce or require strict compliance with any term and/or condition of this Agreement or to exercise any right of termination shall, constitute a waiver of any such term, condition or right, nor shall it constitute a waiver of any other term, condition or right. No waiver, amendment or modification of this Agreement shall be valid unless made in a written instrument executed by both parties hereto.

f. **ENTIRE AGREEMENT; AMENDMENTS.** This Agreement, the attachments hereto, and all Ancillary Documents shall constitute the entire Agreement by, of and between the Parties. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall be deemed to be the original. However, Company reserves the right to amend or supplement this Agreement and any Ancillary Document by amendment, field bulletin, letter, email, publication on a website maintained by Company for dealers, or other appropriate official written communication. In the event of any conflict between the terms of any Ancillary Document and this Agreement, the terms of such Ancillary Document shall control. Dealer's continuing relationship with Company hereunder after transmission by Company of such official written communication shall conclusively constitute assent thereto.

g. **CERTIFICATIONS.** Dealer certifies that it has not previously been terminated by Manufacturer. Dealer represents and warrants that it shall not place a Program contract on a self-financed loan. "Self-financed" means a loan/lease that is arranged and self-funded by an automobile dealership.

h. **CANCELLATION OF DIVIDEND PROGRAM.** Dealer hereby acknowledges and agrees that the Company's Dividend Program will be/was terminated as of October 1, 2022 and any outstanding Advance Dividend Agreement between Dealer and Company is hereby terminated, effective as of October 1, 2022, subject to any net payments owed to or from Company in accordance with the terms and conditions of any Management Fee Advance Request Form.

8. **JURISDICTION; VENUE; ATTORNEYS FEES.**

a. The validity, interpretation and construction of this Agreement, and all other matters related to this Agreement, will be governed and interpreted by the laws of the State of Tennessee. Any action brought to enforce this Agreement shall be brought in state court in Williamson County, Tennessee or federal court as provided below. Contractor consents to the exclusive jurisdiction of the appropriate state court in Williamson County, Tennessee or, if original jurisdiction can be established, in the federal court in the U.S. District Court for the Middle District of Tennessee in connection with any action arising out of this Agreement.

b. Should either party institute or participate in a legal or equitable proceeding against the other to enforce or interpret this Agreement, the non-prevailing party shall pay the prevailing party's costs, expert and professional fees, attorneys' fees, including in-house counsel expenses, and all other costs incurred by the prevailing party in preparation for the proceeding.

The person who signs this Agreement as or on behalf of Dealer represents and warrants that he or she has authority to execute this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as shown below.

| Sunrise | "Company" |
|---|---|
| DEALER CORPORATE NAME | ADMINISTRATOR NAME |
| | President |
| DBA (if applicable) | TITLE (Sr. Manager/Director) |
| *anthony deo*     6/18/2023 | *Jack Crowley*     6/26/2023 |
| SIGNATURE    DATE | SIGNATURE    DATE |
| anthony deo     COO     6/18/2023 | Jack Crowley |
| PRINT NAME AND TITLE    DATE | PRINT NAME |

| **PERSONAL GUARANTY** | | |
|---|---|---|
| Effective Date: 6/15/2023 | Guarantor: anthony deo | |
| Corporate Name ("Dealer"): Sunrise | DBA name, if any: | Dealer ID: (assigned by NESNA) SA10084 |

THIS **PERSONAL GUARANTY** ("Guaranty") is given as of the Effective Date, by    Guarantor to induce Nissan Extended Services North America, G.P., a Delaware general partnership ("NESNA") to advance funds to Dealer as more particularly provided below.

WHEREAS, as of the Effective Date, NESNA and Dealer entered or are entering into a Dealer Participation Agreement (as amended, restated or modified from time to time, the "Agreement");

WHEREAS, the Agreement provides for NESNA to advance to Dealer certain amounts in connection with Dealer's authorized marketing and sale of various assurance products;

WHEREAS, Guarantor desires NESNA to advance sums to Dealer pursuant to the Agreement; and

WHEREAS, as a condition to NESNA's willingness to enter into the Agreement with Dealer, NESNA requires thatGuarantor guaranty the payment and other obligations of Dealer under the Agreement, if applicable, or any future agreements between Dealer and NESNA wherein NESNA advances funds to Dealer ("Future Agreements") (collectively the Agreement and the Future Agreements are herein referred to as the "Dealer Agreements"), and Guarantor has agreed to do so.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows:

Guarantor unconditionally guarantees to NESNA the prompt payment of any and all sums due NESNA by Dealer under the terms of the Dealer Agreements, and further agrees to indemnify and hold NESNA harmless of and from any and all wrongful acts or conduct of Dealer or Dealer's employees or agents, including all costs, expenses and attorney's fees incurred  by  NESNA  in  collection of any sums due NESNA  by Dealer  under the terms of the Dealer  Agreements,  or incurred by NESNA in connection with any default of Dealer of the terms and conditions of the Dealer Agreements. It is specifically agreed that this is an absolute and continuing guaranty and shall extend to and cover any and all forms of indebtedness and liability on the part of Dealer  to NESNA incurred subject to, as a result of, or as a part of the Dealer Agreements and shall not be limited to any amount whatsoever.

It is specifically understood and agreed that at the option of NESNA, Guarantor may be joined in any action, suit or proceeding commenced by NESNA against Dealer in connection with or based upon any default of Dealer in the terms, conditions and covenants of the Dealer Agreements and recovery may be had against Guarantor in any such action, suit or proceeding, or in any independent action, suit or proceeding against Guarantor, and without the  requirement that  NESNA first assert, prosecute or pursue any remedy or claim that it might have against Dealer.

Any sum due by Dealer under the terms of the Dealer Agreements  shall, if not promptly paid by Dealer,  be paid  by  Guarantor within fifteen (15) days of notice by NESNA to Guarantor. Such payment shall be made at NESNA's office at One Nissan Way, Mail Stop: 06-216, Franklin, Tennessee 37067, Attn: NESNA Controller. Such address shall also be NESNA's address for the purpose of Guarantor giving NESNA notice hereunder.

The obligations of Guarantor under this Guaranty shall be continuing,  absolute and unconditional under any and all circumstances and shall be paid by Guarantor regardless of (a) the validity, regularity, legality or enforceability of any of the liabilities or any collateral security or guaranty therefor; (b) any defense, offset or counterclaim which may at any time be available to or be asserted by Dealer or Guarantor or any other guarantor against NESNA; or (c) any other event or circumstance whatsoever which may constitute an equitable or legal discharge of a surety or a guarantor, it being the purpose and intent of the Guarantor that this Guaranty and the Guarantor's obligations hereunder shall remain in full force and  effect and  be binding upon  Guarantorand Guarantor's successors until the liability and the obligations of Guarantor under this Guaranty shall have been satisfied by payment in full.

Guarantor hereby waives all Guarantor's rights of subrogation and reimbursement and any other related rights  and defenses available to Guarantor under any applicable law or otherwise, including (a) any defenses Guarantor may have to the obligations under the Guaranty by reason of an election of remedies by NESNA and (b) any rights or defenses Guarantor may have by reason of protection afforded to Dealer with respect to the liabilities guaranteed by the Guaranty pursuant to any laws of or any other jurisdiction limiting or discharging Dealer's indebtedness.

Guarantor agrees that, at any time, without the need to reserve rights against Guarantor and without notice to or further approval of Guarantor, and without in any way affecting the obligations of Guarantor hereunder or limiting the rights of NESNA at law or in equity, NESNA may (i) amend, renew or extend the terms of the Dealer Agreements, including the amount and timing of payment or performance of any of Dealer's obligations thereunder, (ii) accept partial payments from Dealer thereunder, (iii) release, terminate, waive, abandon, compromise or subordinate the liabilities, in whole or in part; (iv) receive and hold additional security for or guaranties of Dealer's obligations; (v) release or agree not to sue, in whole or in part, Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the liabilities; or (vi) accelerate, compromise, settle, compound, sue for, or collect, either in whole or in part, any of the liabilities, any of the terms thereof, or any agreement, covenant, condition, or obligation of or with Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the obligations guaranteed hereby.

Neither this Guaranty nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by NESNA. This Guaranty shall be binding upon and inure to the benefit of NESNA and its successors and assigns. This Guaranty may not be assigned in whole or in part by Guarantor. NESNA may assign its rights hereunder, in whole or in part, at any time without the consent of Guarantor.

The failure or refusal by NESNA to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by NESNA.

This Guaranty shall not be deemed to give any right or remedy to any third party whatsoever unless otherwise specifically granted hereunder.

This Guaranty constitutes the entire agreement of Guarantor with respect to the subject matter hereof and supersedes all prior agreements by Guarantor with respect to such subject matter, and no waivers or modifications shall be valid unless duly approved in writing by NESNA.

If any provision of this Guaranty shall be held for any reason to be invalid, illegal or unenforceable, such impairment shall not affect any other provision of this Guaranty.

This Guaranty may only be terminated with the express written consent of NESNA.

Guarantor  specifically understands and agrees that this Guaranty is subject to the jurisdiction of and shall be construed and controlled by the laws of the state of Tennessee. Any action arising from this Guaranty shall be brought in the state courts in Williamson County, Tennessee. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS BETWEEN GUARANTOR AND NESNA OR DEALER AND NESNA OR THE TRANSACTIONS RELATED THERETO.

In the event of any action or proceeding commenced by NESNA to enforce the terms of this Guaranty, Guarantor agrees to pay NESNA all expenses incurred by NESNA relative to such action or proceeding, including, but not limited to, court costs plus reasonable attorneys' fees.

Any notices from NESNA to Guarantor shall be in writing and shall be deemed given (i) when delivered in person to Guarantor or (ii) upon 2 business days after being placed in the U.S. mail addressed to Guarantor at its address set forth below, or (iii) upon delivery by an express courier service to Guarantor's address set for the below. Any notices from Guarantor to NESNA shall be in writing and shall be deemed given (i) upon 2 business days after being placed in the U.S. mail addressed to NESNA at its address set forth above, or (ii) upon delivery by an express courier service to NESNA's address set for the below. Guarantor and NESNA may each change its address for notice purposes by giving notice to the other as provided for above.

This Guaranty may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this Guaranty if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.

**GUARANTOR**:

Signature _anthony deo_                                  Date: 6/18/2023

Name: _anthony deo_

Address: 180 Michael drive

11791

**QualityGuard+Plus**®

# QUALITYGUARD+PLUS
# MANAGEMENT FEE
# ADVANCE REQUEST FORM

| | |
|---|---|
| **Dealer Participation Agreement Date:** 10/01/2022 | |
| **Dealer Name:** Northshore Motors | **NNA Dealer #:** SA10073 |
| **Advance Effective Date (MM/YY)** 10/22 | **Advance Term (months):** 24 |

| **1. ADVANCE PAYMENT OPTION: Use whole numbers (i.e. no decimal points).** | |
|---|---|
| QualityGuard+Plus Contract Volume | 1,200 |
| Management Fee amount per contract ($) | $ 500 |
| **Total Over-Remit Advance Request**      * Netting Out balance of current advance. | **$ 600,000** |

| **2. ALTERNATE PAYEE OPTION (up to 4): Use whole percentage numbers (i.e. 10% not 9.9%).** | |
|---|---|
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |

**By signing below, I agree to the terms and conditions set forth on Exhibit A to this Management Fee Advance Request Form and the Dealer Participation Agreement as incorporated by reference herein. This Management Fee Advance Agreement ("MFAA") may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this MFAA if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.**

| | | |
|---|---|---|
| *anthony deo* | anthony deo | 10/20/2022 |
| Dealer Signature | Print | Date |
| *Lisa Cicchini* | Lisa Cicchini | 10/20/2022 |
| Regional Financial Services Manager | Print | Date |
| *Jack Crowley* | Jack Crowley | 11/28/2022 |
| NESNA Sr. Manager or Director | Print | Date |
| | | |
| NESNA | Print | Date |

Case 2:24-cv-06003-ALC-JMW   Document 61-25   Filed 02/21/25   Page 16 of 49 PageID #: XXXX

**EXHIBIT A**

**TERMS AND CONDITIONS TO MANAGEMENT FEE ADVANCE REQUEST FORM**

1. These terms and conditions ("Terms") are attached to the Management Fee Advance Request Form ("Form") and together the Terms and Form are henceforth referred to as the Management Fee Advance Agreement ("MFAA"). This MFAA is made a part of the Dealer Participation Agreement between Company and Dealer, including any amendments thereto (the "DPA"). Capitalized terms used but not defined in this MFAA are defined in the DPA.

2. In consideration of Dealer agreeing to actively promote and sell the Products selected as part of this MFAA (the "MFAA Products"), Company will collect a Management Fee from the Dealer to compensate Dealer and/or Alternate Payees (individually and collectively referred to herein as ("Payee") for administrative and marketing services provided in connection with the sale of such MFAA Products by Dealer. Dealer has requested an Advance of such Management Fee pursuant to this MFAA.

3. As of the Advance Effective Date, Company will charge the Dealer the Management Fee for each MFAA Product as set forth in the MFAA. At the time of sale, the applicable Management Fee is added to the dealer net cost of each MFAA Product sold by Dealer. Dealer will be invoiced at the end of each month on its NVA or via ACH, as applicable, for dealer net cost plus applicable Management Fee for all MFAA Products sold that month. Company will distribute the Management Fee to the Payee as set forth in this MFAA. Dealer, for itself and for the Payee, agrees that the Management Fee shall compensate Payee for certain administrative and marketing services provided by Payee to the Dealer.

4. Dealer will pay to Company the Management Fee by the same procedure by which Dealer pays Company the dealer cost for each MFAA Product sold by Dealer, as such procedures may be modified from time to time by Company in its sole discretion.

5. In consideration of Dealer substantially exclusively selling the MFAA Products to customers in lieu of any competitive assurance products and such other consideration as set forth herein, Company agrees to advance to Payee the Advance within seven (7) days after mutual execution of this MFAA. The Advance shall be repaid in full to Company on or before the last day of the Advance Term ("Advance Repayment Date"), or (b) the effective date of termination of this MFAA.

6. Until such time as the Advance has been repaid to Company in full, all Management Fees actually collected by Company hereunder on behalf of Payee will be applied by Company, as and when received, as a credit in repayment of the Advance. Once the Advance has been repaid to Company in full, Company will pay to Payee on a monthly basis, electronically or otherwise, the Management Fees thereafter actually collected on behalf of Payee. If the Advance is not repaid in full by the Advance Repayment Date or in the event any other sum becomes due to Company hereunder, Company shall be entitled to recover the unpaid balance of the Advance by (a) charging the Dealer's NVA or via ACH, as applicable, and/or (b) right of offset against any moneys Company or any Company affiliate thereof may owe or have custody of that is due Dealer.

7. Company will provide Dealer a month end report on the Management Fees actually collected hereunder, electronically, as soon as practicable after the end of each month. Until such time as the Advance has been repaid to Company in full, such report shall include an accounting of all credits to-date of collected Management Fees in repayment of the Advance.

8. Should Company receive any communication from any third party that questions, objects to or refuses to pay the Management Fee, Company shall direct the communication to Dealer for resolution. Company shall not be obligated to take any action with respect to third parties that question, object

to or refuse to pay the Management Fee, and shall not otherwise have any obligation to Payee with respect thereto except as provided for in this section.

9. Dealer agrees to defend and hold harmless Company and its affiliates and their respective directors, officers, agents, shareholders and employees from and against any and all claims, demands, investigations, proceedings and actions, whether at law, equity or by any administrative body, and any and all liabilities, losses, damages or expenses resulting therefore, including court or arbitration costs and reasonable attorneys' fees, relating to or arising out of, or alleged to relate to or arise out of the Management Fee, including but not limited to (a) claims of any Dealer, its employees or affiliates, (b) claims for the payment of any taxes or other charges with respect to the collection of the Management Fee, and (c) claims by any regulatory agency or other third party. The obligations of this section shall survive the termination of this MFAA.

10. Company will evaluate Dealer performance throughout the Advance Term. Dealer authorizes Company to debit Dealer's NVA or ACH, as applicable, for the unearned portion of the Advance at any time at Company's discretion ("Advance Recovery").

11. Company will evaluate Dealer's performance at the end of each six-month allocation period (or partial allocation period if less than six months at the end of the Advance Term).

   a. Advance dollars are allocated equally by month across the Advance Term.

   b. If Dealer does not earn at least 75% of the Advance allocated for an allocation period or partial allocation period (the "Minimum Performance Objective"), as applicable, Company may initiate Advance Recovery on a graduated basis as provided in Table #1 below.

   c. If Dealer does not achieve the Minimum Performance Objective, Dealer will be subject to an Advance Recovery by Company. The entire Advance or a portion of the advance may be recovered. Dealer's NVA or ACH will be debited for the Advance Recovery amount as determined using the following parameters:

   **Table #1: Calculation of Advance Recovery**

   | % Earned of Allocation Period | Advance Recovery Schedule |
   |---|---|
   | 75%+ | $0 |
   | 50-74% | 50% of Unearned Advance Allocation |
   | 25-49% | 100% of Unearned Advance Allocation |
   | 0-24% | 100% of Total Unearned Advance |

   d. If an Advance Recovery is issued, Dealer will have the opportunity to earn additional Management Fee Dollars for the balance of the Advance Term.

12. This MFAA shall continue in full force and effect from the Advance Effective Date unless earlier terminated as provided herein. Either party hereto may terminate this MFAA without cause, at any time upon thirty (30) days prior written notice, provided that Company shall promptly credit in repayment of the Advance or remit to Payee, as applicable, any Management Fees collected after any such termination. If Dealer terminates this MFAA without cause, Dealer agrees to cause Payee to repay to Company the unearned portion of the Advance in full within thirty (30) days after giving Company notice of termination. Company may also terminate this MFAA effective immediately upon written notice to Dealer should Company receive a notice from any governing agency to cease collection of the Management Fee. Company may further terminate this MFAA effective immediately

upon the occurrence of any of the following events anytime during the Advance Term, as applicable, in which event any then unearned portion of the Advance shall immediately be repaid in full:

    d. Dealer's DPA with Company is terminated;

    e. Dealer fails, for any reason, to offer and sell all the MFAA Products as set forth in this MFAA;

    f. Dealer sells or offers to sell any product that is considered competitive with any of the MFAA Products; or

    g. Dealer is in default under this MFAA, its DPA, or any other agreement with Company or any affiliate thereof.

The obligations of this section shall survive the termination of this MFAA.

13. Each of the parties hereto warrants and represents that it has full right, power and authority to enter into this MFAA. Each of the parties hereto further warrants and represents that its entering into this MFAA shall not conflict with or violate any provision of any existing agreement it may have with any Dealer, employee, or other person or entity.

14. Dealer shall be solely responsible for its compliance and the compliance of the Payee with all applicable laws, regulations or other legal mandates relative to the Management Fee, including, without limitation, the payment of any taxes owing in connection with the collection of the Management Fee by Company and the remittance of the Management Fee to Payee, including but not limited to all tax laws.

15. All notices and correspondence pertaining to this MFAA will be issued pursuant to the Notice section of the DPA.

16. The parties acknowledge that this MFAA does not in any way create an agency relationship between them, and that Dealer is not an agent of Company its performance under this MFAA or in the sale of MFAA Products.

17. The DPA is incorporated herein by reference. If there is a conflict with any of the terms and conditions of the DPA, the MFAA controls.

Case 3:24-cv-00600-KAC-JEM   Document 67-19   Filed 01/31/25   Page 19 of 49 PageID #: 2160

| PERSONAL GUARANTY | | |
|---|---|---|
| Effective Date: 10/1/2022 | Guarantor: ANTHONY DEO | |
| Corporate Name ("Dealer"): NORTHSHORE MOTORS | DBA name, if any: | Dealer ID: (assigned by NESNA) SA10073 |

THIS **PERSONAL GUARANTY** ("Guaranty") is given as of the Effective Date, by Guarantor to induce Nissan Extended Services North America, G.P., a Delaware general partnership ("NESNA") to advance funds to Dealer as more particularly provided below.

WHEREAS, as of the Effective Date, NESNA and Dealer entered or are entering into a Dealer Participation Agreement (as amended, restated or modified from time to time, the "Agreement");

WHEREAS, the Agreement provides for NESNA to advance to Dealer certain amounts in connection with Dealer's authorized marketing and sale of various assurance products;

WHEREAS, Guarantor desires NESNA to advance sums to Dealer pursuant to the Agreement; and

WHEREAS, as a condition to NESNA's willingness to enter into the Agreement with Dealer, NESNA requires that Guarantor guaranty the payment and other obligations of Dealer under the Agreement, if applicable, or any future agreements between Dealer and NESNA wherein NESNA advances funds to Dealer ("Future Agreements") (collectively the Agreement and the Future Agreements are herein referrred to as the "Dealer Agreements"), and Guarantor has agreed to do so.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows:

Guarantor unconditionally guarantees to NESNA the prompt payment of any and all sums due NESNA by Dealer under the terms of the Dealer Agreements, and further agrees to indemnify and hold NESNA harmless of and from any and all wrongful acts or conduct of Dealer or Dealer's employees or agents, including all costs, expenses and attorney's fees incurred by NESNA in collection of any sums due NESNA by Dealer under the terms of the Dealer Agreements, or incurred by NESNA in connection with any default of Dealer of the terms and conditions of the Dealer Agreements. It is specifically agreed that this is an absolute and continuing guaranty and shall extend to and cover any and all forms of indebtedness and liability on the part of Dealer to NESNA incurred subject to, as a result of, or as a part of the Dealer Agreements and shall not be limited to any amount whatsoever.

It is specifically understood and agreed that at the option of NESNA, Guarantor may be joined in any action, suit or proceeding commenced by NESNA against Dealer in connection with or based upon any default of Dealer in the terms, conditions and covenants of the Dealer Agreements and recovery may be had against Guarantor in any such action, suit or proceeding, or in any independent action, suit or proceeding against Guarantor, and without the requirement that NESNA first assert, prosecute or pursue any remedy or claim that it might have against Dealer.

Any sum due by Dealer under the terms of the Dealer Agreements shall, if not promptly paid by Dealer, be paid by Guarantor within fifteen (15) days of notice by NESNA to Guarantor. Such payment shall be made at NESNA's office at One Nissan Way, Mail Stop: 06-216, Franklin, Tennessee 37067, Attn: NESNA Controller. Such address shall also be NESNA's address for the purpose of Guarantor giving NESNA notice hereunder.

The obligations of Guarantor under this Guaranty shall be continuing, absolute and unconditional under any and all circumstances and shall be paid by Guarantor regardless of (a) the validity, regularity, legality or enforceability of any of the liabilities or any collateral security or guaranty therefor; (b) any defense, offset or counterclaim which may at any time be available to or be asserted by Dealer or Guarantor or any other guarantor against NESNA; or (c) any other event or circumstance whatsoever which may constitute an equitable or legal discharge of a surety or a guarantor, it being the purpose and intent of the Guarantor that this Guaranty and the Guarantor's obligations hereunder shall remain in full force and effect and be binding upon Guarantor and Guarantor's successors until the liability and the obligations of Guarantor under this Guaranty shall have been satisfied by payment in full.

Guarantor hereby waives all Guarantor's rights of subrogation and reimbursement and any other related rights and defenses available to Guarantor under any applicable law or otherwise, including (a) any defenses Guarantor may have to the obligations under the Guaranty by reason of an election of remedies by NESNA and (b) any rights or defenses Guarantor may have by reason of protection afforded to Dealer with respect to the liabilities guaranteed by the Guaranty pursuant to any laws of or any other jurisdiction limiting or discharging Dealer's indebtedness.

Guarantor agrees that, at any time, without the need to reserve rights against Guarantor and without notice to or further approval of Guarantor, and without in any way affecting the obligations of Guarantor hereunder or limiting the rights of NESNA at law or in equity, NESNA may (i) amend, renew or extend the terms of the Dealer Agreements, including the amount and timing of payment or performance of any of Dealer's obligations thereunder, (ii) accept partial payments from Dealer thereunder, (iii) release, terminate, waive, abandon, compromise or subordinate the liabilities, in whole or in part; (iv) receive and hold additional security for or guaranties of Dealer's obligations; (v) release or agree not to sue, in whole or in part, Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the liabilities; or (vi) accelerate, compromise, settle, compound, sue for, or collect, either in whole or in part, any of the liabilities, any of the terms thereof, or any agreement, covenant, condition, or obligation of or with Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the obligations guaranteed hereby.

DocuSign Envelope ID: 3A547653-6293-4F96-A903-1DC282F67376

Neither this Guaranty nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by NESNA. This Guaranty shall be binding upon and inure to the benefit of NESNA and its successors and assigns. This Guaranty may not be assigned in whole or in part by Guarantor. NESNA may assign its rights hereunder, in whole or in part, at any time without the consent of Guarantor.

The failure or refusal by NESNA to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by NESNA.

This Guaranty shall not be deemed to give any right or remedy to any third party whatsoever unless otherwise specifically granted hereunder.

This Guaranty constitutes the entire agreement of Guarantor with respect to the subject matter hereof and supersedes all prior agreements by Guarantor with respect to such subject matter, and no waivers or modifications shall be valid unless duly approved in writing by NESNA.

If any provision of this Guaranty shall be held for any reason to be invalid, illegal or unenforceable, such impairment shall not affect any other provision of this Guaranty.

This Guaranty may only be terminated with the express written consent of NESNA.

Guarantor specifically understands and agrees that this Guaranty is subject to the jurisdiction of and shall be construed and controlled by the laws of the state of Tennessee. Any action arising from this Guaranty shall be brought in the state courts in Williamson County, Tennessee. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS BETWEEN GUARANTOR AND NESNA OR DEALER AND NESNA OR THE TRANSACTIONS RELATED THERETO.

In the event of any action or proceeding commenced by NESNA to enforce the terms of this Guaranty, Guarantor agrees to pay NESNA all expenses incurred by NESNA relative to such action or proceeding, including, but not limited to, court costs plus reasonable attorneys' fees.

Any notices from NESNA to Guarantor shall be in writing and shall be deemed given (i) when delivered in person to Guarantor or (ii) upon 2 business days after being placed in the U.S. mail addressed to Guarantor at its address set forth below, or (iii) upon delivery by an express courier service to Guarantor's address set for the below. Any notices from Guarantor to NESNA shall be in writing and shall be deemed given (i) upon 2 business days after being placed in the U.S. mail addressed to NESNA at its address set forth above, or (ii) upon delivery by an express courier service to NESNA's address set for the below. Guarantor and NESNA may each change its address for notice purposes by giving notice to the other as provided for above.

This Guaranty may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this Guaranty if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.

**GUARANTOR**:

Signature: _anthony deo_     Date: 10/20/2022

Name: anthony deo

Address: 180 MICHAEL DRIVE

SYOSSET NY 11791

DocuSign Envelope ID: 3A547653-6293-4F96-A903-1DC282F67376

**QualityGuard+Plus**

# QUALITYGUARD+PLUS
# MANAGEMENT FEE
# ADVANCE REQUEST FORM

| | |
|---|---|
| **Dealer Participation Agreement Date:** 10/01/2022 | |

| | |
|---|---|
| **Dealer Name:** Northshore Motors | **NNA Dealer #:** SA10073 |
| **Advance Effective Date (MM/YY)** 10/22 | **Advance Term (months):** 24 |

| **1. ADVANCE PAYMENT OPTION:  Use whole numbers (i.e. no decimal points).** | |
|---|---|
| **QualityGuard+Plus Contract Volume** | 1,200 |
| Management Fee amount per contract ($) | $ 500 |
| **Total Over-Remit Advance Request**          * Netting Out balance of current advance. | **$ 600,000** |

| **2. ALTERNATE PAYEE OPTION (up to 4):  Use whole percentage numbers (i.e. 10% not 9.9%).** | |
|---|---|
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |

**By signing below, I agree to the terms and conditions set forth on Exhibit A to this Management Fee Advance Request Form and the Dealer Participation Agreement as incorporated by reference herein. This Management Fee Advance Agreement ("MFAA") may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this MFAA if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.**

| | | |
|---|---|---|
| *anthony deo* | anthony deo | 10/20/2022 |
| Dealer Signature | Print | Date |
| *Lisa Cicchini* | Lisa Cicchini | 10/20/2022 |
| Regional Financial Services Manager | Print | Date |
| *Jack Crowley* | Jack Crowley | 11/28/2022 |
| NESNA Sr. Manager or Director | Print | Date |
| | | |
| NESNA | Print | Date |

# EXHIBIT A

## TERMS AND CONDITIONS TO MANAGEMENT FEE ADVANCE REQUEST FORM

1. These terms and conditions ("Terms") are attached to the Management Fee Advance Request Form ("Form") and together the Terms and Form are henceforth referred to as the Management Fee Advance Agreement ("MFAA"). This MFAA is made a part of the Dealer Participation Agreement between Company and Dealer, including any amendments thereto (the "DPA"). Capitalized terms used but not defined in this MFAA are defined in the DPA.

2. In consideration of Dealer agreeing to actively promote and sell the Products selected as part of this MFAA (the "MFAA Products"), Company will collect a Management Fee from the Dealer to compensate Dealer and/or Alternate Payees (individually and collectively referred to herein as ("Payee") for administrative and marketing services provided in connection with the sale of such MFAA Products by Dealer. Dealer has requested an Advance of such Management Fee pursuant to this MFAA.

3. As of the Advance Effective Date, Company will charge the Dealer the Management Fee for each MFAA Product as set forth in the MFAA. At the time of sale, the applicable Management Fee is added to the dealer net cost of each MFAA Product sold by Dealer. Dealer will be invoiced at the end of each month on its NVA or via ACH, as applicable, for dealer net cost plus applicable Management Fee for all MFAA Products sold that month. Company will distribute the Management Fee to the Payee as set forth in this MFAA. Dealer, for itself and for the Payee, agrees that the Management Fee shall compensate Payee for certain administrative and marketing services provided by Payee to the Dealer.

4. Dealer will pay to Company the Management Fee by the same procedure by which Dealer pays Company the dealer cost for each MFAA Product sold by Dealer, as such procedures may be modified from time to time by Company in its sole discretion.

5. In consideration of Dealer substantially exclusively selling the MFAA Products to customers in lieu of any competitive assurance products and such other consideration as set forth herein, Company agrees to advance to Payee the Advance within seven (7) days after mutual execution of this MFAA. The Advance shall be repaid in full to Company on or before the last day of the Advance Term ("Advance Repayment Date"), or (b) the effective date of termination of this MFAA.

6. Until such time as the Advance has been repaid to Company in full, all Management Fees actually collected by Company hereunder on behalf of Payee will be applied by Company, as and when received, as a credit in repayment of the Advance. Once the Advance has been repaid to Company in full, Company will pay to Payee on a monthly basis, electronically or otherwise, the Management Fees thereafter actually collected on behalf of Payee. If the Advance is not repaid in full by the Advance Repayment Date or in the event any other sum becomes due to Company hereunder, Company shall be entitled to recover the unpaid balance of the Advance by (a) charging the Dealer's NVA or via ACH, as applicable, and/or (b) right of offset against any moneys Company or any Company affiliate thereof may owe or have custody of that is due Dealer.

7. Company will provide Dealer a month end report on the Management Fees actually collected hereunder, electronically, as soon as practicable after the end of each month. Until such time as the Advance has been repaid to Company in full, such report shall include an accounting of all credits to-date of collected Management Fees in repayment of the Advance.

8. Should Company receive any communication from any third party that questions, objects to or refuses to pay the Management Fee, Company shall direct the communication to Dealer for resolution. Company shall not be obligated to take any action with respect to third parties that question, object

DocuSign Envelope ID: 3A547653-6293-4F96-A903-1DC282F67376

to or refuse to pay the Management Fee, and shall not otherwise have any obligation to Payee with respect thereto except as provided for in this section.

9. Dealer agrees to defend and hold harmless Company and its affiliates and their respective directors, officers, agents, shareholders and employees from and against any and all claims, demands, investigations, proceedings and actions, whether at law, equity or by any administrative body, and any and all liabilities, losses, damages or expenses resulting therefore, including court or arbitration costs and reasonable attorneys' fees, relating to or arising out of, or alleged to relate to or arise out of the Management Fee, including but not limited to (a) claims of any Dealer, its employees or affiliates, (b) claims for the payment of any taxes or other charges with respect to the collection of the Management Fee, and (c) claims by any regulatory agency or other third party. The obligations of this section shall survive the termination of this MFAA.

10. Company will evaluate Dealer performance throughout the Advance Term. Dealer authorizes Company to debit Dealer's NVA or ACH, as applicable, for the unearned portion of the Advance at any time at Company's discretion ("Advance Recovery").

11. Company will evaluate Dealer's performance at the end of each six-month allocation period (or partial allocation period if less than six months at the end of the Advance Term).

   a. Advance dollars are allocated equally by month across the Advance Term.

   b. If Dealer does not earn at least 75% of the Advance allocated for an allocation period or partial allocation period (the "Minimum Performance Objective"), as applicable, Company may initiate Advance Recovery on a graduated basis as provided in Table #1 below.

   c. If Dealer does not achieve the Minimum Performance Objective, Dealer will be subject to an Advance Recovery by Company. The entire Advance or a portion of the advance may be recovered. Dealer's NVA or ACH will be debited for the Advance Recovery amount as determined using the following parameters:

   **Table #1: Calculation of Advance Recovery**

   | % Earned of Allocation Period | Advance Recovery Schedule |
   |---|---|
   | 75%+ | $0 |
   | 50-74% | 50% of Unearned Advance Allocation |
   | 25-49% | 100% of Unearned Advance Allocation |
   | 0-24% | 100% of Total Unearned Advance |

   d. If an Advance Recovery is issued, Dealer will have the opportunity to earn additional Management Fee Dollars for the balance of the Advance Term.

12. This MFAA shall continue in full force and effect from the Advance Effective Date unless earlier terminated as provided herein. Either party hereto may terminate this MFAA without cause, at any time upon thirty (30) days prior written notice, provided that Company shall promptly credit in repayment of the Advance or remit to Payee, as applicable, any Management Fees collected after any such termination. If Dealer terminates this MFAA without cause, Dealer agrees to cause Payee to repay to Company the unearned portion of the Advance in full within thirty (30) days after giving Company notice of termination. Company may also terminate this MFAA effective immediately upon written notice to Dealer should Company receive a notice from any governing agency to cease collection of the Management Fee. Company may further terminate this MFAA effective immediately

DocuSign Envelope ID: 3A547653-6293-4F96-A903-1DC282F67376

upon the occurrence of any of the following events anytime during the Advance Term, as applicable, in which event any then unearned portion of the Advance shall immediately be repaid in full:

    d. Dealer's DPA with Company is terminated;

    e. Dealer fails, for any reason, to offer and sell all the MFAA Products as set forth in this MFAA;

    f. Dealer sells or offers to sell any product that is considered competitive with any of the MFAA Products; or

    g. Dealer is in default under this MFAA, its DPA, or any other agreement with Company or any affiliate thereof.

The obligations of this section shall survive the termination of this MFAA.

13. Each of the parties hereto warrants and represents that it has full right, power and authority to enter into this MFAA. Each of the parties hereto further warrants and represents that its entering into this MFAA shall not conflict with or violate any provision of any existing agreement it may have with any Dealer, employee, or other person or entity.

14. Dealer shall be solely responsible for its compliance and the compliance of the Payee with all applicable laws, regulations or other legal mandates relative to the Management Fee, including, without limitation, the payment of any taxes owing in connection with the collection of the Management Fee by Company and the remittance of the Management Fee to Payee, including but not limited to all tax laws.

15. All notices and correspondence pertaining to this MFAA will be issued pursuant to the Notice section of the DPA.

16. The parties acknowledge that this MFAA does not in any way create an agency relationship between them, and that Dealer is not an agent of Company its performance under this MFAA or in the sale of MFAA Products.

17. The DPA is incorporated herein by reference. If there is a conflict with any of the terms and conditions of the DPA, the MFAA controls.

Case 3:24-cv-08000-AJC-JBW    Document 61-25    Filed 01/22/25    Page 25 of 49 PageID
# 3416

DocuSign Envelope ID: 3A547653-6293-4F96-A903-1DC282F67376

| PERSONAL GUARANTY | | |
|---|---|---|
| Effective Date: 10/1/2022 | Guarantor: ANTHONY DEO | |
| Corporate Name ("Dealer"): NORTHSHORE MOTORS | DBA name, if any: | Dealer ID: (assigned by NESNA) SA10073 |

THIS **PERSONAL GUARANTY** ("Guaranty") is given as of the Effective Date, by  Guarantor to induce  Nissan Extended Services North America, G.P., a Delaware general partnership ("NESNA") to advance funds to Dealer as more particularly provided below.

WHEREAS, as of the Effective Date, NESNA and Dealer entered or are entering into a Dealer Participation Agreement (as amended, restated or modified from time to time, the "Agreement");

WHEREAS, the Agreement provides for NESNA to advance to Dealer certain amounts in connection with Dealer's authorized marketing and sale of various assurance products;

WHEREAS, Guarantor desires NESNA to advance sums to Dealer pursuant to the Agreement; and

WHEREAS, as a condition to NESNA's willingness to enter into the Agreement with Dealer, NESNA requires that Guarantor guaranty the payment and other obligations of Dealer under the Agreement, if applicable, or any future agreements between Dealer and NESNA wherein NESNA advances funds to Dealer ("Future Agreements") (collectively the Agreement and the Future Agreements are herein referrred to as the "Dealer Agreements"), and Guarantor has agreed to do so.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows:

Guarantor unconditionally guarantees to NESNA the prompt payment of any and all sums due NESNA by Dealer under the terms of the Dealer Agreements, and further agrees to indemnify and hold NESNA harmless of and from any and all wrongful acts or conduct of Dealer or Dealer's employees or agents, including all costs, expenses and attorney's fees incurred by NESNA in collection of any sums due NESNA by Dealer under the terms of the Dealer Agreements, or incurred by NESNA in connection with any default of Dealer of the terms and conditions of the Dealer Agreements. It is specifically agreed that this is an absolute and continuing guaranty and shall extend to and cover any and all forms of indebtedness and liability on the part of Dealer to NESNA incurred subject to, as a result of, or as a part of the Dealer Agreements and shall not be limited to any amount whatsoever.

It is specifically understood and agreed that at the option of NESNA, Guarantor may be joined in any action, suit or proceeding commenced by NESNA against Dealer in connection with or based upon any default of Dealer in the terms, conditions and covenants of the Dealer Agreements and recovery may be had against Guarantor in any such action, suit or proceeding, or in any independent action, suit or proceeding against Guarantor, and without the requirement that NESNA first assert, prosecute or pursue any remedy or claim that it might have against Dealer.

Any sum due by Dealer under the terms of the Dealer Agreements shall, if not promptly paid by Dealer, be paid by Guarantor within fifteen (15) days of notice by NESNA to Guarantor.  Such payment shall be made at NESNA's office at One Nissan Way, Mail Stop:  06-216, Franklin, Tennessee 37067, Attn: NESNA Controller. Such address shall also be NESNA's address for the purpose of Guarantor giving NESNA notice hereunder.

The obligations of Guarantor under this Guaranty shall be continuing, absolute and unconditional under any and all circumstances and shall be paid by Guarantor regardless of (a) the validity, regularity, legality or enforceability of any of the liabilities or any collateral security or guaranty therefor; (b) any defense, offset or counterclaim which may at any time be available to or be asserted by Dealer or Guarantor or any other guarantor against NESNA; or (c) any other event or circumstance whatsoever which may constitute an equitable or legal discharge of a surety or a guarantor, it being the purpose and intent of the Guarantor that this Guaranty and the Guarantor's obligations hereunder shall remain in full force and effect and be binding upon Guarantor and Guarantor's successors until the liability and the obligations of Guarantor under this Guaranty shall have been satisfied by payment in full.

Guarantor hereby waives all Guarantor's rights of subrogation and reimbursement and any other related rights and defenses available to Guarantor under any applicable law or otherwise, including (a) any defenses Guarantor may have to the obligations under the Guaranty by reason of an election of remedies by NESNA and (b) any rights or defenses Guarantor may have by reason of protection afforded to Dealer with respect to the liabilities guaranteed by the Guaranty pursuant to any laws of or any other jurisdiction limiting or discharging Dealer's indebtedness.

Guarantor agrees that, at any time, without the need to reserve rights against Guarantor and without notice to or further approval of Guarantor, and without in any way affecting the obligations of Guarantor hereunder or limiting the rights of NESNA at law or in equity, NESNA may (i) amend, renew or extend the terms of the Dealer Agreements, including the amount and timing of payment or performance of any of Dealer's obligations thereunder, (ii) accept partial payments from Dealer thereunder, (iii) release, terminate, waive, abandon, compromise or subordinate the liabilities, in whole or in part; (iv) receive and hold additional security for or guaranties of Dealer's obligations; (v) release or agree not to sue, in whole or in part, Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the liabilities; or (vi) accelerate, compromise, settle, compound, sue for, or collect, either in whole or in part, any of the liabilities, any of the terms thereof, or any agreement, covenant, condition, or obligation of or with Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the obligations guaranteed hereby.

DocuSign Envelope ID: 3A547653-6293-4F96-A903-1DC282F67376

Neither this Guaranty nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by NESNA. This Guaranty shall be binding upon and inure to the benefit of NESNA and its successors and assigns. This Guaranty may not be assigned in whole or in part by Guarantor. NESNA may assign its rights hereunder, in whole or in part, at any time without the consent of Guarantor.

The failure or refusal by NESNA to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by NESNA.

This Guaranty shall not be deemed to give any right or remedy to any third party whatsoever unless otherwise specifically granted hereunder.

This Guaranty constitutes the entire agreement of Guarantor with respect to the subject matter hereof and supersedes all prior agreements by Guarantor with respect to such subject matter, and no waivers or modifications shall be valid unless duly approved in writing by NESNA.

If any provision of this Guaranty shall be held for any reason to be invalid, illegal or unenforceable, such impairment shall not affect any other provision of this Guaranty.

This Guaranty may only be terminated with the express written consent of NESNA.

Guarantor specifically understands and agrees that this Guaranty is subject to the jurisdiction of and shall be construed and controlled by the laws of the state of Tennessee. Any action arising from this Guaranty shall be brought in the state courts in Williamson County, Tennessee. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS BETWEEN GUARANTOR AND NESNA OR DEALER AND NESNA OR THE TRANSACTIONS RELATED THERETO.

In the event of any action or proceeding commenced by NESNA to enforce the terms of this Guaranty, Guarantor agrees to pay NESNA all expenses incurred by NESNA relative to such action or proceeding, including, but not limited to, court costs plus reasonable attorneys' fees.

Any notices from NESNA to Guarantor shall be in writing and shall be deemed given (i) when delivered in person to Guarantor or (ii) upon 2 business days after being placed in the U.S. mail addressed to Guarantor at its address set forth below, or (iii) upon delivery by an express courier service to Guarantor's address set for the below. Any notices from Guarantor to NESNA shall be in writing and shall be deemed given (i) upon 2 business days after being placed in the U.S. mail addressed to NESNA at its address set forth above, or (ii) upon delivery by an express courier service to NESNA's address set for the below. Guarantor and NESNA may each change its address for notice purposes by giving notice to the other as provided for above.

This Guaranty may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this Guaranty if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.

**GUARANTOR**:

Signature: _anthony deo_     Date: 10/20/2022

Name: anthony deo

Address: 180 MICHAEL DRIVE

SYOSSET NY 11791

# QualityGuard+Plus®

## QUALITYGUARD+PLUS
## MANAGEMENT FEE
## ADVANCE REQUEST FORM

| | |
|---|---|
| **Dealer Participation Agreement Date:** 09/01/2021 | |
| **Dealer Name:** Northshore Motors | **NNA Dealer #:** SA10073 |
| **Advance Effective Date (MM/YY)** 09/21 | **Advance Term (months):** 24 |

| 1. ADVANCE PAYMENT OPTION:  Use whole numbers (i.e. no decimal points). | |
|---|---|
| **QualityGuard+Plus Contract Volume** | 960 |
| Management Fee amount per contract ($) | $ 500 |
| **Total Over-Remit Advance Request** | **$ 480,000** |

| 2. ALTERNATE PAYEE OPTION (up to 4):  Use whole percentage numbers (i.e. 10% not 9.9%). | |
|---|---|
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |

**By signing below, I agree to the terms and conditions set forth on Exhibit A to this Management Fee Advance Request Form and the Dealer Participation Agreement as incorporated by reference herein.**

| Dealer Signature | Anthony Deo | 12·14·21 |
|---|---|---|
| | Print | Date |
| *Lisa Cicchini* | Lisa Cicchini | 8/25/21 |
| Regional Financial Services Manager | Print | Date |
| | Jack Crowley | 12/15/2021 |
| NESNA Sr. Manager or Director | Print | Date |
| NESNA | Print | Date |

## EXHIBIT A

### TERMS AND CONDITIONS TO MANAGEMENT FEE ADVANCE REQUEST FORM

1.  These terms and conditions ("Terms") are attached to the Management Fee Advance Request Form ("Form") and together the Terms and Form are henceforth referred to as the Management Fee Advance Agreement ("MFAA"). This MFAA is made a part of the Dealer Participation Agreement between Company and Dealer, including any amendments thereto (the "DPA"). Capitalized terms used but not defined in this MFAA are defined in the DPA.

2.  In consideration of Dealer agreeing to actively promote and sell the Products selected as part of this MFAA (the "MFAA Products"), Company will collect a Management Fee from the Dealer to compensate Dealer and/or Alternate Payees (individually and collectively referred to herein as ("Payee") for administrative and marketing services provided in connection with the sale of such MFAA Products by Dealer. Dealer has requested an Advance of such Management Fee pursuant to this MFAA.

3.  As of the Advance Effective Date, Company will charge the Dealer the Management Fee for each MFAA Product as set forth in the MFAA. At the time of sale, the applicable Management Fee is added to the dealer net cost of each MFAA Product sold by Dealer. Dealer will be invoiced at the end of each month on its NVA or via ACH, as applicable, for dealer net cost plus applicable Management Fee for all MFAA Products sold that month. Company will distribute the Management Fee to the Payee as set forth in this MFAA. Dealer, for itself and for the Payee, agrees that the Management Fee shall compensate Payee for certain administrative and marketing services provided by Payee to the Dealer.

4.  Dealer will pay to Company the Management Fee by the same procedure by which Dealer pays Company the dealer cost for each MFAA Product sold by Dealer, as such procedures may be modified from time to time by Company in its sole discretion.

5.  In consideration of Dealer substantially exclusively selling the MFAA Products to customers in lieu of any competitive assurance products and such other consideration as set forth herein, Company agrees to advance to Payee the Advance within seven (7) days after mutual execution of this MFAA. The Advance shall be repaid in full to Company on or before the last day of the Advance Term ("Advance Repayment Date"), or (b) the effective date of termination of this MFAA.

6.  Until such time as the Advance has been repaid to Company in full, all Management Fees actually collected by Company hereunder on behalf of Payee will be applied by Company, as and when received, as a credit in repayment of the Advance. Once the Advance has been repaid to Company in full, Company will pay to Payee on a monthly basis, electronically or otherwise, the Management Fees thereafter actually collected on behalf of Payee. If the Advance is not repaid in full by the Advance Repayment Date or in the event any other sum becomes due to Company hereunder, Company shall be entitled to recover the unpaid balance of the Advance by (a) charging the Dealer's NVA or via ACH, as applicable, and/or (b) right of offset against any moneys Company or any Company affiliate thereof may owe or have custody of that is due Dealer.

7.  Company will provide Dealer a month end report on the Management Fees actually collected hereunder, electronically, as soon as practicable after the end of each month. Until such time as the Advance has been repaid to Company in full, such report shall include an accounting of all credits to-date of collected Management Fees in repayment of the Advance.

8.  Should Company receive any communication from any third party that questions, objects to or refuses to pay the Management Fee, Company shall direct the communication to Dealer for resolution. Company shall not be obligated to take any action with respect to third parties that question, object

to or refuse to pay the Management Fee, and shall not otherwise have any obligation to Payee with respect thereto except as provided for in this section.

9. Dealer agrees to defend and hold harmless Company and its affiliates and their respective directors, officers, agents, shareholders and employees from and against any and all claims, demands, investigations, proceedings and actions, whether at law, equity or by any administrative body, and any and all liabilities, losses, damages or expenses resulting therefore, including court or arbitration costs and reasonable attorneys' fees, relating to or arising out of, or alleged to relate to or arise out of the Management Fee, including but not limited to (a) claims of any Dealer, its employees or affiliates, (b) claims for the payment of any taxes or other charges with respect to the collection of the Management Fee, and (c) claims by any regulatory agency or other third party. The obligations of this section shall survive the termination of this MFAA.

10. Company will evaluate Dealer performance throughout the Advance Term. Dealer authorizes Company to debit Dealer's NVA or ACH, as applicable, for the unearned portion of the Advance at any time at Company's discretion ("Advance Recovery").

11. Company will evaluate Dealer's performance at the end of each six-month allocation period (or partial allocation period if less than six months at the end of the Advance Term).

    a. Advance dollars are allocated equally by month across the Advance Term.

    b. If Dealer does not earn at least 75% of the Advance allocated for an allocation period or partial allocation period (the "Minimum Performance Objective"), as applicable, Company may initiate Advance Recovery on a graduated basis as provided in Table #1 below.

    c. If Dealer does not achieve the Minimum Performance Objective, Dealer will be subject to an Advance Recovery by Company. The entire Advance or a portion of the advance may be recovered. Dealer's NVA or ACH will be debited for the Advance Recovery amount as determined using the following parameters:

    **Table #1: Calculation of Advance Recovery**

    | % Earned of Allocation Period | Advance Recovery Schedule |
    |---|---|
    | 75%+ | $0 |
    | 50-74% | 50% of Unearned Advance Allocation |
    | 25-49% | 100% of Unearned Advance Allocation |
    | 0-24% | 100% of Total Unearned Advance |

    d. If an Advance Recovery is issued, Dealer will have the opportunity to earn additional Management Fee Dollars for the balance of the Advance Term.

12. This MFAA shall continue in full force and effect from the Advance Effective Date unless earlier terminated as provided herein. Either party hereto may terminate this MFAA without cause, at any time upon thirty (30) days prior written notice, provided that Company shall promptly credit in repayment of the Advance or remit to Payee, as applicable, any Management Fees collected after any such termination. If Dealer terminates this MFAA without cause, Dealer agrees to cause Payee to repay to Company the unearned portion of the Advance in full within thirty (30) days after giving Company notice of termination. Company may also terminate this MFAA effective immediately upon written notice to Dealer should Company receive a notice from any governing agency to cease collection of the Management Fee. Company may further terminate this MFAA effective immediately

upon the occurrence of any of the following events anytime during the Advance Term, as applicable, in which event any then unearned portion of the Advance shall immediately be repaid in full:

    d. Dealer's DPA with Company is terminated;

    e. Dealer fails, for any reason, to offer and sell all the MFAA Products as set forth in this MFAA;

    f. Dealer sells or offers to sell any product that is considered competitive with any of the MFAA Products; or

    g. Dealer is in default under this MFAA, its DPA, or any other agreement with Company or any affiliate thereof.

The obligations of this section shall survive the termination of this MFAA.

13. Each of the parties hereto warrants and represents that it has full right, power and authority to enter into this MFAA. Each of the parties hereto further warrants and represents that its entering into this MFAA shall not conflict with or violate any provision of any existing agreement it may have with any Dealer, employee, or other person or entity.

14. Dealer shall be solely responsible for its compliance and the compliance of the Payee with all applicable laws, regulations or other legal mandates relative to the Management Fee, including, without limitation, the payment of any taxes owing in connection with the collection of the Management Fee by Company and the remittance of the Management Fee to Payee, including but not limited to all tax laws.

15. All notices and correspondence pertaining to this MFAA will be issued pursuant to the Notice section of the DPA.

16. The parties acknowledge that this MFAA does not in any way create an agency relationship between them, and that Dealer is not an agent of Company its performance under this MFAA or in the sale of MFAA Products.

17. The DPA is incorporated herein by reference. If there is a conflict with any of the terms and conditions of the DPA, the MFAA controls.

| GUARANTY | | |
|---|---|---|
| Effective Date: 9.1.2021 | Guarantor: Anthony Deo | |
| Corporate Name ("Dealer"): Northshore Motors | DBA name, if any: | Dealer ID: (assigned by NESNA) SA10073 |

THIS **GUARANTY** ("Guaranty") is given as of the Effective Date, by Guarantor to induce Nissan Extended Services North America, G.P., a Delaware general partnership ("NESNA") to advance funds to Dealer as more particularly provided below.

WHEREAS, as of the Effective Date, NESNA and Dealer entered or are entering into a Dealer Participation Agreement (as amended, restated or modified from time to time, the "Agreement");

WHEREAS, the Agreement provides for NESNA to advance to Dealer certain amounts in connection with Dealer's authorized marketing and sale of various assurance products;

WHEREAS, Guarantor desires NESNA to advance sums to Dealer pursuant to the Agreement; and

WHEREAS, as a condition to NESNA's willingness to enter into the Agreement with Dealer, NESNA requires that Guarantor guaranty the payment and other obligations of Dealer under the Agreement, if applicable, or any future agreements between Dealer and NESNA wherein NESNA advances funds to Dealer ("Future Agreements") (collectively the Agreement and the Future Agreements are herein referrred to as the "Dealer Agreements"), and Guarantor has agreed to do so.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows:

Guarantor unconditionally guarantees to NESNA the prompt payment of any and all sums due NESNA by Dealer under the terms of the Dealer Agreements, and further agrees to indemnify and hold NESNA harmless of and from any and all wrongful acts or conduct of Dealer or Dealer's employees or agents, including all costs, expenses and attorney's fees incurred by NESNA in collection of any sums due NESNA by Dealer under the terms of the Dealer Agreements, or incurred by NESNA in connection with any default of Dealer of the terms and conditions of the Dealer Agreements. It is specifically agreed that this is an absolute and continuing guaranty and shall extend to and cover any and all forms of indebtedness and liability on the part of Dealer to NESNA incurred subject to, as a result of, or as a part of the Dealer Agreements and shall not be limited to any amount whatsoever.

It is specifically understood and agreed that at the option of NESNA, Guarantor may be joined in any action, suit or proceeding commenced by NESNA against Dealer in connection with or based upon any default of Dealer in the terms, conditions and covenants of the Dealer Agreements and recovery may be had against Guarantor in any such action, suit or proceeding, or in any independent action, suit or proceeding against Guarantor, and without the requirement that NESNA first assert, prosecute or pursue any remedy or claim that it might have against Dealer.

Any sum due by Dealer under the terms of the Dealer Agreements shall, if not promptly paid by Dealer, be paid by Guarantor within fifteen (15) days of notice by NESNA to Guarantor. Such payment shall be made at NESNA's office at One Nissan Way, Mail Stop: 06-216, Franklin, Tennessee 37067, Attn: NESNA Controller. Such address shall also be NESNA's address for the purpose of Guarantor giving NESNA notice hereunder.

The obligations of Guarantor under this Guaranty shall be continuing, absolute and unconditional under any and all circumstances and shall be paid by Guarantor regardless of (a) the validity, regularity, legality or enforceability of any of the liabilities or any collateral security or guaranty therefor; (b) any defense, offset or counterclaim which may at any time be available to or be asserted by Dealer or Guarantor or any other guarantor against NESNA; or (c) any other event or circumstance whatsoever which may constitute an equitable or legal discharge of a surety or a guarantor, it being the purpose and intent of the Guarantor that this Guaranty and the Guarantor's obligations hereunder shall remain in full force and effect and be binding upon Guarantor and Guarantor's successors until the liability and the obligations of Guarantor under this Guaranty shall have been satisfied by payment in full.

Guarantor hereby waives all Guarantor's rights of subrogation and reimbursement and any other related rights and defenses available to Guarantor under any applicable law or otherwise, including (a) any defenses Guarantor may have to the obligations under the Guaranty by reason of an election of remedies by NESNA and (b) any rights or defenses Guarantor may have by reason of protection afforded to Dealer with respect to the liabilities guaranteed by the Guaranty pursuant to any laws of or any other jurisdiction limiting or discharging Dealer's indebtedness.

v 09-04-2019

Guarantor agrees that, at any time, without the need to reserve rights against Guarantor and without notice to or further approval of Guarantor, and without in any way affecting the obligations of Guarantor hereunder or limiting the rights of NESNA at law or in equity, NESNA may (i) amend, renew or extend the terms of the Dealer Agreements, including the amount and timing of payment or performance of any of Dealer's obligations thereunder, (ii) accept partial payments from Dealer thereunder, (iii) release, terminate, waive, abandon, compromise or subordinate the liabilities, in whole or in part; (iv) receive and hold additional security for or guaranties of Dealer's obligations; (v) release or agree not to sue, in whole or in part, Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the liabilities; or (vi) accelerate, compromise, settle, compound, sue for, or collect, either in whole or in part, any of the liabilities, any of the terms thereof, or any agreement, covenant, condition, or obligation of or with Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the obligations guaranteed hereby.

Neither this Guaranty nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by NESNA.This Guaranty shall be binding upon and inure to the benefit of NESNA and its successors and assigns.  This Guaranty may not be assigned in whole or in part by Guarantor. NESNA may assign its rights hereunder, in whole or in part, at any time without the consent of Guarantor.

The failure or refusal by NESNA to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by NESNA.

This Guaranty shall not be deemed to give any right or remedy to any third party whatsoever unless otherwise specifically granted hereunder.

This Guaranty constitutes the entire agreement of Guarantor with respect to the subject matter hereof and supersedes all prior agreements by Guarantor with respect to such subject matter, and no waivers or modifications shall be valid unless duly approved in writing by NESNA.

If any provision of this Guaranty shall be held for any reason to be invalid, illegal or unenforceable, such impairment shall not affect any other provision of this Guaranty.

This Guaranty may only be terminated with the express written consent of NESNA.

Guarantor specifically understands and agrees that this Guaranty is subject to the jurisdiction of and shall be construed and controlled by the laws of the state of Tennessee.  Any action arising from this Guaranty shall be brought in the state courts in Williamson County, Tennessee. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS BETWEEN GUARANTOR AND NESNA OR DEALER AND NESNA OR THE TRANSACTIONS RELATED THERETO.

In the event of any action or proceeding commenced by NESNA to enforce the terms of this Guaranty, Guarantor agrees to pay NESNA all expenses incurred by NESNA relative to such action or proceeding, including, but not limited to, court costs plus reasonable attorneys' fees.

Any notices from NESNA to Guarantor shall be in writing and shall be deemed given (i) when delivered in person to Guarantor or (ii) upon 2 business days after being placed in the U.S. mail addressed to Guarantor at its address set forth below, or (iii) upon delivery by an express courier service to Guarantor's address set for the below. Any notices from Guarantor to NESNA shall be in writing and shall be deemed given (i) upon 2 business days after being placed in the U.S. mail addressed to NESNA at its address set forth above, or (ii) upon delivery by an express courier service to NESNA's address set for the below. Guarantor and NESNA may each change its address for notice purposes by giving notice to the other as provided for above.

**GUARANTOR**:

Signature: _____     Date: ___12·14·21_____

Name: _Anthony Deo_

Address: _180 Michael Drive_
_Syosset NY 11791_

v 09-04-2019



SECURITY+PLUS
AND
QUALITYGUARD+PLUS
MANAGEMENT FEE
ADVANCE REQUEST
FORM

DocuSign Envelope ID: 33FB02FD-F8BB-4D47-8937-0BB548828CC9

| Dealer Participation Agreement Date: | | 06/12/2023 | |
|---|---|---|---|
| Dealer Name: NorthShore Motors | | NNA Dealer #: | SA10073 |
| Advance Effective Date (MM/YY)  06/23 | | Advance Term (months): | 18 |

| 1.  ADVANCE PAYMENT OPTION: | Term: | **18** |
|---|---|---|
| **Security+Plus & QualityGuard+Plus Sales(Monthly)** | | |
| New Net Vehicle Volume | (A) | 0 |
| Net Security+Plus Service Contracts (New and Pre-Owned) | (B) | 0 |
| Net QualityGuard+Plus Service Contracts | (C) | 37.58055 |
| Total Net Contracts (B + C) | (D) | 37.58055 |
| | | |
| **Security+Plus 100% Markup Calculations** | | |
| Average Security+Plus Net Cost Per Contract (Including 100% Markup) | (E) | $ 0 |
| **Net Security+Plus Sales Dollars (B x E)** | (F) | $ 0 |
| **2023 REQUESTED SECURITY+PLUS ADVANCE (100% Markup) (F / 2)\*** | (G) | $ 0 |
| | | |
| **Security+Plus and QualityGuard+Plus Over-Remit Markup Calculations** | | |
| Amount per Contract to Over-Remit | (H) | $ 800 |
| **2023 REQUESTED SECURITY+PLUS and QUALITYGUARD+PLUS ADVANCE (Over-Remit) (D x H)\*** | (I) | $ 541,160 |
| **TOTAL 2023 REQUESTED ADVANCE  (G + I)\*** | (J) | $ 541,160 |
| **Advance Fee %, if applicable** (Pursuant to Section 5 of Exhibit A and as set forth in Exhibit A-1) | (K) | 0.0% |
| **Advance Fee Amount, if applicable (K x J)** | (L) | $ 0 |
| **NET TOTAL ADVANCE PAYMENT (J – L)\*** | (M) | $ 541,160 |

*\* Subject to any adjustment pursuant to Section 5 of the terms and conditions set forth on Exhibit A hereto.*

In this Docusign, you will find a new 18-month advance with no new money paid out, only an extended term of 18 months. Please review, fill in where instructed, and sign the documents as soon as possible. A minimum of 38 QualityGuard VSC contracts will need to be received from Northshore Motors each month for 18 months, and a minimum of 17 QG contracts will need to be received from Sunrise Auto Outlet a month for 18 months to repay this advance. Any shortages in either store's contract count will result in a collection of the unresolved portion of that month's agreed-upon amounts.

Example: NorthShore is required to produce 37.5 contacts on average. If 36 are produced, a debit request for the difference would be $800 per contract, so we would ask for the $800 (1 contract) + $400 (.5 of a contract amount) for a total of $1200 to keep the advance on track to be paid off at the end of the 18 months term.

| **2a. ALTERNATE PAYEE OPTION (up to 4): Use whole percentage numbers (i.e. 10% not 9.9%).** | | |
|---|---|---|
| **Security Plus (100% option)** | | |
| Name: NESNA | Percentage: | 100.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |

| **2b. ALTERNATE PAYEE OPTION (up to 4): Use whole percentage numbers (i.e. 10% not 9.9%).** | | |
|---|---|---|
| **Security Plus & QualityGuard (Over-Remit option)** | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |
| Name: | Percentage: | 0.0% |
| Address: | | |

By signing below, I agree to the terms and conditions set forth on Exhibit A to this Management Fee Advance Request Form and the Dealer Participation Agreement as incorporated by reference herein. This Management Fee Advance Agreement ("MFAA") may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this MFAA if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.

| *anthony deo* | anthony deo | 6/18/2023 |
|---|---|---|
| Dealer Signature | Print | Date |
| *Lisa Cicchini* | Lisa Cicchini | 6/19/2023 |
| Regional Financial Services Manager | Print | Date |

| | | |
|---|---|---|
| DocuSigned by: | Jack Crowley | 6/26/2023 |
| *Jack Crowley* | | |
| NESNA Sr. Manager or Director | Print | Date |

| | | |
|---|---|---|
| NESNA | Print | Date |

## EXHIBIT A

## TERMS AND CONDITIONS TO MANAGEMENT FEE ADVANCE REQUEST FORM

1. These terms and conditions ("Terms") are attached to the Management Fee Advance Request Form ("Form") and together the Terms and Form are henceforth referred to as the Management Fee Advance Agreement ("MFAA"). This MFAA is made a part of the Dealer Participation Agreement between Company and Dealer, including any amendments thereto (the "DPA"). Capitalized terms used but not defined in this MFAA are defined in the DPA.

2. In consideration of Dealer agreeing to actively promote and sell the Products selected as part of this MFAA (the "MFAA Products"), Company will collect a Management Fee from the Dealer to compensate Dealer and/or Alternate Payees (individually and collectively referred to herein as ("Payee") for administrative and marketing services provided in connection with the sale of such MFAA Products by Dealer. Dealer has requested an Advance of such Management Fee pursuant to this MFAA.

3. As of the Advance Effective Date, Company will charge the Dealer the Management Fee for each MFAA Product as set forth in the MFAA. At the time of sale, the applicable. Management Fee is added to the dealer net cost of each MFAA Product sold by Dealer. Dealer will be invoiced at the end of each month on its NVA or via ACH, as applicable, for dealer net cost plus applicable Management Fee for all MFAA Products sold that month. Company will distribute the Management Fee to the Payee as set forth in this MFAA. Dealer, for itself and for the Payee, agrees that the Management Fee shall compensate Payee for certain administrative and marketing services provided by Payee to the Dealer.

4. Dealer will pay to Company the Management Fee by the same procedure by which Dealer pays Company the dealer cost for each MFAA Product sold by Dealer, as such procedures may be modified from time to time by Company in its sole discretion.

5. In consideration of Dealer substantially exclusively selling the MFAA Products to customers in lieu of any competitive assurance products and such other consideration as set forth herein, Company agrees to advance to Dealer or Payee the Advance within fifteen (15) days after mutual execution of this MFAA; provided that, notwithstanding anything to the contrary, (x) for any Advance longer than twelve (12) months, Company shall be entitled to a fee which it may deduct from the Advance at such rate as set forth in Exhibit A-1 hereto and (y) if as of the Advance Effective Date (i) Dealer owes any amounts to Company from a prior advance or otherwise, as determined by Company in its sole discretion, then Company shall deduct such amounts from the Advance and (ii) Dealer has any excess earned Management Fees owed by Company to Dealer, as determined by Company in its sole discretion, then Company shall add such amounts to the Advance, in each case prior to making the Advance to Dealer or Payee and in such amounts determined by Company in its sole discretion. The Advance shall be repaid in full to Company on or before the last day of the Advance Term ("Advance Repayment Date"), or (b) the effective date of termination

3

of this MFAA.

6. Until such time as the Advance has been repaid to Company in full, all Management Fees actually collected by Company hereunder on behalf of Payee will be applied by Company, as and when received, as a credit in repayment of the Advance. Once the Advance has been repaid to Company in full, Company will pay to Payee on a monthly basis, electronically or otherwise, the Management Fees thereafter actually collected on behalf of Payee. If the Advance is not repaid in full by the Advance Repayment Date or in the event any other sum becomes due to Company hereunder, Company shall be entitled to recover the unpaid balance of the Advance by (a) charging the Dealer's NVA or via ACH, as applicable, and/or (b) right of offset against any moneys Company or any Company affiliate thereof may owe or have custody of that is due Dealer.

7. Company will provide Dealer a month end report on the Management Fees actually collected hereunder, electronically, as soon as practicable after the end of each month. Until such time as the Advance has been repaid to Company in full, such report

shall include an accounting of all credits to-date of collected Management Fees in repayment of the Advance.

8. Should Company receive any communication from any third party that questions, objects to or refuses to pay the Management Fee, Company shall direct the communication to Dealer for resolution. Company shall not be obligated to take any action with respect to third parties that question, object to or refuse to pay the Management Fee, and shall not otherwise have any obligation to Payee with respect thereto except as provided for in this section.

9. Dealer agrees to defend and hold harmless Company and its affiliates and their respective directors, officers, agents, shareholders and employees from and against any and all claims, demands, investigations, proceedings and actions, whether at law, equity or by any administrative body, and any and all liabilities, losses, damages or expenses resulting therefore, including court or arbitration costs and reasonable attorneys' fees, relating to or arising out of, or alleged to relate to or arise out of the Management Fee, including but not limited to (a) claims of any Dealer, its employees or affiliates, (b) claims for the payment of any taxes or other charges with respect to the collection of the Management Fee, and (c) claims by any regulatory agency or other third party. The obligations of this section shall survive the termination of this MFAA.

10. Company will evaluate Dealer performance throughout the Advance Term. Dealer authorizes Company to debit Dealer's NVA or ACH, as applicable, for the unearned portion of the Advance at any time at Company's discretion ("Advance Recovery").

11. Company will evaluate Dealer's performance at the end of each six-month allocation period (or partial allocation period if less than six months at the end of the Advance Term).

   a. Advance dollars are allocated equally by month across the Advance Term.

   b. If Dealer does not earn at least 75% of the Advance allocated for an allocation period or partial allocation period (the "Minimum Performance Objective"), as applicable, Company may initiate Advance Recovery on a graduated basis as provided in Table #1 below.

   c. If Dealer does not achieve the Minimum Performance Objective, Dealer will be subject to an Advance Recovery by Company. The entire Advance or a portion of the advance may be recovered. Dealer's NVA or ACH will be debited for the

Advance Recovery amount as determined using the following parameters:

**Table #1: Calculation of Advance Recovery**

| % Earned of Allocation Period | Advance Recovery Schedule |
|---|---|
| 75%+ | $0 |
| 50-74% | 50% of Unearned Advance Allocation |
| 25-49% | 100% of Unearned Advance Allocation |
| 0-24% | 100% of Total Unearned Advance |

d. If an Advance Recovery is issued, Dealer will have the opportunity to earn additional Management Fee Dollars for the balance of the Advance Term.

12. This MFAA shall continue in full force and effect from the Advance Effective Date unless earlier terminated as provided herein. Either party hereto may terminate this MFAA without cause, at any time upon thirty (30) days prior written notice, provided that Company shall promptly credit in repayment of the Advance or remit to Payee, as applicable, any Management Fees collected after any such termination. If Dealer terminates this MFAA without cause, Dealer agrees to cause Payee to repay, or to repay on behalf of Payee, to Company the unearned portion of the Advance in full within thirty (30) days after giving Company notice of termination. Company may also terminate this MFAA effective immediately upon written notice to Dealer should Company receive a notice from any governing agency tocease collection of the Management Fee. Company may further terminate this MFAA effective immediately upon the occurrence of any of the following events anytime during the Advance Term, as applicable, in which event any then unearned portion of the Advance shall immediately be repaid in full:

    a. Dealer's DPA with Company is terminated;

    b. Dealer fails, for any reason, to offer and sell all the MFAA Products as set forth inthis MFAA;

    c. Dealer sells or offers to sell any product that is considered competitive with anyof the MFAA Products; or

    d. Dealer is in default under this MFAA, its DPA, or any other agreement with Company or any affiliate thereof.

    e. The obligations of this section shall survive the termination of this MFAA.

13. Each of the parties hereto warrants and represents that it has full right, power and authority to enter into this MFAA. Each of the parties hereto further warrants and represents that its entering into this MFAA shall not conflict with or violate any provision of any existing agreement it may have with any Dealer, employee, or other person or entity.

14. Dealer shall be solely responsible for its compliance and the compliance of the Payee with all applicable laws, regulations or other legal mandates relative to the Management Fee, including, without limitation, the payment of any taxes owing in connection with the collection of the Management Fee by Company and the remittance of the Management Fee to Payee, including but not limited to all tax laws.

15. All notices and correspondence pertaining to this MFAA will be issued pursuant to the Notice section of the DPA.

16. The parties acknowledge that this MFAA does not in any way create an agency relationship between them, and that Dealer is not an agent of Company its performance under this MFAA or in the sale of MFAA Products.

17. The DPA is incorporated herein by reference. If there is a conflict with any of the terms and conditions of the DPA, the MFAA controls.

By signing below, I acknowledge and agree to the terms of this Exhibit A to Management Fee Advance Agreement.

DocuSigned by:

*anthony leo*

**DEALER SIGNATURE**

6/18/2023

**DATE**

**EXHIBIT A-1**

**Schedule of Fees**

| Advance Term | Fee |
|---|---|
| 0-17 months | 0% |
| 18-23 months | 1.5% |
| 24-29 months | 2.0% |
| 30-35 months | 2.5% |
| 36+ months | 3.0% |

DocuSign Envelope ID: 33FB02FD-F8BB-4D47-8937-0BB548828CC9

| DEALER AGREEMENT ("Agreement") | |
|---|---|
| **Effective Date:** 06/15/2023 <br> (mm/dd/yyyy) | **Dealer ID:** SA10073    (assigned by NESNA) |
| **Corporate Name:** NORTHSHORE | **State of Domicile:** Ny |
| **DBA name, if any:** | |

This Agreement is between Nissan Extended Services North America, G.P., a Delaware general partnership, or Nissan Extended Services North America, Inc., a Delaware corporation, as applicable ("Company") with administrative offices at One Nissan Way, Franklin, TN 37067 and the entity named above ("Dealer").

WHEREAS, Company desires to offer certain automotive assurance programs ("Program I Programs") and products ("Product I Products") for sale by dealers that have entered into a Dealer Sales and Service Agreement ("DSSA") with Nissan North America, Inc. (the "Manufacturer") on the terms and conditions set forth herein; and

WHEREAS, Dealer desires to select Products from the Programs to sell to its customers; and

NOW THEREFORE, Company and Dealer ('the Parties') hereto agree as follows:

1.  **DEALER OBLIGATIONS.**
    a.  **AGREEMENT PERIOD.** This Agreement begins on the date indicated above and shall remain in effect until terminated as provided herein.
    b.  **AUTHORIZATION.** Dealer certifies that it holds appropriate licenses and/or registrations required by state regulatory authorities to make auto installment sales, or provide lending or leasing services, and is authorized to offer Programs to its consumers subject to the terms and conditions of this Agreement. Dealer shall only offer the Programs on the Program contracts approved and supplied by Company. Dealer is not authorized and is expressly forbidden, without the prior written approval of Company, to (i) incur any indebtedness or liability on behalf of Company; (ii) enter into any legal proceeding in connection with Company's business; (iii) obligate Company to any Program contract (iv) waive or modify any term, condition or limitation of any Program contract or any other Agreement under any Program, extend the time of payment or waive any payment under any Program contract, or bind Company in reinstatement of any canceled Program contract or (v) possess or exercise any authority on behalf of Company other than that expressly provided for in this Agreement. Dealer shall have no authority to adjudicate, authorize, settle, compromise, or pay any benefits under any Program contract.
    c.  **ELIGIBILITY.** Dealer is responsible for marketing to eligible consumers only as specified in this agreement under Section 1.l. Dealer shall assist Company in resolving any discrepancies or errors which may occur in the administration of the Program(s).
    d.  **PROGRAM COSTS AND FEES.** The Program costs and fees are contained in the rate chart(s) provided to the Dealer by Company on the Company Pricing Schedule(s) ("Pricing Schedule"). Program cost and fees include insurance premiums for the related insurance policy, if applicable, and administrative fees. Company may periodically adjust the Program cost and fees and any adjustment shall take effect following notice of Dealer or on the effective date shown on a new Pricing Schedule, as the case may be. Dealer shall be entitled to participate in additional Programs following notification of the Company and completion of required documentation.
    e.  **REMITTANCE TO COMPANY.** Dealer is authorized to collect amounts due for Programs and shall hold amounts due Company in a fiduciary capacity as trustee for Company until remitted to and received by Company. Amounts owing to Company for all Program contracts issued during each calendar month shall be due on the payment due date stated in the Dealer's monthly Billing Statement (the "Billing Statement") posted on NESNA's Administration Platform or successor system ("PCRS"). Dealer authorizes the Company to debit the Dealer's non-vehicle account with the Manufacturer ("NVA") via Electronic Funds Transfer/Automated Clearing House ("ACH") for such amounts. Failure to remit a Program contract within sixty (60) days of its date of issue shall relieve the Company and any applicable insurer from any liability for amounts due Dealer under said Program contract unless such late Program contracts have been resubmitted in accordance with the instructions provided by Company. Any claims occurring after the remittance due date and before the date the Program contract(s) and payment are received by Company are the responsibility of Dealer and shall be reimbursed to Company within thirty (30) days of Dealer's receipt of Company's written request. Dealer agrees to pay all costs associated with collections, including attorney's fees, court costs and other related expenses or fees. At all times, Dealer shall be responsible for a complete accounting of any pre-printed Program contracts supplied by Company. Company is responsible for the monthly fees to maintain a Company sponsored e-menu (e.g. MaximTrak). Dealer is responsible for the monthly fee associated with dealer management system (DMS) integration unless otherwise agreed by the Company (e.g. through programs designed to assist dealers by subvening some or all of the costs of DMS integration).
    f.  **PAYMENT OF MANAGEMENT FEES.** Dealer hereby authorizes Company to pay portions of the remittance amount for each Program contract as a management fee ("Management Fee"), if applicable, in the amounts and directly to the individuals or entities both as identified on the Management Fee Information Form attached to this Agreement. Company shall provide Dealer with statements in electronic form at the end of each month reflecting the Management Fees collected from the Dealer by Company on the Dealer's behalf and redistributed to the individuals or entities both as identified on the Management Fee Information Form. Dealer shall review all such statements and shall notify Company, in writing, of specific mistakes or discrepancies in the statement(s) within ninety (90) days after the date of the compensation shown in such statement(s). Dealer shall indemnify and hold Company harmless from any and all claims arising from such payments.
    g.  **MANAGEMENT FEE ADVANCE.** In the event Dealer elects from time to time to accept an advance on Management Fees (each, a "Over-Remit Advance"), Company shall promptly, following the Advance Effective Date set forth in the related Management Fee Advance Request Form, pay Dealer the advance amount noted on the related Management Fee Advance Request Form, as adjusted in accordance with the terms and conditions thereof . In exchange for the Over-Remit Advance, Dealer agrees to sell, on an exclusive basis for the entire Term, assurance products selected by the Dealer on the Dealer Setup Form and such future assurance products issued by or on behalf of the Company as agreed by the Dealer in writing. Dealer agrees to be bound to all terms and conditions set forth in the Management Advance Request Forms.
    h.  **REFUNDS.** Upon cancellation of any Program contracts during the reporting period, Company shall pay Dealer the unearned portion of the Program cost received by Company, less an administrative fee as associated with a consumer refund on a Program contract. For the purposes of making Dealer's customer (or its lender) whole, Dealer shall add to such amount paid by the Company the unearned portion of any fees, allowances, retail mark-upor compensation originally paid to any party. Dealer shall credit the unearned portion of the customer cost to the consumer's lender/lessor, if the customer cost was funded by such lender/lessor. If the customer cost was not funded by a lender/lessor, or the loan/lease was paid in full and such proof was provided to Dealer by the consumer, the refund shall be payable directly to the consumer. Refunds

must be paid to the appropriate party as indicated above within thirty (30) days of the refund request or sooner if mandated by law. In the event that Company pays the Program contract holder or lienholder the full calculated refund amount Dealer will be responsible for reimbursing Company Dealer's prorated chargeback portion, plus expenses, within thirty (30) days of receipt of written notice from Company. Dealer shall remain responsible to the Company for all refunds and collections associated with unearned or refunded Management Fees paid, regardless of the individual or entity paid. If the refund is not paid timely by Dealer as outlined in this Agreement or by the laws of the state, Dealer is responsible for all penalties or costs due under the Program contract(s). In the event that this Agreement is terminated, Dealer's obligation to refund its portion of any Program cost refunded for which it received compensation shall survive the termination of this Agreement. For business processed electronically, cancellation refunds processed may be netted as reflected in the Dealer's monthly Billing Statement.

i. **OFFSET.** Company reserves the right to offset any amounts due to or from Dealer under this or any other agreements Dealer may have from time to time with Company or its affiliates. The foregoing shall survive the expiration or earlier termination of this Agreement.

j. **KEEPING OF RECORDS.** Dealer agrees to maintain accurate and complete records relating to its obligations under this Agreement and to make such records available for inspection by Company or its representatives at any time during normal business hours. Related records may include but are not limited to vehicle transaction records, buyer orders, odometer statements, transaction receipts, vehicle inspection forms, and service history records, as may be required by a particular Program or Product. Dealer shall assist Company in resolving any discrepancies or errors that may occur. Records shall be kept for seven (7) years after all obligations under the Program contract(s) have expired.

k. **MATERIALS.** Dealer shall not create, distribute, or use any marketing, sales, or administrative materials, regarding Company's Programs or containing Company's name, or the name of its parent or any of its affiliates, trade names, or logos, without prior written approval from Company. Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject Company to liability or loss of goodwill; may damage the reputation of Company or Company's customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company's standards of good taste and honest dealing; or may be detrimental to the business interests of Company. Dealer shall maintain in a secure and safe place, and upon request, shall account for all the supplies and materials furnished by Company to Dealer with respect to this Agreement. Dealer shall return the supplies and materials immediately and in no event later than five (5) days of Company's request if this Agreement is terminated

l. **DIRECT SALES.** Dealer shall sell Program contract(s) only through in-dealership, customer face-to-face methods. Dealer may not conduct sales via the internet or make Program or Product prices available on the internet. Dealer may, however, promote awareness of Program contracts on its dealership website.

m. **PROCEDURES.** Dealer will follow the instructions and procedures regarding the offering of Program contracts, remittance processes, and claims procedures and any instructional materials provided by Company including any and all additions, deletions, amendments or alterations approved by Company. Dealer further agrees to comply with all applicable laws and regulations and to be bound by all Program Rules, Pricing Schedules, Assurance Products Resource Manual(s), bulletins, field letters, forms, communications and similar documentation issued by the Company, including all amendments, revisions or replacements thereto (collectively, and as the same may be amended or replaced from time to time, the "Ancillary Documents") now in force and such as may be hereafter adopted. Dealer shall not engage in unlawful discrimination, misrepresentation of, or any unfair trade practice pertaining to the Program contract(s) that is prohibited by law. Dealer agrees to provide full disclosure to the Program contract purchaser of all provisions of the Program contract before procuring the purchaser's signature on the Program contract. Dealer shall not negotiate or endorse any check or other negotiable instrument made payable to Company. While this Agreement is in force, or at any time thereafter, Dealer shall not induce the lapse, cancellation, or termination of any Program contract. For Products that require installation or application of components obtained from a third party vendor (e.g. theft deterrent systems, appearance protection plans) Dealer agrees to use only third party vendors approved by Company, and to only offer the Product on vehicles where the components are installed in accordance with the instructions provided by the third party vendor. Dealer agrees, when applicable, to permit vendor's service technicians designated by Company to conduct repairs at Dealer's location pursuant to the Program contracts issued by the Dealer's. Dealer is not liable for any damages or injuries caused by service technicians designated by Company unless damage or injury was sustained as a direct or in direct result of Dealer's actions.

n. **INDEMNIFICATION.** Dealer agrees to indemnify, defend (with counsel acceptable to Company) and hold Company harmless from all demands, claims, liabilities, damages, losses, judgments, and expenses (including attorney's fees), arising out of or caused by Dealer's (including its employees or its assignees) failure to comply with all applicable laws and regulations or acts or omissions of Dealer or its employees with respect to the offering or administration of the Program(s), including but not limited to the failure of Dealer to follow Company's procedures and instructions or to comply with the terms of this Agreement, and any claim arising between Dealer and Manufacturer. The foregoing provisions shall survive the expiration or earlier termination of this Agreement.

o. **REGULATORY INQUIRIES.** In the event Company receives any inquiry or notification of charges from a regulatory agency regarding Program contract(s), Dealer shall promptly provide to Company information and records requested by Company regarding the inquiry. In the event Dealer receives any inquiry or notification of charges from a regulatory agency, Dealer shall immediately provide such inquiry to Company, provide any information and records requested by Company regarding the inquiry, and timely respond to each inquiry after Company reviews such response.

2. **COMPANY'S OBLIGATIONS.**

a. **ADMINISTRATION.** Company shall be responsible for acceptance or rejection of new Program contracts, cancellation and transfer processing, claim authorization and payments, and provision of supplies such as forms, brochures, and marketing materials as needed for the sale of Program contracts.

b. **CLAIMS.** Company shall process requests for benefit upon receipt of complete documentation for a benefit request under any Program contract. Company shall not be responsible for processing any benefit request not covered under the Program contract, not reported to Company as provided herein, or for any Program contract for which Company has not received payment as provided herein. Any improper claim for benefit under the applicable Program contract if any, may be denied by Company and such claim for benefit will be the sole responsibility of Dealer.

c. **INELIGIBLE PROGRAM CONTRACT SALES.** Company shall not have any liability or administrative obligations for Program contract(s) sold or marketed in violation of this Agreement, Program contract terms or any law, regulation or administrative ruling. If Company pays a claim and subsequently determines that the Program contract was sold or marketed in violation of this Agreement, the Program contract terms, or any law, regulation or administrative ruling, Dealer shall reimburse the cost of all claims paid and costs incurred by Company prior to the Program contract's termination within thirty (30) days of Dealer's receipt of Company's written request.

d. **COOPERATION.** Subject to the terms of this Agreement, Company agrees to cooperate fully with Dealer and to render all assistance reasonably necessary in order to enable Dealer to carry out its obligations hereunder. All administrative forms relating to this Agreement, including Program contract forms, and marketing materials, reasonably necessary for Dealer to conduct the business of entering into Program contract(s) hereunder,

shall be furnished by Company.

    e.    **MAINTAIN PHONE NUMBER.** Company shall make available a toll free telephone number to enable consumers to contact Company.

**3.    CONFIDENTIAL INFORMATION.**

    a.    Each party hereto acknowledges that in the course of performing its obligations under this Agreement, it may receive or have access to information which is confidential or proprietary to the other party or its affiliates, including, but not limited to, rates, pricing, training, Program/Product materials, non-public personal information about customers or other information ("Confidential Information"). The receiving party shall not, without the prior written consent of disclosing party, disclose any Confidential Information to any third party for a period of ten (10) years from and after the expiration or earlier termination of this Agreement, except to receiving party's employees and its affiliates' employees who are under the same level of confidentiality protection as the receiving party.

    b.    Confidential Information shall not include any information that (i) is or subsequently becomes publicly available without receiving party's breach of any obligation owed to disclosing party; (ii) became known to receiving party prior to disclosing party's disclosure of such information to receiving party; (iii) became known to receiving party from a source other than disclosing party other than by the breach of an obligation of confidentiality owed to disclosing party; or (iv) is independently developed by receiving party.

    c.    Receiving party acknowledges that it has received, may receive, or may have access to consumer, customer or individual information ("Private Information"), which information may be subject to the protections of federal, state and/or local privacy, safeguards or information security laws, and receiving party further agrees, warrants and represents that it will comply with requirements imposed by these laws, including financial privacy laws.

**4.    TERMINATION.**

    a.    This Agreement may be terminated at will at any time by either Party with sixty (60) days written notice to the other.

    b.    Company may terminate this Agreement immediately, without written notice, upon Dealer's act of fraud, malfeasance, misappropriation, withholding or non-payment of amounts due, willful neglect of any duty or obligation hereunder, including non-conformance with Company's Dealer eligibility requirements, or violation of this Agreement or applicable laws, regulations or administrative rulings.

    c.    This Agreement shall automatically terminate without prior notice, upon (i) the dissolution of Dealer's partnership, LLC, or corporation, as the case may be, (ii) Dealer's invoking, or having invoked against it, any form of federal bankruptcy jurisdiction or state jurisdiction for receivership, liquidation, or conservatorship, or (iii) Dealer becomes or is declared insolvent according to any law.

    d.    This agreement shall automatically terminate upon termination of the DSSA between Dealer and Manufacturer.

    e.    In the event that this Agreement is terminated as provided herein, Dealer shall promptly forward to such person as Company shall designate in writing, (i) all Program contract forms, administrative forms and other written materials supplied by Company to Dealer pursuant to this Agreement other than executed forms of Program contracts then in effect (ii) all other written materials in the possession or control of Dealer, which contain the name, logo service mark, trade name or trade mark which is created by or on behalf of Company to market or administer the Programs (including, without limitation, all stationery and advertisement) and (iii) all duplicate copies of any of the above forms and materials in the possessions or control of Dealer.

    f.    Termination shall not affect the rights or duties of either Party with respect to the Program contracts issued prior to the termination date of this Agreement.

    g.    Dealer shall continue to be liable for its portion of any refund of Program cost, Management Fees, or any retail mark-up or other fees on Program contracts still in force after the termination of this Agreement and charge backs for canceled Program contracts. Any amounts subject to future cancellations will be collected by Company at the time of Dealer termination or buy/sell. Company will recover the pro-rata portion of any applicable Management Fee or any retail mark-up or other fees from Dealer in order to reimburse the customer the retail amount of any refund due to a Program contract cancellation after Dealer's termination. Dealer's active Program contract dollar portfolio will be determined as of the last full month-end prior to the Dealer termination date. Company reserves the right to do a one-time lump sum charge back at the time of Dealer termination or buy/sell which will show as a debit to the outgoing Dealer's final statement (NVA) for the following recoveries:

Unearned Advances:

    (i)    Over-Remit Advance Recovery Amount = Outstanding Over-Remit Advance – aggregate Management Fees paid by Dealer to NESNA as of termination date

Ongoing Cancellations:

    (i)    Management Fee Recovery Amount = The Management Fee portion of active Program contract dollar portfolio x cancellation %

    (ii)    Mark-Up Recovery Amount = Retail markup on active Program contract dollar portfolio x cancellation %

**5.    DEALER DEFECTION.**

    A "Defecting Dealer" means a Dealer in run-off status (defined as net sales dollars less than or equal to zero due to ongoing cancellations of their active Program contracts as reported in PCRS) that continues to be a party to a DSSA with the Manufacturer. A Dealer Defection shall not affect the rights or duties of either Party with respect to the Program contracts issued prior to the Dealer Defection. A Defecting Dealer shall continue to be liable for its portion of any refund of Program cost, Management Fees, retail mark-up or any other fees on Program contracts still in force and charge backs for canceled Program contracts. Any amounts subject to future cancellations will be collected by Company at the time of Dealer defection. Company will recover the pro-rata portion of the Management Fee in order to reimburse the customer the retail amount of any refund due to a Program contract cancellation after Dealer defection. Any applicable Management Fee or any retail mark-up or other fees will continue to be processed as a credit or debit as applicable to the Dealer's NVA as long as Dealer has an active DSSA with the Manufacturer. Defecting Dealer's active Program contract dollar portfolio will be determined as of the last full month-end prior to such determination date. Company reserves the right to do a one-time lump sum charge back at the time of determination of defecting status which will be shown as a debit to the NVA of Defecting Dealer's (or affiliate's) statement for the following recoveries:

Unearned Advances:

    (i)    Over-Remit Advance Recovery Amount = Outstanding Over-Remit Advance – aggregate Management Fees paid by Dealer to NESNA as of determination date

Ongoing Cancellations:

    (i)    Management Fee Recovery Amount = Active Program contract dollar portfolio x Management Fee rebate % x cancellation %

**6.    SERVICE MARK AND TRADE NAME PROTECTION.**

    a.    Dealer agrees to cooperate fully in the quality control program conducted by Company relating to the use of all service marks and trade names

used in connection with the Program and the nature and quality of services rendered and goods distributed under such service marks and trade names, including but not limited to brand awareness training and periodic re-certification. Dealer agrees to ensure that all finance & insurance staff selling Company's Programs have completed brand awareness training and required re-certifications. Company will have the right to specify, delineate, or limit the services or goods in connection with which Dealer may use any of such service marks or trade names. In the event that the nature of the quality of the services or goods in connection with which Dealer uses any of such service marks or trade names is not acceptable to Company, Company will have the right to require Dealer to institute appropriate procedures to correct any deficiencies noted by Company.

b. Dealer agrees, at the request and expense of Company, to assist Company in protecting and enforcing the rights of Company in and to any and all of the service marks and trade names which Dealer may then be using.

c. Dealer will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names Company authorizes the Dealer to use in the performance of this Agreement, except as permitted in Section 6.b.

7. **MISCELLANEOUS.**

a. **NOTICES.** Any notice or other communication required shall be sent electronically or in writing and sent via United States Postal Service registered, or certified mail, postage prepaid, return receipt requested; or by a nationally recognized delivery service, addressed to the party to be notified at its address specified herein, or in the event of a change in address, to the address on file with Company.

b. **ASSIGNMENT.** Dealer shall not assign or transfer any rights or benefit under this Agreement, either in whole or in part without the prior written consent of Company. Subject to the foregoing, this Agreement shall be binding upon and shall insure to the benefit of and shall be enforceable by the heirs, legal representatives, successors and assignees of the parties hereto.

c. **SEVERABILITY.** If any term or condition of this Agreement, or the application of such term or condition, shall be found by a court of competent jurisdiction to be, to any extent, invalid or unenforceable, the remainder of this Agreement and the application of all other terms and conditions shall be valid to the fullest extent permitted by law.

d. **EXPENSES.** Company shall not be liable for any expense of Dealer, including without limitation, the cost of any rentals, transportation, postage, other advertising, employee costs, local license fees, or sales taxes.

e. **WAIVER OR MODIFICATION.** No forbearance, neglect or other failure of either Party to enforce or require strict compliance with any term and/or condition of this Agreement or to exercise any right of termination shall, constitute a waiver of any such term, condition or right, nor shall it constitute a waiver of any other term, condition or right. No waiver, amendment or modification of this Agreement shall be valid unless made in a written instrument executed by both parties hereto.

f. **ENTIRE AGREEMENT; AMENDMENTS.** This Agreement, the attachments hereto, and all Ancillary Documents shall constitute the entire Agreement by, of and between the Parties. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall be deemed to be the original. However, Company reserves the right to amend or supplement this Agreement and any Ancillary Document by amendment, field bulletin, letter, email, publication on a website maintained by Company for dealers, or other appropriate official written communication. In the event of any conflict between the terms of any Ancillary Document and this Agreement, the terms of such Ancillary Document shall control. Dealer's continuing relationship with Company hereunder after transmission by Company of such official written communication shall conclusively constitute assent thereto.

g. **CERTIFICATIONS.** Dealer certifies that it has not previously been terminated by Manufacturer. Dealer represents and warrants that it shall not place a Program contract on a self-financed loan. "Self-financed" means a loan/lease that is arranged and self-funded by an automobile dealership.

h. **CANCELLATION OF DIVIDEND PROGRAM.** Dealer hereby acknowledges and agrees that the Company's Dividend Program will be/was terminated as of October 1, 2022 and any outstanding Advance Dividend Agreement between Dealer and Company is hereby terminated, effective as of October 1, 2022, subject to any net payments owed to or from Company in accordance with the terms and conditions of any Management Fee Advance Request Form.

8. **JURISDICTION; VENUE; ATTORNEYS FEES.**

a. The validity, interpretation and construction of this Agreement, and all other matters related to this Agreement, will be governed and interpreted by the laws of the State of Tennessee. Any action brought to enforce this Agreement shall be brought in state court in Williamson County, Tennessee or federal court as provided below. Contractor consents to the exclusive jurisdiction of the appropriate state court in Williamson County, Tennessee or, if original jurisdiction can be established, in the federal court in the U.S. District Court for the Middle District of Tennessee in connection with any action arising out of this Agreement.

b. Should either party institute or participate in a legal or equitable proceeding against the other to enforce or interpret this Agreement, the non-prevailing party shall pay the prevailing party's costs, expert and professional fees, attorneys' fees, including in-house counsel expenses, and all other costs incurred by the prevailing party in preparation for the proceeding.

The person who signs this Agreement as or on behalf of Dealer represents and warrants that he or she has authority to execute this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as shown below.

| | |
|---|---|
| NORTHSHORE | "Company" |
| DEALER CORPORATE NAME | ADMINISTRATOR NAME |
| | President |
| DBA (If applicable) | TITLE (Sr. Manager/Director) |
| *anthony deo* 6/18/2023 | *Jack Crowley* 6/26/2023 |
| SIGNATURE DATE | SIGNATURE DATE |
| anthony deo COO 6/18/2023 | Jack Crowley |
| PRINT NAME AND TITLE DATE | PRINT NAME |

| PERSONAL GUARANTY | | |
|---|---|---|
| Effective Date:<br>6/15/2023 | Guarantor: anthony deo | |
| Corporate Name ("Dealer"):<br>NORTHSHORE | DBA name, if any: | Dealer ID: (assigned by NESNA)<br>SA10073 |

THIS **PERSONAL GUARANTY** ("Guaranty") is given as of the Effective Date, by Guarantor to induce Nissan Extended Services North America, G.P., a Delaware general partnership ("NESNA") to advance funds to Dealer as more particularly provided below.

WHEREAS, as of the Effective Date, NESNA and Dealer entered or are entering into a Dealer Participation Agreement (as amended, restated or modified from time to time, the "Agreement");

WHEREAS, the Agreement provides for NESNA to advance to Dealer certain amounts in connection with Dealer's authorized marketing and sale of various assurance products;

WHEREAS, Guarantor desires NESNA to advance sums to Dealer pursuant to the Agreement; and

WHEREAS, as a condition to NESNA's willingness to enter into the Agreement with Dealer, NESNA requires thatGuarantor guaranty the payment and other obligations of Dealer under the Agreement, if applicable, or any future agreements between Dealer and NESNA wherein NESNA advances funds to Dealer ("Future Agreements") (collectively the Agreement and the Future Agreements are herein referred to as the "Dealer Agreements"), and Guarantor has agreed to do so.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees as follows:

Guarantor unconditionally guarantees to NESNA the prompt payment of any and all sums due NESNA by Dealer under the terms of the Dealer Agreements, and further agrees to indemnify and hold NESNA harmless of and from any and all wrongful acts or conduct of Dealer or Dealer's employees or agents, including all costs, expenses and attorney's fees incurred by NESNA in collection of any sums due NESNA by Dealer under the terms of the Dealer Agreements, or incurred by NESNA in connection with any default of Dealer of the terms and conditions of the Dealer Agreements. It is specifically agreed that this is an absolute and continuing guaranty and shall extend to and cover any and all forms of indebtedness and liability on the part of Dealer to NESNA incurred subject to, as a result of, or as a part of the Dealer Agreements and shall not be limited to any amount whatsoever.

It is specifically understood and agreed that at the option of NESNA, Guarantor may be joined in any action, suit or proceeding commenced by NESNA against Dealer in connection with or based upon any default of Dealer in the terms, conditions and covenants of the Dealer Agreements and recovery may be had against Guarantor in any such action, suit or proceeding, or in any independent action, suit or proceeding against Guarantor, and without the requirement that NESNA first assert, prosecute or pursue any remedy or claim that it might have against Dealer.

Any sum due by Dealer under the terms of the Dealer Agreements shall, if not promptly paid by Dealer, be paid by Guarantor within fifteen (15) days of notice by NESNA to Guarantor. Such payment shall be made at NESNA's office at One Nissan Way, Mail Stop: 06-216, Franklin, Tennessee 37067, Attn: NESNA Controller. Such address shall also be NESNA's address for the purpose of Guarantor giving NESNA notice hereunder.

The obligations of Guarantor under this Guaranty shall be continuing, absolute and unconditional under any and all circumstances and shall be paid by Guarantor regardless of (a) the validity, regularity, legality or enforceability of any of the liabilities or any collateral security or guaranty therefor; (b) any defense, offset or counterclaim which may at any time be available to or be asserted by Dealer or Guarantor or any other guarantor against NESNA; or (c) any other event or circumstance whatsoever which may constitute an equitable or legal discharge of a surety or a guarantor, it being the purpose and intent of the Guarantor that this Guaranty and the Guarantor's obligations hereunder shall remain in full force and effect and be binding upon Guarantorand Guarantor's successors until the liability and the obligations of Guarantor under this Guaranty shall have been satisfied by payment in full.

Guarantor hereby waives all Guarantor's rights of subrogation and reimbursement and any other related rights and defenses available to Guarantor under any applicable law or otherwise, including (a) any defenses Guarantor may have to the obligations under the Guaranty by reason of an election of remedies by NESNA and (b) any rights or defenses Guarantor may have by reason of protection afforded to Dealer with respect to the liabilities guaranteed by the Guaranty pursuant to any laws of or any other jurisdiction limiting or discharging Dealer's indebtedness.

Guarantor agrees that, at any time, without the need to reserve rights against Guarantor and without notice to or further approval of Guarantor, and without in any way affecting the obligations of Guarantor hereunder or limiting the rights of NESNA at law or in equity, NESNA may (i) amend, renew or extend the terms of the Dealer Agreements, including the amount and timing of payment or performance of any of Dealer's obligations thereunder, (ii) accept partial payments from Dealer thereunder, (iii) release, terminate, waive, abandon, compromise or subordinate the liabilities, in whole or in part; (iv) receive and hold additional security for or guaranties of Dealer's obligations; (v) release or agree not to sue, in whole or in part, Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the liabilities; or (vi) accelerate, compromise, settle, compound, sue for, or collect, either in whole or in part, any of the liabilities, any of the terms thereof, or any agreement, covenant, condition, or obligation of or with Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the obligations guaranteed hereby.

Neither this Guaranty nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by NESNA. This Guaranty shall be binding upon and inure to the benefit of NESNA and its successors and assigns. This Guaranty may not be assigned in whole or in part by Guarantor. NESNA may assign its rights hereunder, in whole or in part, at any time without the consent of Guarantor.

The failure or refusal by NESNA to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by NESNA.

This Guaranty shall not be deemed to give any right or remedy to any third party whatsoever unless otherwise specifically granted hereunder.

This Guaranty constitutes the entire agreement of Guarantor with respect to the subject matter hereof and supersedes all prior agreements by Guarantor with respect to such subject matter, and no waivers or modifications shall be valid unless duly approved in writing by NESNA.

If any provision of this Guaranty shall be held for any reason to be invalid, illegal or unenforceable, such impairment shall not affect any other provision of this Guaranty.

This Guaranty may only be terminated with the express written consent of NESNA.

Guarantor specifically understands and agrees that this Guaranty is subject to the jurisdiction of and shall be construed and controlled by the laws of the state of Tennessee. Any action arising from this Guaranty shall be brought in the state courts in Williamson County, Tennessee. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS BETWEEN GUARANTOR AND NESNA OR DEALER AND NESNA OR THE TRANSACTIONS RELATED THERETO.

In the event of any action or proceeding commenced by NESNA to enforce the terms of this Guaranty, Guarantor agrees to pay NESNA all expenses incurred by NESNA relative to such action or proceeding, including, but not limited to, court costs plus reasonable attorneys' fees.

Any notices from NESNA to Guarantor shall be in writing and shall be deemed given (i) when delivered in person to Guarantor or (ii) upon 2 business days after being placed in the U.S. mail addressed to Guarantor at its address set forth below, or (iii) upon delivery by an express courier service to Guarantor's address set for the below. Any notices from Guarantor to NESNA shall be in writing and shall be deemed given (i) upon 2 business days after being placed in the U.S. mail addressed to NESNA at its address set forth above, or (ii) upon delivery by an express courier service to NESNA's address set for the below. Guarantor and NESNA may each change its address for notice purposes by giving notice to the other as provided for above.

This Guaranty may be executed by hand or by any electronic signature platform and may be delivered via PDF attached to email, electronic signature platform, or other similar transmission method, and this Guaranty if executed and delivered by any of the foregoing means shall be valid and effective for all purposes.

**GUARANTOR**:

Signature: _anthony deo_

Name: ~~anthony deo~~

Address: 180 Michael drive

11791

Date: 6/18/2023

# DEALER ADMINISTRATIVE AGREEMENT

### Agreements Acknowledgement

THIS AGREEMENT (INCLUDING ALL LISTED SCHEDULES) is entered into by and between Nation Motor Club, LLC, dba Nation Safe Drivers with general offices located at 800 West Yamato Road, Suite: 100, Boca Raton, FL 33431 and _____**Sunrise Auto**_____ with offices located at _____**189 Sunrise Hwy, Amityville, NY 11701**_____, effective _____**10.1.2021**_____ .

## Agreements and Schedules included in this package are listed as follows:

### 1. Ultimate Silver Protection ($400 Benefit)

### 2. Ultimate Silver Protection ($800 Benefit)

### 3. Tire & Wheel WITH Cosmetic & Curb Schedule

### 4. Tire & Wheel WITHOUT Cosmetic & Curb Schedule

### 5. Tire & Wheel With Curb, Cosmetic & Chrome Schedule

*IN WITNESS WHEREOF, the parties have duly executed and made these Agreements effective as of* __**10.1.2021**__

**DEALER**

**NATION SAFE DRIVERS**

_____
By (Print Name)

_____
By (Print Name)

_____
Signature

_____
Signature

_____
Title

_____
Title

**Please fax completed forms to 561-226-3626 or email a scanned copy to nesnasetup@nsdmc.com**

In the event of disclosure of such information for the purpose of the transaction of business or as requested by a regulatory body or pursuant to a subpoena or order by a court of law, a notification shall be given by the disclosing party the other party so as to inform it of such disclosure.

The term "confidential and proprietary information" shall not mean any information which, at the time of disclosure, is in the public domain through no wrongful act of the disclosing party, and is rightfully obtained by or from any third party without any similar restriction and without breach or any obligation owed to the other party, or is disclosed pursuant to a court order or request or governmental agency.

The parties also agree that, in addition to all the remedies otherwise available, including, but not limited to, recovery of damages and reasonable attorney fees incurred in the enforcement of these provisions, each party shall have the right and be entitled to injunctive relief to restrain and enjoin any actual or threatened breach of the provisions of Section "6" of this agreement. Each party's remedies for breach of this shall be cumulative and the pursuit of one remedy shall not be deemed to exclude any other remedies.

The parties agree that, by reason of the circumstances and nature of the arrangement between NSD and CONTRACTOR, the restrictions and provisions set forth in this Agreement are reasonably necessary for each other's protection; are not unreasonable; and are proper in view of the business referred to herein. The confidentiality and non-competition provisions shall survive termination of this Agreement.

### 8. Exclusivity
During the term of this Agreement, CONTRACTOR shall use NSD as the exclusive provider of all products listed in the attached Schedule(s).

### 9. Entire Agreement
A. This Agreement constitutes the entire agreement between the parties and any prior Agreements concerning the same subject matter are superseded hereby; any and all oral representations are expressly disclaimed as having no force and effect upon the provisions of this Agreement.
B. This Agreement may not be modified except by a written addendum executed by both parties hereto.

### 10. Laws Governing
A. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.
B. If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, is construed or adjudged to be invalid or unenforceable, the remainder of this Agreement shall not be effected thereby, but shall be enforced to the greatest extent permitted by law.

*IN WITNESS WHEREOF, the parties have duly executed and made these Agreements effective as of*   __10.1.2021__

**DEALER**

Anthony Deo
_____
By (Print Name)

_____
Signature

_____
Title

**NATION SAFE DRIVERS**

_____
By (Print Name)

_____
Signature

_____
Title

# QualityGuard+Plus®

**QUALITYGUARD+PLUS
MANAGEMENT FEE
ADVANCE REQUEST FORM**

| | |
|---|---|
| **Dealer Participation Agreement Date:** 10/01/2021 | |
| **Dealer Name:** Sunrise Auto | **NNA Dealer #:** SA10084 |
| **Advance Effective Date (MM/YY)** 10/21 | **Advance Term (months):** 24 |

| **1. ADVANCE PAYMENT OPTION: Use whole numbers (i.e. no decimal points).** | |
|---|---|
| **QualityGuard+Plus Contract Volume** | 500 |
| Management Fee amount per contract ($) | $ 500 |
| **Total Over-Remit Advance Request** | **$ 250,000** |

| **2. ALTERNATE PAYEE OPTION (up to 4): Use whole percentage numbers (i.e. 10% not 9.9%).** | |
|---|---|
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |
| Name: | Percentage: |
| Address: | |

**By signing below, I agree to the terms and conditions set forth on Exhibit A to this Management Fee Advance Request Form and the Dealer Participation Agreement as incorporated by reference herein.**

| | | |
|---|---|---|
| Dealer Signature | Anthony Deo  Print | 10/5/21  Date |
| Regional Financial Services Manager | Print | Date |
| NESNA Sr. Manager or Director | Print | Date |
| NESNA | Print | Date |

Guarantor agrees that, at any time, without the need to reserve rights against Guarantor and without notice to or further approval of Guarantor, and without in any way affecting the obligations of Guarantor hereunder or limiting the rights of NESNA at law or in equity, NESNA may (i) amend, renew or extend the terms of the Dealer Agreements, including the amount and timing of payment or performance of any of Dealer's obligations thereunder, (ii) accept partial payments from Dealer thereunder, (iii) release, terminate, waive, abandon, compromise or subordinate the liabilities, in whole or in part; (iv) receive and hold additional security for or guaranties of Dealer's obligations; (v) release or agree not to sue, in whole or in part, Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the liabilities; or (vi) accelerate, compromise, settle, compound, sue for, or collect, either in whole or in part, any of the liabilities, any of the terms thereof, or any agreement, covenant, condition, or obligation of or with Dealer, Guarantor or any other obligor, guarantor, endorser or surety upon any of the obligations guaranteed hereby.

Neither this Guaranty nor any provision hereof may be amended, changed, waived, discharged or terminated except by a written instrument signed by NESNA. This Guaranty shall be binding upon and inure to the benefit of NESNA and its successors and assigns. This Guaranty may not be assigned in whole or in part by Guarantor. NESNA may assign its rights hereunder, in whole or in part, at any time without the consent of Guarantor.

The failure or refusal by NESNA to exercise any rights granted hereunder shall not constitute a waiver of such rights or preclude the subsequent exercise thereof, and no oral communication shall be asserted as a waiver of any such rights hereunder unless such communication shall be confirmed in a writing plainly expressing an intent to waive such rights and signed by NESNA.

This Guaranty shall not be deemed to give any right or remedy to any third party whatsoever unless otherwise specifically granted hereunder.

This Guaranty constitutes the entire agreement of Guarantor with respect to the subject matter hereof and supersedes all prior agreements by Guarantor with respect to such subject matter, and no waivers or modifications shall be valid unless duly approved in writing by NESNA.

If any provision of this Guaranty shall be held for any reason to be invalid, illegal or unenforceable, such impairment shall not affect any other provision of this Guaranty.

This Guaranty may only be terminated with the express written consent of NESNA.

Guarantor specifically understands and agrees that this Guaranty is subject to the jurisdiction of and shall be construed and controlled by the laws of the state of Tennessee. Any action arising from this Guaranty shall be brought in the state courts in Williamson County, Tennessee. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS GUARANTY OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS BETWEEN GUARANTOR AND NESNA OR DEALER AND NESNA OR THE TRANSACTIONS RELATED THERETO.

In the event of any action or proceeding commenced by NESNA to enforce the terms of this Guaranty, Guarantor agrees to pay NESNA all expenses incurred by NESNA relative to such action or proceeding, including, but not limited to, court costs plus reasonable attorneys' fees.

Any notices from NESNA to Guarantor shall be in writing and shall be deemed given (i) when delivered in person to Guarantor or (ii) upon 2 business days after being placed in the U.S. mail addressed to Guarantor at its address set forth below, or (iii) upon delivery by an express courier service to Guarantor's address set for the below. Any notices from Guarantor to NESNA shall be in writing and shall be deemed given (i) upon 2 business days after being placed in the U.S. mail addressed to NESNA at its address set forth above, or (ii) upon delivery by an express courier service to NESNA's address set for the below. Guarantor and NESNA may each change its address for notice purposes by giving notice to the other as provided for above.

**GUARANTOR**:

Signature: _____     Date: ___10·5·21___

Name: ___Anthony Deo___

Address: ___189 Sunrise Hwy___

___Amittyville NY 11701___

v 09-04-2019